**CASE NOS. 19-6390, 19-6392, 19-6393, 19-6394**

---

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**UNITED STATES OF AMERICA
Plaintiff-Appellee**

v.

**ELANCE LUCAS, MARCUS DARDEN,
DERRICK KILGORE, and DECARLOS TITINGTON,
Defendants-Appellants**

**On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
Waverly D. Crenshaw, Jr., U.S. District Judge, No. 3:17-cr-00124**

---

**CORRECTED BRIEF ON BEHALF OF PLAINTIFF-APPELLEE**

---

<div style="display:flex">

**NICHOLAS L. MCQUAID**
**Acting Assistant Attorney General**


**DAVID L. JAFFE**
**Chief**
**IVANA NIZICH**
**Trial Attorney**
**Organized Crime and Gang Section**
**Criminal Division**
**U.S. Department of Justice**

**DONALD Q. COCHRAN**
**United States Attorney**
**Middle District of Tennessee**

**CECIL W. VANDEVENDER**
**BEN SCHRADER**
**Assistant U.S. Attorneys**
**110 Ninth Avenue South, Ste. A-961**
**Nashville, Tennessee 37203-3870**
**(615) 736-5151**

</div>

*Attorneys for Plaintiff-Appellee*

# TABLE OF CONTENTS

<div align="right">Page(s)</div>

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT.................................... x

JURISDISCTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED................................................................................2

STATEMENT OF THE CASE ....................................................................3
   I.     OVERVIEW OF THE CHARGES AND PROCEEDINGS ...........................................3
   II.    PROOF AT TRIAL .................................................................................5
       A. Rico Conspiracy ...........................................................................5
          1. *Formation, structure, and rules of the national gang*.......................5
          2. *History and membership of the Clarksville "deck"*...........................9
          3. *The use of "smashing" and "eradications" to enforce gang rules* .12
       B. Murders and Other Shootings................................................................15
          1. *William Miller* ................................................................................15
          2. *Jesse Hairston* ................................................................................16
          3. *Darius Wilridge*...............................................................................17
          4. *Crystal Allen*...................................................................................18
          5. *Derrick Sherden and Amanda Weyand* ...........................................19
          6. *Lincoln Homes Shooting* ................................................................22
          7. *Malcolm Wright*..............................................................................22
          8. *Treeland Drive Shooting* .................................................................26
          9. *Mini Mart Shooting* ........................................................................28
       C. Drug Trafficking and Related Charges ......................................................28
       D. Defense Case, and the Dispute Over the Gang's National Character ...30
   III.   VERDICT, POST-TRIAL MOTIONS, AND SENTENCING ...................................33

SUMMARY OF THE ARGUMENT.........................................................34

ARGUMENT .............................................................................................37
   I.     SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICTS .....................37
       A. Standard of Review........................................................................37
       B. Sufficient Evidence Supported the RICO Conspiracy Convictions . 38
       C. Sufficient Evidence Supported the Drug Conspiracy Convictions, Including the Calculation of the Applicable Drug Quantity.............43
          1. *The evidence supported the convictions under 21 U.S.C. §846* ...................................................................43

2. *The evidence supported the jury's finding of drug quantity, and the jury was properly instructed on the law* ................................ 46

D. Sufficient Evidence Supported Titington's Convictions Under 21 U.S.C. § 841 and 18 U.S.C. § 924(c) ........................................... 48

II.   THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION, AND IN ANY EVENT DID NOT CONSTITUTE REVERSIBLE ERROR ............................................................................................. 51

A. Standard of Review ................................................................... 51

B. Evidence from Purported "Surprise Experts" was Properly Admitted........................................................................................ 52

1. *Relevant testimony* ............................................................ 52

2. *The district court properly admitted the challenged testimony* .. 58

3. *Any error in admitting the testimony would be harmless* ........... 63

C. Testimony Relaying Statements by Coconspirators was Properly Admitted........................................................................................ 67

1. *Relevant testimony* ............................................................ 67

2. *The district court properly admitted the challenged testimony* .. 69

3. *Any error in admitting the testimony would be harmless* ........... 71

III.  THE JURY VERDICT FORM DID NOT DEPRIVE LUCAS OF A UNANIMOUS VERDICT, AND HIS CUMULATIVE ERROR CLAIMS LACK MERIT ....………71

A. Standard of Review ................................................................... 72

B. Lucas Was Not Deprived of a Unanimous Verdict ....................... 72

C. Lucas's Additional Claims of Cumulative Error are Unavailing..... 77

IV.   THE SENTENCES IMPOSED WERE REASONABLE ...................................... 81

A. Standard of Review ................................................................... 82

B. Titington's Sentence Was Reasonable ........................................... 83

1. *Relevant facts* .................................................................... 83

2. *The district court understood its discretion*.............................. 84

3. *U.S.S.G. § 5G1.3 is not unconstitutional*.................................. 85

C. Lucas's Sentence Was Reasonable................................................. 85

1. *Relevant facts* .................................................................... 85

2. *The district court findings regarding drug weight and firearm possession were correct, and any error was harmless* .............. 87

3. *The district court adequately explained the sentence*................. 90

4. *The sentence was substantively reasonable*.............................. 91

CONCLUSION .................................................................................................92

CERTIFICATE OF COMPLIANCE ....................................................................93

CERTIFICATE OF SERVICE .............................................................................93

ADDENDUM: APPELLEE'S DESIGNATION
OF RELEVANT DISTRICT COURT DOCUMENTS ............................................94

APPENDIX:  GLOSSARY................................................................................ 1a

# TABLE OF AUTHORITIES

**Cases** .................................................................................................**Page(s)**

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ...............................................................................75
*Boyle v. United States*,
  556 U.S. 938 (2009) ....................................................................... 40, 41, 42
*Brady v. Maryland*,
  373 U.S. 83 (1963) .................................................................................72
*Carpenter v. Norfolk & W. Ry. Co.*,
  145 F.3d 1330, 1998 WL 199723 (6th Cir. 1998)....................................65
*Chicago Prof'l Sports Ltd. v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ....................................................................43
*Crosby v. Jones*,
  682 F.2d 1373 (11th Cir. 1982) ..............................................................38
*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...............................................................................67
*Jackson v. Virginia*,
  443 U.S. 307 (1979) ...............................................................................38
*Molina-Martinez v. United States*,
  136 S. Ct. 1338 (2016) ...........................................................................90
*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020) ...........................................................................72
*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ...........................................................................48
*Richardson v. United States*,
  526 U.S. 813 (1999) ...............................................................................73
*Salinas v. United States*,
  522 U.S. 52 (1997) .................................................................................39
*State v. Brown*,
  836 S.W.2d 530 (Tenn. 1992) .................................................................59
*United States v. Bailey*,
  973 F.3d 548 (6th Cir. 2020) ..................................................................70
*United States v. Barnes*,
  822 F.3d 914 (6th Cir. 2016) ............................................................ 50, 51
*United States v. Beals*,
  698 F.3d 248 (6th Cir. 2012) ..................................................................46

*United States v. Burks*,
  974 F.3d 622 (6th Cir. 2020) .............................................................. 4, 22, 24, 76
*United States v. Cecil*,
  615 F.3d 678 (6th Cir. 2010) ....................................................................38
*United States v. Chavez-Lopez*,
  767 F. App'x 431 (4th Cir 2019) .............................................................. 61, 62
*United States v. Childs*,
  539 F.3d 552 (6th Cir. 2008) ....................................................................63
*United States v. Chisom*,
  249 F. App'x 406 (6th Cir. 2007) ...............................................................89
*United States v. Chowdhury*,
  169 F.3d 402 (6th Cir. 1999) ............................................................. 31, 32, 33
*United States v. Cockett*,
  330 F.3d 706 (6th Cir. 2003) ................................................................. 88, 89
*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) .....................................................................58
*United States v. Dado*,
  759 F.3d 550 (6th Cir. 2014) ....................................................................48
*United States v. Davis*,
  577 F.3d 660 (6th Cir. 2009) ....................................................................63
*United States v. Dintz*,
  424 U.S. 600 (1976) ..............................................................................81
*United States v. Doerr*,
  886 F.2d 944 (7th Cir. 1989) ....................................................................70
*United States v. Driver*,
  535 F.3d 424 (6th Cir. 2008) ............................................................. 77, 78, 79
*United States v. Dunham*,
  295 F.3d 605 (6th Cir. 2002) ....................................................................85
*United States v. Faulkenberry*,
  614 F.3d 573 (6th Cir. 2010) ....................................................................52
*United States v. Fowler*,
  535 F.3d 408 (6th Cir. 2008) ................................................................. 39, 73
*United States v. Gallo*,
  763 F.2d 1504 (6th Cir. 1985) ............................................................. 37, 80, 81
*United States v. Ganier*,
  468 F.3d 920 (6th Cir. 2006) ......................................................... 59, 61, 62, 65
*United States v. Gardner*,
  488 F.3d 700 (6th Cir. 2007) ....................................................................43
*United States v. Gibbs*,
  506 F.3d 479 (6th Cir. 2007) ....................................................................63

v

*United States v. Gibson*,
874 F.3d 544 (6th Cir. 2017).................................................................47

*United States v. Gills*,
702 F. App'x 367 (6th Cir. 2017).........................................................42

*United States v. Green*,
548 F.2d 1261 (6th Cir. 1977)..............................................................38

*United States v. Hall*,
979 F.3d 1107 (6th Cir. 2020)..............................................................72

*United States v. Hamm*,
952 F.3d 728 (6th Cir. 2020)................................................................48

*United States v. Jones*,
825 F. App'x 335 (6th Cir. 2020)..................................................... 59, 61

*United States v. Jordan*,
544 F.3d 656 (6th Cir. 2008)................................................................52

*United States v. Kettles*,
970 F.3d 637 (6th Cir. 2020)........................................................... 63, 71

*United States v. Lanham*,
617 F.3d 873 (6th Cir. 2010)................................................................72

*United States v. LaVictor*,
848 F.3d 428 (6th Cir. 2017)................................................................24

*United States v. Ledbetter*,
929 F.3d 338 (6th Cir. 2019)................................................................74

*United States v. Mackey*,
265 F.3d 457 (6th Cir. 2001)................................................................50

*United States v. Mahaffey*,
983 F.3d 238 (6th Cir. 2020)........................................................... 48, 49

*United States v. Maliszewski*,
161 F.3d 992 (6th Cir. 1998)................................................................69

*United States v. Marsh*,
568 F. App'x 15 (2d Cir. 2014)........................................................ 62, 66

*United States v. Martinez*,
430 F.3d 317 (6th Cir. 2005)................................................................70

*United States v. Mitchell*,
681 F.3d 867 (6th Cir. 2012)................................................................85

*United States v. Montgomery*,
969 F.3d 582 (6th Cir. 2020)......................................................... 90, 91

*United States v. Montijo-Maysonet*,
974 F.3d 34 (1st Cir. 2020) ........................................................... 62, 82

*United States v. Morrison*,
852 F.3d 488 (6th Cir. 2017)................................................................90

*United States v. Nicholson*,
   716 F. App'x 400 (6th Cir. 2017).......................................... 39, 41, 42, 73
*United States v. Nixon*,
   694 F.3d 623 (6th Cir. 2012) .........................................................62
*United States v. Nunley*,
   559 F. App'x 470 (6th Cir. 2014).....................................................92
*United States v. Parrish*,
   915 F.3d 1043 (6th Cir. 2019) .......................................................82
*United States v. Potter*,
   927 F.3d 446 (6th Cir. 2019) .........................................................43
*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ..........................................................60
*United States v. Rios*,
   830 F.3d 403 (6th Cir. 2016) ..................................................... 64, 73
*United States v. Robinson*,
   547 F.3d 632 (6th Cir. 2008) .........................................................47
*United States v. Schiro*,
   679 F.3d 521 (7th Cir. 2012) ..................................................... 73, 74
*United States v. Scott*,
   716 F. App'x 477 (6th Cir. 2017).....................................................37
*United States v. Seugasala*,
   702 F. App'x 572 (9th Cir. 2017).....................................................62
*United States v. Sherrill*,
   972 F.3d 752 (6th Cir. 2020) .........................................................78
*United States v. Smith*,
   320 F.3d 647 (6th Cir. 2003) .........................................................46
*United States v. Swiney*,
   203 F.3d 397 (6th Cir. 2000) .........................................................47
*United States v. Tocco*,
   200 F.3d 401 (6th Cir. 2000) .........................................................70
*United States v. Turkette*,
   452 U.S. 576 (1981) ..................................................................40
*United States v. Underwood*,
   859 F.3d 386 (6th Cir. 2017) .........................................................82
*United States v. Villarce*,
   323 F.3d 435 (6th Cir. 2003) .........................................................48
*United States v. Vonner*,
   516 F.3d 382 (6th Cir. 2008) ..................................................... 83, 84, 92
*United States v. Walls*,
   293 F.3d 959 (6th Cir. 2002) ..................................................... 46, 79

*United States v. Washington*,
  702 F.3d 886 (6th Cir. 2012) ................................................................37
*United States v. White*,
  492 F.3d 380 (6th Cir. 2007) ...................................... 59, 67, 68, 69
*United States v. White*,
  617 F. App'x 545 (6th Cir. 2015)................................ 85, 86, 87, 88
*United States v. Wilson*,
  579 F. App'x 338 (6th Cir. 2014)........................................................73
*United States v. Young*,
  847 F.3d 328 (6th Cir. 2017) ................................................... 47, 52

**Statutes**

18 U.S.C. § 922(g) ................................................................... 3, 49
18 U.S.C. § 924(c) ........................................................ 3, 37, 48, 49
18 U.S.C. § 1962(d) ................................................................ 3, 39
18 U.S.C. § 1963(a) ......................................................................75
18 U.S.C. § 3231 ..............................................................................1
18 U.S.C. § 3553(a) ......................................................................87
18 U.S.C. § 3742(a) ........................................................................1
18 U.S.C. § 1962(c) ......................................................................39
21 U.S.C. § 841 ....................................................... 3, 37, 48, 49, 57
21 U.S.C. § 846.................................................................. 3, 43, 47
28 U.S.C. § 1291 ..............................................................................1

**Rules**

Fed. R. Crim. P. 8(b) ......................................................................78
Fed. R. Crim. P. 14(a) ....................................................................78
Fed. R. Crim. P. 16(a)(1)(G) ........................................... 35, 63, 65
Fed. R. Crim. P. 52(b) ....................................................................72
Fed. R. Evid. 602 ............................................................................58
Fed. R. Evid. 701 ............................................................................58
Fed. R. Evid. 702 ....................................................... 58, 59, 61, 62
Fed. R. Evid. 801(d)(2)(E) ............................................................69
U.S.S.G. § 2A1.5(a) ......................................................................76
U.S.S.G. § 2K2.23..........................................................................82
U.S.S.G. § 3B1.1(b) ......................................................................87
U.S.S.G. § 5K2.23..........................................................................84

**Other Authorities**

Pattern Jury Instruction 6.01 ................................................................32

## **STATEMENT REGARDING ORAL ARGUMENT**

The United States submits that oral argument is unnecessary in this case. A thorough review of the facts, issues, and applicable law are adequately set forth in the briefs of the parties, and oral argument would not provide significant assistance to the Court in rendering an appropriate decision.

x

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. The defendants filed timely notices of appeal after the district court entered final judgments following guilty verdicts returned by a jury. (R. 1601, Lucas NOA; R. 1602, Darden NOA; R. 1603, Kilgore NOA; R. 1604, Titington NOA.) This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

After a six-week trial, the jury convicted the defendants—all members of the Gangster Disciples—of numerous counts related to racketeering, drug trafficking, gun possession, murder, and other violent acts. The district court imposed sentences ranging from 20 to 40 years. The issues in this consolidated appeal are:

I.     Was the evidence introduced at trial, which consisted of more than 1,000 exhibits plus testimony from over 80 witnesses, sufficient for any rational juror to find the defendants guilty? *[Kilgore Issue I; Lucas Issue II; Titington Issues I, II, and III]*

II.    Did the district court abuse its discretion by refusing to exclude testimony from (a) certain law enforcement witnesses, on the grounds that it purportedly constituted improper expert testimony, and (b) certain cooperating witnesses, on the grounds that some statements purportedly fell outside the coconspirator exception to the hearsay rule, and (c) if so, would any such evidentiary error require reversal given the record as a whole? *[Darden Issues I and II]*

III.   Did the jury verdict form, when combined with certain findings by the district court at sentencing, deprive Lucas of the right to a unanimous jury verdict, and if not, was Lucas's trial otherwise marked by cumulative error? *[Lucas Issues I and IV]*

IV.    Were the sentences imposed on Titington and Lucas reasonable? *[Lucas Issue III; Titington Issue IV]*

## STATEMENT OF THE CASE

### I.    OVERVIEW OF THE CHARGES AND PROCEEDINGS

This case stems from a long-term investigation into crimes committed by the Gangster Disciples in the Middle District of Tennessee and elsewhere. In November 2018, a grand jury returned a third superseding indictment alleging 45 counts against twelve defendants. (R. 831, Third Superseding Indictment.) The indictment charged racketeering conspiracy, drug conspiracy, illegal gun possession, and various acts of violence, including four murders and two additional shootings. (*Id.*)[1] It also

---

[1] The 45 counts can be broken into several groups:
- One RICO conspiracy count, 18 U.S.C. § 1962(d), spanning more than a decade and alleging 76 separate overt acts, including murder, aggravated assault, drug-trafficking, and obstruction (Count 1);
- One multi-year conspiracy count, 21 U.S.C. § 846, and eleven substantive counts, 21 U.S.C. § 841, relating to drug trafficking (Counts 2, 15-23, 40, 43);
- Two counts related to the September 1, 2007 murder of Jesse Hairston (Counts 3-4);
- Five counts related to the January 6, 2012 double-murder of Derrick Sherden and Amanda Weyand (Counts 5-9);
- Five counts related to the November 3, 2012 murder of Malcolm Wright (Counts 10-14);
- Ten counts related to the August 13, 2014 shooting on Treeland Drive, in Clarksville, Tennessee, which targeted rival gang members and injured five bystanders (Counts 24-33);
- Six counts related to the December 23, 2014 shooting of two rival gang members at a Mini Mart in Clarksville (Counts 34-39); and
- Four counts related to possessing firearms and ammunition as a convicted felon, 18 U.S.C. § 922(g)(1), or during and in relation to a drug-trafficking offense, 18 U.S.C. § 924(c) (Counts 41, 42, 44, 45).

identified other violent crimes as overt acts committed in furtherance of the RICO conspiracy, even though they did not result in separate substantive charges. (*Id.*)

Several defendants pleaded guilty before trial.[2] Others were severed.[3] In March 2019, five defendants proceeded to trial: Marcus Darden, Maurice Burks, Derrick Kilgore, Elance Lucas, and DeCarlos Titington. (R. 1204, Minute Entry.) After a lengthy trial, the jury returned guilty verdicts against all defendants. (R. 1360, Darden Verdict Form; R. 1362, Burks Verdict Form; R. 1364, Kilgore Verdict Form; R. 1366, Lucas Verdict Form; R. 1368, Titington Verdict Form.) Prior to sentencing, the district court granted one defendant, Maurice Burks, a new trial on certain counts, which this Court has since reversed. *See United States v. Burks*, 974 F.3d 622 (6th Cir. 2020). The district court denied post-trial relief for the remaining defendants (R. 1460, Mem. Op.) and sentenced them to terms ranging from 20 to 40 years. (R. 1590, Kilgore Judgment; R. 1592, Darden Judgment; R. 1594, Titington Judgment; R. 1598, Lucas Judgment.)

---

[2] (R. 500, Mitchell Plea Hearing; R. 908, Jenkins Plea Hearing; R. 925, Whitlock Plea Hearing; R. 955, Brown Plea Hearing; R. 1032, Luke Plea Hearing.)

[3] Brandon Hardison was initially severed for trial after the government filed notice of its intent to seek the death penalty. (R. 910, Order.) That notice has since been withdrawn, and Hardison's trial is scheduled for October 2021. (R. 1780, Order.) Lamar Warfield was also effectively severed on the grounds that he was a fugitive at the time of trial, but he has since been arrested and has pleaded guilty. (R. 1768, Warfield Plea Hearing.)

## II.     THE PROOF AT TRIAL

The proof at trial lasted for over six weeks and featured more than 80 witness, including former members of the Gangster Disciples who described the inner-workings of the gang, their familiarity with the defendants, and their personal knowledge of the gang's extensive criminal activity. (*See generally* R. 1460, Mem. Op.) The evidence also included more than 1,000 exhibits, including recordings of the defendants engaging in or discussing criminal activity; gang rosters listing its members; and forensic evidence, including DNA and fingerprint evidence, ballistics analysis, and chemical analysis of controlled substances. (R. 1370, Exhibit and Witness List.)

### A. RICO Conspiracy

#### 1.  *Formation, structure, and rules of the national gang.*

The Gangster Disciples, or "the GDs," were founded in Chicago in the late 1960s. (R. 1472, TTR: Dowlen, #11932-35.)[4] The gang later spread throughout the Midwest and into other parts of the country. (*Id.*) The national gang consists of regional districts, with the Southern District comprising seven states, including Tennessee. (*Id.*) Tennessee is further subdivided into regions that generally correspond with the local telephone area code, with middle Tennessee referred to as

---

[4] When citing the trial record, the government uses "TTR: [name]" to refer to the trial transcript from a particular witness, with "#" referring to the applicable PageID range.

"the 615" area or region. (*Id.* at #11936-37.) Individual cities within each region have their own "deck," with some larger cities divided into two or more decks. (*Id.* at #11928-29, 11935-36; R. 1658, TTR: Jordan, #19184-85.)

At the national level, the gang is governed by a board of directors, with Larry Hoover, the gang's founder, retaining the role of chairman even while serving a life sentence. (R. 1645, TTR: Chaney, #15724-29; R. 1658, TTR: Jordan, #19051-52; R. 1664, TTR: Upton, #20452.) The board establishes policies and "laws" for the gang and appoints state leadership. (R. 1645, TTR: Chaney, #15724-29.)

Each state, region, and deck is headed by a governor or a regent. (*Id.*; R. 1472, TTR: Dowlen, #11928-29, 11935-36.) Other gang members hold positions of authority, or "POAs," within a hierarchical leadership structure, such as coordinator, chief of security, enforcer, treasurer, secretary, and literature coordinator. (R. 1645, TTR: Chaney, #15724-29; R. 1472, TTR: Dowlen, #11944-48.) There are also specialized units within the gang, including the "blackout squad," an elite group "[m]ade up of killers" who carry out murders when someone has "been tagged by a GD to be eradicated." (R. 1474, TTR: Dowlen, #12377; R. 1655, TTR: Austin, #18311.) Rank-and-file members who lack POAs are "outstanding members," while GDs as a whole refer to themselves as "Brothers of the Struggle" (or, in the case of female members, "Sisters of the Struggle"). (R. 1646, TTR: Galbreath, #15830-36;

6

R. 1662, TTR: Stephens, #20177.) Members of rival gangs are the "opposition," and those lacking gang affiliation are "peons." (R. 1472, TTR: Dowlen, #11944, 11974.)

In the past, a person joined the GDs by being "jumped in," or assaulted by current members. (*Id.* at #11950.) More recently, a person would join by being "blessed in," where the new member learns the GDs' literature and pledges to abide by gang rules. (*Id.* at #11949-50.) During the earlier period, members followed rules and policies referred to as the "360 concept"; during the latter period, the gang transitioned to the "720 concept." (R. 1646, TTR: Galbreath, #15834-35.) Although the "720 concept" ostensibly placed more emphasis on positive attributes, under the heading of "Growth and Development," there is little practical difference between the 360 and 720 concepts: as one former member described it, "[T]hings still stayed the same way that they was. Still violence, still drug selling, still all of the same things that were going on under 360. It's just a different perspective." (*Id.*; R. 1664, TTR: Kelley, #20484-85.) Another member, when asked to reconcile the principles of "Growth and Development" with the gang's extensive criminal activity, explained that the GDs "sometimes, like, they help the neighborhoods out and sometimes, like – like, they rob." (R. 1655, TTR: Austin, #18517.)

Gang rules are codified in certain "literature," including the "I Pledge," the "We Pledge," and the "17 laws." (R. 1472, TTR: Dowlen, #11970-72; R. 1646, TTR: Galbreath, #15830-38.) Those rules include, first and foremost, "silence and

secrecy": members do not talk about GD business to anyone outside the gang, and especially not the police. (*Id.*) The rules also include "aid and assist," which requires members to assist "all fellow brothers of the struggle in all righteous endeavors." (*Id.*) In this context, "righteous endeavors" can include assaulting or killing members of rival gangs. (*Id.*) Such assaults and killings can advance the status of the gang as a whole within its community and can advance the status within the gang of the member who carried out the attack. (R. 1472, TTR: Dowlen, at #12034-35.) The rules also include restrictions on personal conduct, including that a member not "consume/inject any addictive drugs," such as "crack, heroin, [or] cocaine." (R. 1473, TTR: Dowlen, #12460.)

Membership also conferred benefits. Chief among these was the facilitation of drug trafficking. (*Id.* at #11886-87, 12018.) Although gang members could not use powder or crack cocaine themselves, they routinely sold these drugs to people in their communities. (*Id.* at #12035-36.) A member could use his gang affiliation to network with GDs in other cities to find drugs at the cheapest prices. (*Id.* at #11886-87, 12019.) Membership also provided a geographic area in which GDs could safely sell drugs, with armed security protecting members from being robbed. (*Id.* at #12018.) If a member of a rival gang tried to sell drugs in a GD-controlled area, he risked being robbed or assaulted by the GDs. (R. 1646, TTR: Galbreath, #15847.)

8

The GDs also provided members with guns for protection, plus "trap" houses and other locations for storing guns and drugs. (R. 1473, TTR: Dowlen, #11907-08, 12024-27; R. 1646, TTR: Galbreath, #15821-22, 15860.) Although carrying a gun was not strictly mandatory, "it was highly recommended to always be in possession of a firearm" so that you could "hold your own for anything that presented itself to you." (R. 1646, TTR: Galbreath, #15860.)

If a GD traveled to another city, he could receive protection from the members there. Indeed, every GD has a "reference number"—"like a GD social security number"—which allows him to "go anywhere in the nation" and prove his membership. (R. 1655, TTR: Austin, #18375.) To remain in good standing, members were typically required to pay monthly dues to "the box"—a fund controlled by the treasurer—which members can draw on to pay commissary expenses while in jail, make bail, facilitate escape from law enforcement, or buy drugs for resale. (R. 1472, TTR: Dowlen, #11999-12007; R. 1646, TTR: Galbreath, #15838, 15849-53.)

### 2. History and membership of the Clarksville "deck."

Danyon Dowlen, also known as "Mac Danger"[5] or "Dangerous Dan," was "blessed in" to the GDs in the late 1990s, while he was in prison. (*Id.* at #11875-79.) Between 2003 and 2010, Dowlen cycled in and out of prison. (*Id.* at #11887-11916.)

---

[5] The prefix "Mac" is frequently part of a GD's street name; it can stand for "Making a Change" or "Manipulating all conversation," reflecting the general goal to "[c]ome out on top regardless of whatever it is." (R. 1646, TTR: Galbreath, # 15835-86.)

9

When not incarcerated, he lived in Clarksville, Tennessee. (*Id.*) During those times, Dowlen watched the Clarksville deck gain members and structure, then backtrack when its leaders went to prison. (*Id.*)

Upon his release in December 2010, Dowlen received a call from the regent for the "615 area," which encompassed Middle Tennessee and parts of Kentucky. (*Id.* at #11918-19.) He asked Dowlen to help get the Clarksville GDs "on count" with the rest of the state and the country. (*Id.* at #11916-20.)

Dowlen agreed, and in May or June of 2011, he called a meeting of about 30 Clarksville-area GDs, where they elected members into POAs. (*Id.* at #11921-22, R. 1473, TTR: Dowlen, #12943.) Many members saw Dowlen "as an older brother," and elected him as the leader over Clarksville. (R. 1472, TTR: Dowlen, #11926-27). As his second-in-command, they elected Marcus Darden, also known as "MD" or "Mac Tuff." (*Id.*) Darden had previously served as the deck's enforcer, because he was "prone to violence," and his responsibility in that role was to "enforce laws and any disrespect from any other gangs or anybody else, to put a stop to it, by any means." (R. 1646, TTR: Galbreath, #15814; 15961-62.) Together, Dowlen and Darden tried "to get everything organized and take it to bigger heights than it was." (R. 1472, TTR: Dowlen, #12032-34.)

In 2011, Darden took over from Dowlen as the head of the Clarksville deck. (*Id.* at #12045.) Darden subsequently assumed leadership over the entire 615 region,

10

with all GDs in Middle Tennessee and parts of Kentucky answerable to him. (*Id.* at # 12045-46, 12049-50.) As the regional governor, Darden had the authority to appoint the POAs for the region and for decks within the 615 region, such as Nashville, Murfreesboro, and Lebanon. (R. 1655, TTR: Austin, #18366.) Darden, in turn, reported to the governor over Tennessee, Byron Purdy, who was known as a "gov of governors," since the heads of other states, including Kentucky and North Carolina, also reported to him. (*Id.* at #18367; R. 1664, TTR: Upton, #20427-28.)

After assuming leadership over Clarksville, Darden sought to "[t]ake [the deck] to heights it had never been before." (R. 1472, TTR: Dowlen, #12038.) Darden's goal was to "raise the stature of [the gang], to have the street fame of it, [and] to be revered as a power to be reckoned with," so that members would be recognized and respected on the streets. (R. 1646, TTR: Galbreath, #15811-12.) Darden "ran [the deck] with an iron fist," purging people around him who were weak or might cooperate with law enforcement, and surrounding himself with allies who could be called upon to carry out gang business. (R. 1655, TTR: Austin, #18357; R. 1472, TTR: Dowlen, #12038-39.)

These allies included the other trial defendants here, several of whom had grown up together in Guthrie, a small town straddling the Kentucky/Tennessee border. (R. 1646, TTR: Galbreath, #15988-89; R. 1643, TTR: Beebe, 15000-01.) Former GDs identified the defendants as fellow gang members. (R. 1472, TTR:

11

Dowlen, #11894-95; R. 1646, TTR: Galbreath, #15955-56; R. 1655, TTR: Austin, #18409; R. 1661, TTR: Mitchell, #19906-09.) Gang rosters and phone lists—seized during the investigation and introduced at trial—also listed the defendants' aliases and phone numbers, and recorded their presence at gang meetings. (R. 1645, TTR: Chaney, #15632, 15639-47, 15685-15708; R. 1649, TTR: Colkmire, #16630.) Text messages, phone records, and social media evidence showed the defendants communicating about gang business, flashing gang signs, and displaying distinctive gang tattoos, such as a six-pointed star or a reference to Larry Hoover. (R. 1643, TTR: D. Hayes, #15173-74; R. 1644, TTR: Harrell, #15291-98; R. 1644, TTR: Meinecke, #15335-65; R. 1645, TTR: Patterson, #15550-55.)

### 3. The use of "smashings" and "eradications" to enforce gang rules.

Members who violated gang rules were subject to penalties. For minor violations, the penalty might be a fine paid to the box. (R. 1472, TTR: Dowlen, #11999-12005.) For more serious violations, the penalty might be a "smashing"— a controlled beating by fellow gang members, with the severity determined by the duration of the beating (from 30 seconds to 6 minutes); the number of people involved; and the ability of the violated member to protect himself ("coverup" versus "no coverup"). (*Id.* at #11997-98; R. 1646, TTR: Galbreath, #15842-44.) For the most serious violations, like cooperating with law enforcement, the penalty was "eradication"—that is, death. (R. 1472, TTR: Dowlen, #11999.) Once gang leaders

12

determined that a violation had occurred, they would issue a "warrant" that authorized other members to place the violating member under "GD arrest," sometimes followed by a "GD trial"—featuring a GD lawyer and jury—before the imposition of punishment. (R. 1655, TTR: Austin, #18413-16; R. 1658, TTR: Jordan, #19164-66.)

The jury heard evidence about several such punishments. For example, in early 2008, Deanton Greenwade left the GDs to join the Crips. (R. 1647, TTR: Galbreath, #16109-12.) When Darden and others found Greenwade in a local store, they tried to assault him, but he escaped, with the GDs shooting after him as he fled. (*Id.*) After the GDs captured Greenwade, they brought him to a gang meeting spot called the Blue Magic Car Wash, where roughly ten GDs assaulted him, knocking a tooth out and rendering him unconscious, such that he had to be carried out and taken to the hospital. (*Id.* at #16113-14.)

In early 2014, Darden ordered a smashing in response to a violation committed by a GD named "Mac T," who had previously held a leadership position in the Clarksville deck. (R. 1655, TTR: Austin, #18327-46.) Darden designated the smashing as a "six-minute, no coverup," and carried it out at a local club. (*Id.*) Darden later told the gang's treasurer that they had slammed Mac T into the wall so hard that the wall broke, and that they needed to pay the club owner to repair the damage. (R. 1658, TTR: Jordan, 19170-71.)

13

Around the same time, Darden ordered the smashing of Errika Stephens, who had first joined the GDs in Memphis when she was thirteen and later connected with the 615 region when she moved to Gallatin, Tennessee. (R. 1662, TTR: Stephens, #20175-76.) Prior to the smashing, a GD named Deversea Fitts, also known as "Vossie," asked Stephens to store some guns in her apartment. (*Id.* at #20196-97.) Police later searched the apartment, seized the guns, and arrested her. (*Id.*) Stephens expected Fitts to bail her out of jail and admit that the guns were his. (*Id.* at #20198-20201.) When he failed to do so, Stephens told police that the guns were his. (*Id.*) After her release, Stephens went to a gang meeting in Nashville, thinking it would be an opportunity to smooth over her dispute with Fitts. (*Id.* at #20203-04.) The real purpose of the meeting, however, was to serve a violation on her for speaking to law enforcement. (*Id.* at #20206-08.) The 615 region did not have any other female members, so several "Sisters of the Struggle" from the Chattanooga area had been brought in. (*Id.*) At Darden's direction, three of these women assaulted Stephens—three minutes, no coverup—with Darden telling Stephens that if she had been in Clarksville, she would never have made it to the meeting. (*Id.*)

In late 2014, a GD named D'Anthony Hall was shot while committing a robbery. (R. 1655, TTR: Austin, #18397-98.) Hall later gave a statement to the police about the shooting. (*Id.* at #18413-16.) The GDs viewed this as a violation of the "silence and secrecy" rule and issued a GD arrest warrant. (*Id.*) Johnny Austin, who

14

was the chief of security at the time, thought that Hall's punishment would be a smashing: three minutes, no coverup. (*Id.*) But one night, Fitts—the head of the blackout squad—told Austin, Hall, and others that they were going to go rob a Blood. (*Id.* at #18360-61, 18419-24.) This was a ruse: in a secluded location, Fitts had another GD shoot and kill Hall. (*Id.*) This was the first time Austin had seen one GD eradicate another for violating gang rules. (*Id.*)

### B. Murders and Other Shootings

The jury also heard evidence about several other murders and shootings, spanning a nine-year period. Some of these incidents formed the basis of substantive charges, while others were overt acts in furtherance of the RICO conspiracy.

### 1. *William Miller.*

In the mid-2000s, the Clarksville GDs were still trying to establish their stature and reputation. (R. 1647, TTR: Galbreath, #16116-18.) One way to do so was by killing members of rival gangs. (*Id.*) In January 2006, Darden and other GDs were at a club, when they noticed William Miller—a member of the Crips also known as Lil Will—disrespecting the GDs by "thr[o]w[ing] down the pitchforks." (R. 1473, TTR: Dowlen, #12312-13.) Pitchforks are a key part of the GDs' symbolism, so "throwing them down" represents "total disrespect" that "would get the worst out of a gangsta." (*Id.*) Although Darden was unable to "get" Miller that night, he and another GD named Rex Whitlock saw Miller out walking the next day. (*Id.*) Darden

15

and Whitlock confronted Miller, then shot him in the back as he walked away. (*Id.*; R. 1648, TTR: D. Wilson, #16364-72.) Miller was flown to Vanderbilt University Medical Center, where doctors found him to be in "acute distress," having lost more than a third of his blood. (R. 1647, TTR: Morris, #16087-98.)

Meanwhile, Darden and Whitlock drove to see Tray Galbreath, another member of the gang's leadership. (R. 1647, TTR: Galbreath, at #16181-84.) As Galbreath approached their car, he noticed that Darden and Whitlock seemed anxious and jittery, and Galbreath could hear sirens in the background. (*Id.*) Whitlock handed Galbreath a hooded sweatshirt and drove off. (*Id.*) Inside the sweatshirt were several guns, at least one of which was still hot, as if from recent use. (*Id.*)

A day or two later, Whitlock told Galbreath that they had shot Miller "to put GD on the map," meaning to "[l]et the streets know that GD is a power to be reckoned" with. (*Id.* at #16186-87.) As they hoped, Miller's shooting put Darden and Whitlock "on the map, and GD followed from there." (*Id.* at #16188.) The escalating gang violence in Clarksville "started from that point on." (*Id.*)

### 2. *Jesse Hairston.*

In July 2006, members of the Bloods killed a Clarksville GD named Sylvester Hockett, also known as "Mac Chicken." (*Id.* at #16197-99.) The GDs felt duty-bound to retaliate. (*Id.*) In September 2007, Whitlock and two other GDs got into an

16

altercation with some Bloods at a in Clarksville. (*Id.* at #16210-12.) They left to retrieve an assault rifle, but "the crowd was gone" when they returned, so "they followed everybody" to a nearby gas station and "parked across the street . . . just watching everybody." (*Id.*)

When Jesse Hairston, a member of the Bloods, pulled out of the gas station, the GDs followed him down a desolate country road. (*Id.*) They pulled up next to Hairston and rolled down the window, at which point Whitlock shot Hairston in the head. (*Id.*) Whitlock later destroyed the murder weapon to avoid detection. (*Id.*) Whitlock explained to Galbreath that he had taken "one of theirs since they took Chicken." (*Id.* at #16208-09.) Police later found Hairston's body in a car on Tobacco Road, shot through the head with a single bullet from an assault rifle. (R. 1648, TTR: Robbins, #16355-62; R. 1649, TTR: Hawes, #16734-41.)

### 3. *Darius Wilridge.*

In December 2007, Darden, Galbreath, and another GD were at a club, when Darden leaned over to Galbreath and said that he was "horny" because he had not "shot a motherfucker in 30 days." (R. 1647, TTR: Galbreath, #16190-91.) Darden and Galbreath then picked a fight with a random bar patron, elbowing him and slamming his head into the bar. (*Id.*)

As they were being kicked out of the club, Darden and Galbreath saw several other GDs fighting with Robert and Darius Wilridge, two cousins who were

17

unaffiliated with any gang. (*Id.* at #16193-94; R. 1648, TTR: R. Wilridge, 16377-80; R. 1648, TTR: D. Wilridge, #16449-50.) That fight, too, was broken up, and the GDs went to another club. (R. 1647, TTR: Galbreath, #16193-96.)

The Wilridges also relocated to this second club, and when the GDs recognized them in the parking lot, another fight broke out. (*Id.*; R. 1648, TTR: R. Wilridge, #16385-93; R. 1648, TTR: D. Wilridge, #16452-63.) At one point, Galbreath and other GDs had Darius Wilridge pinned to the ground. (R. 1647, TTR: Galbreath, #16193-96.) Darden got out of his car, said, "Move, move, move," and shot Darius using a 9mm Beretta with a laser sight. (*Id.*) Robert (whose hand was broken in the melee) got Darius into the car to drive him to the hospital. (R. 1648, TTR: R. Wilridge, 16385-93.)

The GDs followed, with Galbreath shooting at the Wilridges as they fled. (*Id.*; R. 1647, TTR: Galbreath, #16193-96.) The Wilridges made it to the hospital just before running out of gas. (R. 1648, TTR: D. Wilridge, #16452-63.) The GDs spotted a police car in the hospital parking lot and fled. (R. 1647, TTR: Galbreath, #16193-96.) The shooting was "another notch in [Darden's] belt," further boosting his status within the gang. (*Id.* at #16197.)

### 4. *Crystal Allen.*

In September 2009, Crystal Allen was living in a Clarksville neighborhood controlled by the Vice Lords. (R. 1649, TTR: C. Allen, #16660-63.) One evening,

18

as she sat on a car talking to friends, two cars drove by and gunfire broke out. (*Id.*) As she tried to get onto the ground, she was shot through the buttocks. (*Id.*) She was seriously injured and spent five days in the hospital. (*Id.* at #16667.)

Years later, Dowlen was talking to Allen on the street when another GD named James Luke, also known as "New York," walked by. (R. 1473, TTR: Dowlen, #12316-19.) Allen "kind of gave [Luke] a face"; when Dowlen asked Luke and other GDs for an explanation, they reported that Luke had accidentally shot Allen in the earlier incident, while attempting to shoot a high-ranking Vice Lord. (*Id.*) After that, Dowlen and other GDs "would rag on [Luke] because . . . he's a wild shooter, and he might shoot anything." (*Id.*)

### 5. *Derrick Sherden and Amanda Weyand.*

In early 2012, Derrick Sherden, also known as "Meech," moved to Clarksville from Chicago. (R. 1474, TTR: Dowlen, #12347-48.) Sherden claimed to be a GD, but never paid dues or attended meetings in Clarksville. (*Id.*) Sherden sold drugs out of his house, and at one point incurred a drug debt to a GD named Brandon Hardison, also known as "Creep." (*Id.* at #12349-51.) When Hardison got mad at Sherden's continued failure to repay him, Sherden "put it on the BOS that he was going to pay" Hardison back, meaning that he, as a "Brother of the Struggle," was "swearing by GD that he would pay [Hardison] the debt." (*Id.*) Sherden nevertheless failed to repay Hardison. (*Id.*)

19

In early 2012, Dowlen was walking through the Lincoln Homes neighborhood in Clarksville when he saw Sherden drive by. (*Id.* at #12352-55.) Dowlen alerted Hardison, and Hardison came to the area with other GDs, including Tavares Trotter, also known as "Wolf." (*Id.*) Trotter showed off his new "chrome or nickel plated 9 millimeter with pearl handle grips," and said that he knew the house where Sherden lived. (*Id.*) Hardison, Trotter, and the others left to go look for Sherden. (*Id.*)

Later that evening, Dowlen got a call from Trotter, who sounded upset and "was saying, man, that he killed him, that he dead." (*Id.* at #12365.) Trotter later explained that Hardison had killed Sherden. (*Id.*) Dowlen then spoke to Hardison, who explained that when he and Trotter arrived at Sherden's house, Sherden came to the door with a gun. (*Id.* at #12366-67.) After Hardison and Trotter came inside, Hardison excused himself. (*Id.*) Hardison "stepped out, cocked his gun, went back in and shot [Sherden] in the head." (*Id.*) Sherden's hands shot up, prompting Hardison to shoot him again. (*Id.*) Trotter then ran out of the house. (*Id.*)

Hardison went into the back room, where Sherden's girlfriend, Amanda Weyand, had been doing her homework. (*Id.* at #12368.) She "stuck a book up to her face" for protection, but Hardison shot her twice in the head. (*Id.*) Police later found Hardison and Trotter's fingerprints in Sherden's residence, along with cartridge casings and bullet fragments consistent with the 9mm pistol Dowlen had

seen Trotter hand to Hardison prior to the shooting. (R. 1506, TTR: Kirk, #13140-44; R. 1510, TTR: Arney, #13276-88.)

Darden, Dowlen, and other gang leadership met to discuss the shooting, since Hardison had brought "undue heat" on the gang and killed someone who at least claimed to be a GD, which would be a violation of gang rules. (R. 1474, TTR: Dowlen, #12370-74, 12605-06.) Given the matter's seriousness, the attendees patched in the governor over Tennessee, Byron Purdy, over the phone. (*Id.*) The attendees initially favored Hardison's eradication. (*Id.*) Darden, in particular, "was adamant that if [Sherden] was a GD that . . . Mr. Hardison needed to be eradicated." (*Id.* at #12376.) Dowlen, however, observed that the gang had never received proof from Chicago that Sherden was a GD; that Sherden had broken his oath by failing to repay Hardison; and that eradicating Hardison could draw more attention from law enforcement. (*Id.* at #12375-76.)

The gang leadership eventually decided that Hardison would not be eradicated. (*Id.*) To the contrary, they promoted Hardison to the blackout squad. (*Id.*) His status in the gang increased, since he was now "known as a frontline soldier and a killer, and if anything came up where something needed to be handled, he was first in the litter to go." (*Id.* at #12377-78.)

### 6. *Lincoln Homes Shooting.*

Later in 2012, Dowlen received a call from Titington, who told him that he was under attack from unknown assailants, evidently in a case of mistaken identity. (R. 1473, TTR: Dowlen, #12319-23.) Dowlen grabbed a sawed-off AK-47 and a Glock .40 handgun, and had his girlfriend drop him off near the Lincoln Homes area. (*Id.*) Shortly after he and Titington met up, two SUVs drove up, and a person in military fatigues got out and walked towards them with a shotgun on his shoulder. (*Id.* at #12323-28.) A shootout ensued, with Titington lying on the ground firing a pistol with each hand and Dowlen shooting the AK-47 while the unknown assailant and others fled in the SUVs. (*Id.*)

### 7. *Malcolm Wright.*[6]

In the fall of 2012, tensions between the GDs and the Bloods escalated when the Bloods killed a GD named Shannon Fairley, also known as "Mac Juve." (R. 1473, TTR: Dowlen, #12177-78, 12384-86.) The GDs initially formulated a plan to kill members of the Bloods at Plush Nightclub, but called it off after noticing law enforcement in the area and concluding that the plan would be a "suicide mission." (*Id.* at #12379-84.)

---

[6] Additional details of Wright's murder are discussed in this Court's opinion in *Burks*, 974 F.3d at 624-28, and the associated briefing.

On November 2, 2012, most of the Clarksville GDs were at an area nightclub providing security for a concert. (R. 1473, TTR: Dowlen, #12389; R. 1475, TTR: Ford, #12688.) Hardison, however, went to a sports bar called Sidelines, which was generally associated with the Bloods. (R. 1473, TTR: Dowlen, #12430-31; R. 1475, TTR: Ford, #12685-86.) Numerous Bloods were there, including Malcolm Wright, also known as "X Gotti." (R. 1483, TTR: Gaskin, #12783-84; R. 1475, TTR: Ford, #12685.) Also present was a high-ranking member of the Vice Lords named Dezorick Ford, known as "Lord Slick." (R. 1475, TTR: Ford, #12624, 12683-85.)

Ford viewed this scenario as the perfect opportunity to take "a sneaky shot" on behalf of the Vice Lords. (*Id.* at #12687-88.) Ford could attack Hardison without being recognized; this would not only allow Ford to assault a GD, it would likely result in the Bloods getting blamed, thereby instigating further conflict between two of the Vice Lords' chief rivals. (*Id.* at #12687-88.) So Ford leaned over to one of the Bloods and said, "Let's smash him." (*Id.* at #12685-86.)

Ford then sucker punched Hardison in the back of the head. (*Id.* at #12689, 12693-95.) A melee ensued, with a number of Bloods jumping on Hardison, before a security guard broke up the fight and kicked Hardison out of the bar. (*Id.*)

Dowlen received a call from Darden, who reported that Hardison had "been jumped" at Sidelines, and that he (Darden) "was calling for all hands on deck" to respond. (R. 1473, TTR: Dowlen, #12426-28.) Any GD who received word of the

23

"all hands" call and was "able to move" was expected to report to Sidelines before heading to a nearby club called C-Ray's. (*Id.*)

Several GDs—including Darden, Hardison, and Burks—assembled in the parking lot of C-Ray's. (R. 1321, TTR: Daniels, #10197-99, 10212-16.)[7] They formulated a plan to enter C-Ray's and "execute" the person who had disrespected them, with Hardison saying, "'This N-word got to die.'" (*Id.* at #10209-12.)[8] Darden then ordered the GDs into the club. (*Id.* at #10213-14.)

Inside, Wright and his girlfriend, Kristine Gaskin, were approached by Hardison and several other GDs, who asked Wright if he was a Blood. (R. 1483, TTR: Gaskin, #12799-127802, 12815-18.) When Wright acknowledged that he was, Hardison punched him in the mouth; other GDs joined in and "started to jump him." (*Id.* at #12802-03.) Gaskin was pushed out of the way and crouched behind a wall in an anteroom. (*Id.* at #12803-05.)

---

[7] When Daniels first took the stand, he refused to answer questions and was held in contempt. (R. 1511, TTR: Daniels, #13296-97, 13303-15.) When he retook the stand one week later, he acknowledged that he had gone to C-Ray's on November 3, 2012, but then gave answers inconsistent with his prior grand jury testimony. (R. 1321, TTR: Daniels, #10174-95.) The government introduced portions of his grand jury testimony under Federal Rule of Evidence 801(d)(1)(A), which made his statements admissible as impeachment and substantive evidence. *See Burks*, 974 F.3d at 636; *United States v. LaVictor*, 848 F.3d 428, 451 (6th Cir. 2017).

[8] Before trial, the district court asked the parties and their witnesses to limit "[t]he use of foul, profane, expletive or such other language" by, for instance, substituting "N-word" and "F-word" in place of references to or quotations of the actual words themselves. (R. 1143, Order, #8214.)

At that point, Gaskin heard a gunshot. (*Id.* at #12805-06.) People began running out of the club "like a stampede." (*Id.*) Gaskin saw Wright "stumble" toward the front door. (*Id.* at #12806-07.) She then "heard another gunshot while [Wright] fell in the doorway." (*Id.*) Gaskin helped Wright walk out the front door and took him around to the side of the building, where he collapsed on a ramp. (*Id.* at #12810-12.) Wright was then taken to the hospital and pronounced dead. (*Id.* at #12813-14.)

Meanwhile, from the parking lot, Daniels saw a crowd of screaming people stampede out of C-Ray's. (R. 1321, TTR: Daniels, #10218-19.) Another GD approached Daniels and told him they could not leave until Burks came out. (*Id.* at #10219-20.) Roughly thirty seconds later, Burks emerged and everyone departed. (*Id.*)

Burks separately admitted his role as the shooter to both Daniels and Dowlen. (*Id.* at #10219-23; R. 1472, TTR: Dowlen, #12024; R. 1473, TTR: Dowlen, #12122.; R. 1474, TTR: Dowlen, #12434-41.) He later made a similar, albeit less explicit, confession to Dezorick Ford when they were in custody together. (R. 1475, TTR: Ford, #12701-11.) Burks's status increased as a result of Wright's murder, because "now it was for sure that he would take care of business if it came to it." (R. 1474, TTR: Dowlen, at #12440.)

25

### 8. *Treeland Drive Shooting.*

On August 13, 2014, Lawrence Mitchell, a GD known as "Chop," was outside of his aunt's house, speaking to a GD named Christopher Fletcher and another friend. (R. 1661, TTR: Mitchell, #19917-19.) A car pulled up and started shooting. (*Id.* at #19922-24.) Chaos ensued, with "people running around everywhere" and "kids screaming." (*Id.* at #19922-24.) Fletcher and his companion were shot and taken to the hospital. (*Id.* at #19927-29.) Meanwhile, another GD named Deron Lundy chased after the shooters and exchanged gunfire with them. (*Id.* at #19925-26.)

A large group of GDs—including Darden, Burks, Kilgore, Lundy, and Mitchell, as well as Lamar Warfield, Keilo Hoosier, and others—assembled in Guthrie. (*Id.* at #19934-35.) They determined that the Vice Lords were responsible and formulated a plan for revenge. (*Id.* at #19934-42.) Darden and Burks then departed. (*Id.* at #19942-43.) The remaining GDs drove in two vehicles to Treeland Drive, where a high-ranking Vice Lord lived. (*Id.* at #19945.) Upon arrival, the first vehicle—a Ford F-150 pickup with Kilgore, Lundy, and Warfield—began firing. (*Id.* at #19942-46.)

The shooting sounded "like fireworks" and seemed to go on "forever." (R. 1660, TTR: Barger, #19559-65.) A bystander named Taylor Barger was shot through the stomach and in the leg and groin. (*Id.* at #19566.) She was flown to Vanderbilt

26

and hospitalized for four days. (*Id.*) To this day, Barger experiences chronic pain, nightmares, and nerve damage. (*Id.* at #19567-68.)

Barger's best friend, Lacey McIntire, described the scene as "[c]haos." (R. 1660, TTR: McIntire, #19603-04.) As she lay "facedown in the dirt," she looked back and "it just looked like fire was coming from the truck." (*Id.*) McIntire herself was shot in the leg and taken to the hospital. (*Id.* at #19605-07.) Meanwhile, inside a house on Treeland Drive, a sixteen-year-old bystander was lying in bed when he heard what he thought were fireworks. (R. 1660, TTR: D.F., #19654-57.) When he went to the window to investigate, a bullet ripped off one of his fingertips. (*Id.* at #19656-57, 19667.)

The GDs sped off. (R. 1661, TTR: Mitchell, 19949-50.) Police followed, but the second vehicle—a Chevrolet Impala with Mitchell and Hoosier—served as a "blocker car" and helped the Ford pickup escape. (*Id.*) The chase exceeded 120 mph, with the Impala briefly eluding the police before crashing. (*Id.*; R. 1660, TTR: Bushnell, #19672-88.) Mitchell and Hoosier fled on foot, but police quickly located Mitchell in a nearby field. (R. 1661, TTR: Mitchell, #19951.)

The next day, police found the Ford F-150 parked outside a church in Guthrie, only half a mile from a frequent GD meeting spot. (R. 1660, TTR: Ayrest, 19700-04.) Police found a water bottle in the front seat and blood in the back seat. (*Id.*; R.

27

1660, TTR: Honholt, #19752-57.) DNA on the water bottle matched to Kilgore, and the blood matched to Warfield. (R. 1661, TTR: Proctor, #19834-36.)

### 9. *Mini Mart Shooting.*

On December 23, 2014, Titington went to a Mini Mart in a Vice Lords neighborhood. (R. 1662, TTR: Hackney, #20055-56.) Two Vice Lords assaulted him, and Titington dropped a gun to the floor. (R. 1662, TTR: Newman, #20070-71.) (*Id.*) The Vice Lords ran out the store and drove off. (*Id.* at #20072-73.) Titington picked up his gun and followed after them. (*Id.*) Once outside, Titington calmly looked right, looked left, saw the Vice Lords, and began firing after them, pulling the trigger at least fourteen times. (*Id.*; R. 1662, TTR: Hodge, #20099-20106.)

About six weeks later, Clarksville police received a call that a car had crashed into a tree. (R. 1644, TTR: Skinner, #15462-67.) They found Titington in the driver's seat, passed out at the wheel. (*Id.*) Police also found a baggie containing cocaine, $743 in cash, and a loaded Glock 9mm pistol. (*Id.* at #15466-70; R. 1645, TTR: Lockerman, #15499-15504.) Forensic analysis showed that this was the same gun Titington had used in the Mini Mart shootout. (R. 1662, TTR: Hodge, #20104-06.)

### C. Drug Trafficking and Related Charges

Numerous witnesses testified that the Clarksville GDs made money by selling powder cocaine, crack cocaine, and other drugs. (R. 1658, TTR: Jordan, #19193-

94.) For example, Galbreath testified that he personally sold drugs more or less continuously for years, to both resellers and end users. (R. 1646, TTR: Galbreath, #15857-58.) For a time, Rex Whitlock was the gang's main supplier, and he regularly traveled to Atlanta to pick up multiple kilograms of cocaine. (*Id.* at #15863-64.) Between May and August 2008, for example, Galbreath accompanied Whitlock on four or five trips, bringing back six to eight kilograms each time and typically paying around $25,000 per kilo. (*Id.*)

Around this time, a GD named Deandrea Mason, also known as "Seattle," lived with a drug addict named John Windsor Clark. (R. 1645, TTR: Clark, #15568-69.) Clark let the GDs take his car on these trips to Atlanta and use his house to cook crack cocaine; in exchange, they provided him with free drugs. (*Id.* at #15572-84.) Clark regularly watched Mason and Whitlock cooking 3-5 kilograms of cocaine into crack as Darden served as an armed guard and lookout. (*Id.* at #15579-86.)

In 2008, Galbreath and Whitlock got arrested returning from Atlanta with eight kilograms of cocaine, temporarily disrupting the GDs' primary source for large quantities of cocaine. (R. 1646, TTR: Galbreath, #15870.) Burks and Lucas later became the main suppliers for the rest of the gang. (R. 1473, TTR: Dowlen, #12122.)

The gang also controlled areas in which GDs (and only GDs) could safely sell drugs, and used trap houses to cook, store, and sell drugs, and to stash guns and money. (*Id.* at #11886-87, 12018-19, 12035-36; R. 1646, TTR: Galbreath, #15821-

29

22, 15846-48, 15860.) The gang's drug-trafficking was lucrative: the jury saw individual GDs flashing as much as $50,000 in cash at a given time, despite the fact that no witness ever knew the defendants to have a legitimate job. (R. 1646, TTR: Galbreath, #15981, 15988; R. 1647, TTR: Galbreath, #16116-17.)

The jury also heard evidence about controlled buys from the defendants, plus traffic stops of the defendants where police discovered drugs, guns, and other tools of the trade. (R. 1644, TTR: Luebke, #15389-15401; R. 1644, TTR: Evans, #15419-24; R. 1644, TTR: Skinner, #15465-70; R. 1648, TTR: Briggs, #16535-57; R. 1649, TTR: Anderson, #16811-35; R. 1649, TTR: Clark, #16745-75; R. 1657, TTR: Kilday, #18842-43; R. 1658, TTR: Evans, #18979.)[9]

### D. Defense Case, and the Dispute Over the Gang's National Character

Throughout trial, the defendants disputed the proposition that the GDs maintained a national structure or hierarchy, or that Larry Hoover continued to exercise a leadership role from prison. In the defense case, Lucas called Wallace "Gator" Bradley, who had helped found the GDs and had long been close friends with Hoover. (R. 1664, TTR: Bradley, #20362-63.) Bradley testified that the national gang as it once existed largely ended in the mid-1990s, after Hoover (and other senior gang members) were convicted in Chicago. (*Id.* at #20367-70.) Bradley

---

[9] Details of specific drug-related events are discussed below in connection with the defendants' sufficiency challenges.

30

acknowledged, however, that the GDs still have a board of directors, which holds nationwide conference calls, and that Hoover may retain authority to appoint its members. (*Id.* at 20402-03.) The defense theory on this point was included in the district court's jury instructions, over the government's objection:

> [E]ach of the defendants maintain[s] that there does not exist a national criminal organization or enterprise called the Gangster Disciples as charged in the indictment. The national criminal organization called the Gangster Disciples was destroyed through federal prosecution in the 1990's. Its founder and leader, Larry Hoover, was sentenced to six life sentences and has been incarcerated in the Federal Bureau of Prisons supermax prison for more than 20 years. Many groups around the country may claim to be Gangster Disciples, but there is no such national group as charged in the indictment. Further, each defendant maintains that the government has failed to prove their guilt beyond a reasonable doubt. They did not engage in any act of violence, did not order any act of violence, did not conspire with anyone to commit violence, and did not conspire with anyone to possess and distribute powder or crack cocaine, nor did they join any enterprise with the common purpose to commit violence or to distribute powder or crack cocaine.

(R. 1666, Jury Instructions, #20924-25.)[10]

Proof about the gang's structure introduced during the government's case-in-chief focused mostly on the state, regional, and deck levels. The jury heard, however,

---

[10] The government opposed this instruction because it "merely represented each defendant's view of the facts of the case, rather than a distinct legal theory," *see United States v. Chowdhury*, 169 F.3d 402, 407 (6th Cir. 1999) (cleaned up), and because the dispute over the gang's *national* (rather than regional or local) character was immaterial to guilt, and therefore ran the risk of confusing the jury. (R. 1341, Govt. Response.) The district court found the instruction warranted by Sixth Circuit Pattern Jury Instruction 6.01. (R. 1664, TTR: Charge Conference, #20536-48.)

31

that GDs could tap into gang networks in other states when they traveled or were on the lam; that major gang-related decisions were still decided by a national board; and that Larry Hoover continued to be regarded as the gang's chairman and leader, with the money in the box generally "considered Larry's money." (R. 1658, TTR: Jordan, #19077.) GDs from various states met annually to celebrate Hoover's birthday, referred to as "G Day." (R. 1655, TTR: Austin, #18391-92, 18399.) Austin described traveling to Memphis in 2014 to celebrate "G Day" and provide security for the state officers. (*Id.*) The event was "a celebration" for "the whole nation of GD," with members from 26 states, plus some of Hoover's friends and family, in attendance. (*Id.* at #18399-18408.) It featured an awards ceremony at a Holiday Inn ballroom, where Austin was recognized as the "[m]ost improved gangsta." (*Id.* at #18405.)

In its rebuttal case, the government presented evidence about separate wiretap investigations in Memphis and Atlanta showing that national gang leaders have regular conference calls featuring the national board and state governors. (R. 1664, TTR: Upton, #20451-52.) The jury also heard that Hoover receives money from gang leaders while in prison, some of which he passes along to family members. (R. 1664, TTR: Kelley, #20490, 20496-99.) Hoover also uses phone calls and family meetings to conduct gang business and was caught using a cipher to communicate with another high-ranking GD in his prison. (*Id.* at #20491-94.)

### III.    VERDICT, POST-TRIAL MOTIONS, AND SENTENCING

After six weeks of proof—and seven days of deliberations spread out over two weeks—the jury found Burks, Kilgore, and Lucas guilty on all counts; Darden guilty on all counts but one; and Titington guilty on six of eleven counts. (R. 1360, Darden Verdict Form; R. 1362, Burks Verdict Form; R. 1364, Kilgore Verdict Form; R. 1366, Lucas Verdict Form; R. 1368, Titington Verdict Form.) The district court denied the defendants' motions for judgments of acquittal. (R. 1460, Mem. Op.)

The court held an initial sentencing hearing for all defendants to address objections to the Pre-Sentence Investigation Reports, followed by individual hearings for each defendant. (R. 1530, Order.) At those hearings, the district court sentenced Darden to 480 months' imprisonment; Kilgore to 420 months' imprisonment; Titington to 270 months' imprisonment; and Lucas to 240 months' imprisonment. (R. 1590, Kilgore Judgment; R. 1592, Darden Judgment; R. 1594, Titington Judgment; R. 1598, Lucas Judgment.)[11] These appeals follow.

---

[11] Details of Lucas and Titington's hearings are discussed below in the section addressing their sentencing claims.

33

## SUMMARY OF THE ARGUMENT

**I.** Sufficient evidence supported the verdicts. The six-week trial featured extensive proof that the defendants, all Gangster Disciples, participated in racketeering and drug-trafficking conspiracies. Among other things, the proof showed that the GDs are an "enterprise" within the meaning of the RICO statute, given that the gang is a highly structured organization with hierarchical leadership roles, governing laws, and systems for internal discipline.

The proof further showed that each of the defendants participated in a drug conspiracy involving more than 5 kilograms of powder cocaine and 280 grams of crack cocaine. The GDs controlled territories where members could safely sell drugs and provided members with guns and a network of trap houses to facilitate the operation. Members also tapped into a multi-state network to source drugs and used the resulting sale proceeds to pay monthly dues. Given the wealth of evidence about this extensive, years-long conspiracy, the jury—which was properly instructed under current law—reasonably found that the conspiracy involved quantities of both powder and crack cocaine that triggered enhanced penalties.

The proof also allowed a reasonable juror to infer that, when Titington was arrested in February 2015 with cocaine and a gun, he intended to distribute the drugs and possessed the firearm to further that offense.

**II.** The district court did not abuse its discretion when it admitted testimony from four witnesses whom Darden challenged as undisclosed experts. None of the challenged testimony was in the form of an opinion, and none of it relied on a process of reasoning that can be mastered only by specialists in the field. It thus fell outside the scope of Federal Rule of Evidence 702 and was not subject to the disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(G).

The district court likewise did not abuse its discretion when it admitted testimony under the coconspirator exception to the hearsay rule. The challenged out-of-court statements were each made by one GD to another during the course of the conspiracy, and they each furthered the conspiracy by informing fellow gang members of the conspiracy's progress. They were thus excluded from the definition of hearsay.

Furthermore, any error in admitting the challenged testimony was harmless. Most of the testimony was cumulative or undisputed, and the proof taken as a whole was overwhelming.

**III.** Lucas was not deprived of his Sixth Amendment right to a unanimous verdict. The jury was required to find each element of the RICO-conspiracy offense but did not need to agree on the specific racketeering activities forming the requisite "pattern." The jury here *did* find three penalty-enhancing facts that each raised the statutory maximum to life. But those findings were separate from the underlying

conviction, so any decision by the district court to "remove" one of them at sentencing would be irrelevant to the Sixth Amendment challenge. In any event, the district court did not "remove" any jury finding at sentencing.

Lucas's cumulative-error claim also fails. Because this was a RICO-conspiracy case, the evidence would have been admissible even if Lucas had been tried separately. The district court therefore did not plainly err by failing to sever him. Nor did the district court plainly err by failing to grant Lucas a new trial on the basis of an undisclosed report pertaining to a minor detail of a crime for which Lucas faced no substantive charges. Nor did the district court plainly err by failing to grant a mistrial on the basis of a minor jury dispute that did not constiue misconduct.

**IV.** Finally, the district court's sentences were procedurally and substantively reasonable. The district court recognized its discretion to depart downward when sentencing Titington, so its decision not to do so is unreviewable on appeal. And it did not plainly err by following controlling law governing the constitutionality of a specific guideline. When sentencing Lucas, the district court correctly calculated the offense level by reference to the jury's verdict and the proof at trial. And its decision to vary upward slightly from the applicable range was adequately explained and substantively reasonable.

This Court should affirm in all respects.

36

## ARGUMENT

### I. SUFFICIENT EVIDENCE SUPPORTED THE JURY'S VERDICTS.

Three defendants—Lucas, Kilgore, and Titington—challenge the sufficiency of the evidence supporting particular convictions. First, Lucas and Kilgore challenge their RICO-conspiracy convictions. (Lucas Br. at 29-36; Kilgore Br. at 41-49.) Second, Kilgore and Titington challenge their drug-conspiracy convictions, with Kilgore challenging the substantive violation (Kilgore Br. at 32-41) and Titington challenging the jury's determination of drug type and quantity (Titington Br. at 20-30). Third, Titington challenges his convictions under 21 U.S.C. § 841(a) and 18 U.S.C. § 924(c), based on a February 2015 incident when he was arrested with drugs and a gun. (Titington Br. at 12-20.) Each challenge is unavailing.

### A. Standard of Review.

"This court reviews challenges to the sufficiency of the evidence supporting a criminal conviction in the light most favorable to the Government, and [it] must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012). "Circumstantial evidence alone can meet this burden," *id.*, as can "'the uncorroborated testimony of an accomplice,'" *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017) (quoting *United States v. Gallo*, 763 F.2d 1504,

37

1518 (6th Cir. 1985)), and all reasonable inferences and resolutions of credibility are made in the jury's favor. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

Titington takes a contrary view, asserting that "if, after viewing the evidence in the light most favorable to the prosecution, reasonable inferences from the evidence conflict, then the evidence is not sufficient to support the verdict." (Titington Br. at 13 (citing *Crosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982)).) But as this Court has explained, "[t]he permissible inferences to be drawn from [circumstantial] evidence need not be consonant only with an hypothesis of guilt," *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir. 1977) (citation omitted), and "need not exclude every logical hypothesis other than guilt," *United States v. Cecil*, 615 F.3d 678, 691 (6th Cir. 2010) (quotations omitted). Accordingly, the mere existence of competing inferences—some consistent with guilt, some consistent with innocence—does not demonstrate insufficiency.[12]

### B. Sufficient Evidence Supported the RICO Conspiracy Convictions.

Lucas and Kilgore challenge their convictions on Count One, charging RICO conspiracy. The RICO statute makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

---

[12] Titington takes issue with the district court's decision to deny his Rule 29 motion without a detailed evidentiary analysis. (Titington Br. at 14-15.) To preserve his sufficiency challenge for appellate review, Titington was permitted to rely on a general motion. But a defendant who chooses that approach cannot complain if the district court takes a similar approach when denying it.

38

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "The elements predominant in a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997).

The statute also makes it a crime "to conspire to violate" its substantive provisions. 18 U.S.C. § 1962(d). A RICO conspiracy exists if a defendant agrees with one or more others "to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," and it does not require proof of any overt act or proof that an individual defendant personally committed, or agreed to commit, any of the predicate acts making up the pattern of racketeering activity. *Salinas*, 522 U.S. at 64-66; *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008); *see also United States v. Nicholson*, 716 F. App'x 400, 405 (6th Cir. 2017) (RICO conspiracy requires the government to prove "that each defendant agreed (1) to associate with an enterprise that has activities affecting interstate commerce; (2) to participate in the conduct of the enterprise's affairs; and (3) that either he or another conspirator would engage in a pattern of racketeering activity").

Here, Lucas and Kilgore do not dispute that the GDs engaged in a pattern of racketeering activity that affected interstate commerce. Nor do they dispute that they each knowingly joined the conspiracy. Instead, Lucas and Kilgore argue that

39

insufficient evidence proved that the GDs were an "enterprise" within the meaning of the RICO statute. (Lucas Br. at 36-37; Kilgore Br. at 41-45.)

"The statute does not specifically define the outer boundaries of the 'enterprise' concept but states that the term 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). This definition reaches "businesslike entities" with an "ascertainable structure," such as "an organizational hierarchy, a framework for making decisions, an internal discipline mechanism, regular meetings, or a practice of reinvesting proceeds to promote and expand the enterprise." *Id.* at 954-56 (Stevens, J., dissenting) (cleaned up) (arguing that the definition should be limited to such entities). But it also goes further, "reach[ing] 'a group of persons associated together for a common purpose of engaging in a course of conduct,'" the existence of which can be established "'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Id.* at 944-45 (majority op.) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). Such association-in-fact enterprises "require[] only three structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to

40

pursue the enterprise's purpose.'" *Nicholson*, 716 F. App'x at 405 (quoting *Boyle*, 556 U.S. at 946).

The proof at trial easily satisfied these requirements. Indeed, the GDs qualified as an "enterprise" even under the more restrictive definition embraced by the *Salinas* dissenters: the GDs have an organizational hierarchy (including a national board of directors and a long list of officers with defined roles); a framework for making decisions (set out in the 17 laws); an internal discipline mechanism (GD arrests followed by smashings and eradications); regular meetings (where members take attendance and recite loyalty pledges); and a practice of reinvesting proceeds to promote and expand the enterprise (in the form of dues paid to the box). One of the gang documents introduced at trial even explicitly addressed the GDs' "Operational Structure":

> When it comes to the organization, the individuals are subordinate to the organization, the minority is subordinate to the majority, and the entire membership is subordinate to our honorable chairman and executive staff. Whosoever violates these Articles of Organization Structure will be charged with disruption of organizational unity and will be dealt with in that fashion as an enemy of the people. We have witnessed what comes from the lack of unity and discipline. Now let us observe what comes from unity and total discipline. If we are to become a power to reckon with, we must first take on our new concept. Everyone has a responsibility, and everyone must endure their share, for we make up this organization as individuals who have come together as a collective whole.

(R. 1645, TTR: Chaney, #15731-32.) If this is not an enterprise within the meaning of the RICO statute, it is difficult to imagine what would be.

41

Moreover, even without proof of the gang's formal organizational structure, evidence showed that the defendants here associated closely together over many years for common purposes, including making money through drug-trafficking, avoiding detection by law enforcement, and using violence to enhance their status and protect themselves and their profits from rival gangs. They were thus, at a minimum, an association-in-fact enterprise. *See, e.g.*, *Nicholson*, 716 F. App'x at 405-06; *United States v. Gills*, 702 F. App'x 367, 374 (6th Cir. 2017).

Lucas and Kilgore nevertheless insist that the GDs "were free agents[ who] sold drugs to whomever they wished at whatever price they wished, and did not give any share of the proceeds to GDs." (Lucas Br. at 36; *see also* Kilgore Br. at 46 ("The Gangster Disciples never received the proceeds of drug sales.").) In fact, the proof showed that the GDs required members to pay dues, and that each of the defendants made their money (and thus paid their dues) by selling drugs, since none of them had a legitimate job. Regardless, the existence of an enterprise does not require any particular proof that each member sent a specific percentage of his profits to a central account. *Cf. Boyle*, 556 U.S. at 948 (noting that an association-in-fact enterprise "need not have a name, regular meetings, [or] dues" and may include "an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence"). Just as a law firm or accounting firm may allow its members to keep all their own profits for themselves, *see, e.g.*, *Chicago Prof'l Sports Ltd. v. Nat'l Basketball Ass'n*,

42

95 F.3d 593, 598 (7th Cir. 1996) (describing "'eat what you kill'" compensation structure), a gang may be an enterprise even if only a small percentage of each member's profits—or none at all—gets consolidated into a central, shared account. Lucas and Kilgore's challenge on this point should therefore be rejected, and their RICO conspiracy convictions should be affirmed.

### C. Sufficient Evidence Supported the Drug Conspiracy Convictions, Including the Calculation of the Applicable Drug Quantity.

Kilgore next challenges the sufficiency of the evidence supporting his conviction on Count Two, charging drug conspiracy under 21 U.S.C. § 846. And while Titington does not challenge his conviction for the offense itself, he challenges the jury's findings that the drug conspiracy involved more than five kilograms of powder cocaine and 280 grams of crack cocaine. Both contentions are without merit.

#### 1. The evidence supported the convictions under 21 U.S.C. § 846.

"To sustain a conviction for drug conspiracy under section 846, the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007); *see also United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019) (noting the minor "semantic difference" between this three-element test and the two-element pattern jury instruction).

Ample evidence supported each of these elements. Numerous cooperating witnesses described how the GDs, over many years, (i) regularly purchased kilogram quantities of powder cocaine and cooked it into crack for resale; (ii) controlled geographic territories in which GDs (and only GDs) could safely sell drugs without competition; (iii) maintained a network of trap houses and vehicles for cooking, storing, and selling drugs; (iv) supplied members with guns to protect themselves and fellow members; and (v) provided a network for finding drugs in other cities at favorable prices. The jury also heard evidence about controlled buys and traffic stops in which each individual defendant was found with drugs. As such, the jury had a strong foundation to find that a conspiracy existed and that each defendant knew of it and voluntarily participated in it.

Kilgore nevertheless contends that no conspiracy existed because each gang member sold drugs independently. He primarily emphasizes that each gang member kept nearly all profits for himself and only occasionally offered modest discounts to fellow GDs. The evidence on this minor point was, at most, equivocal. One witness said that the GDs generally offered fellow members a better price on drugs than what they would offer outsiders. (R. 1646, TTR: Galbreath, #15854; R. 1475, TTR: Ford, #12632.) Another witness, however, stated that while he might shave a few dollars off the price when selling to a GD rather than a Vice Lord, "I'm not fixing to give you no cheap price just because you my brother." (R. 1655, TTR: Austin, #18391.)

But a drug conspiracy need not take any single form or adhere to a particular set of rules; all that is required is an agreement to violate the drug laws. So even if it were true that the GDs did not pool profits or offer each other discounts, that would not undercut the existence of a conspiracy, given the proof that the GDs collaborated with each other on territory, guns, and physical protection while selling drugs. But the evidence *did* show collective financing: (i) the GDs pooled at least some of their profits by using drug money to pay dues to the box; (ii) a member could borrow money from the box to buy drugs, with the understanding that he would later repay it; (iii) most GDs typically offered at least modest discounts to fellow gang members; (iv) GDs sometimes referred drug customers to fellow members if they temporarily lacked drugs to sell; and (v) members fronted large quantities of drugs to GDs who were on the lam, to allow them to support themselves through additional drug sales. This is more than enough to show the existence of a conspiracy.

Kilgore also argues (Kilgore Br. at 35-40) that even if a drug conspiracy existed at one point, it ended in 2008, when Rex Whitlock and Tray Galbreath were arrested with over eight kilograms of cocaine. But a disruption or realignment of the supply chain does not automatically convert one conspiracy into multiple conspiracies.[13] Instead, "[t]o prove a single conspiracy, the government need only

---

[13] A claim of multiple conspiracies is typically analyzed as a theory of prejudicial variance. *See, e.g.*, *United States v. Beals*, 698 F.3d 248, 258-59 (6th Cir. 2012). Here, Kilgore has not argued a variance, either below or on appeal. And the district

show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Smith*, 320 F.3d 647, 653 (6th Cir. 2003). "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Id.* Nor is a single conspiracy "converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy." *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002).

The GDs operated an overarching conspiracy to make money by selling drugs. And while different members played different roles at different times, there was always a collective venture directed toward a common goal. Kilgore's separate-conspiracies claim—whether framed as a sufficiency challenge or a prejudicial-variance challenge—therefore fails.

### 2. *The evidence supported the jury's finding of drug quantity, and the jury was properly instructed on the law.*

Titington challenges the jury's findings that the drug conspiracy involved more than five kilograms of powder cocaine and 280 grams of crack cocaine. His

---

court gave the pattern jury instructions on multiple conspiracies in any event. (R. 1666, TTR: Jury Instructions, 20892-93.) Regardless, the claim fails even if Kilgore's framing of it as a sufficiency challenge is correct.

46

argument on this point is largely premised on the claim that the district court misinstructed the jury when it told them that their finding of drug type and quantity could be based on what was attributable to each defendant either "as a result of his own conduct" or "the conduct of other coconspirators that was reasonably foreseeable to him," but need not include a finding "that the defendant *knew* that his offense involved this quantity of drugs." (R. 1666, TTR: Jury Instructions, #20891 (emphasis added).)[14] According to Titington, the district court should have required the jury to find that each defendant actually *knew* that his offense involved the triggering drug types and quantities.

As Titington acknowledges, his argument is reviewed for plain error (since it was not raised below) and foreclosed by circuit precedent. *See, e.g.*, *United States v. Hamm*, 952 F.3d 728, 739 (6th Cir. 2020); *United States v. Dado*, 759 F.3d 550, 569-71 (6th Cir. 2014); *United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003). He

---

[14] This Court has issued conflicting decisions on whether the applicable drug type and quantity in a § 846 case can be based solely on what the conspiracy as a whole actually *involved* or instead requires individualized proof tying that type and quantity to the defendant's personal conduct or the conduct of coconspirators that was reasonably foreseeable to him. *Compare United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008) *with United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000). *See also United States v. Young*, 847 F.3d 328 (6th Cir. 2017); *United States v. Gibson*, 874 F.3d 544 (6th Cir. 2017) (en banc) (considering the issue en banc but affirming the panel decision by an equally divided Court). The Court need not reengage with the issue here, since the jury found the applicable drug type and quantity under the more defendant-friendly *Swiney* standard—which, in the government's view, remains controlling authority in this circuit.

nevertheless maintains that recent Supreme Court precedent, in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), requires that his conviction be reversed.

This Court recently considered that very argument at length and rejected it. *United States v. Mahaffey*, 983 F.3d 238 (6th Cir. 2020). As such, the district court did not plainly err when it instructed the jury.

Under the controlling legal standard, the jury's finding regarding drug type and quantity was amply supported by the evidence. After all, the proof showed that the conspiracy involved vast quantities of powder and crack cocaine, greatly exceeding the statutory threshold. And circumstantial evidence permitted the inference that these quantities were reasonably foreseeable to Titington, given his longstanding role in the GDs and the fact that members—including Titington himself—were regularly involved in drug-trafficking.

## D. Sufficient Evidence Supported Titington's Convictions Under 21 U.S.C. § 841 and 18 U.S.C. § 924(c).

Titington next challenges his convictions on two counts stemming from an incident in which he was arrested with drugs and a gun. On February 15, 2015, Clarksville police received a call shortly before 3 a.m. about a car wreck with possible injuries. (R. 1644, TTR: Skinner, #15462-63.) When officers arrived, they found a silver Taurus crashed into a tree with the engine still running. (*Id.* at #15463-65.) Titington was unconscious behind the wheel. (*Id.*)

48

Police searched the car and found, on the driver's side floorboard, a loaded Glock 9mm pistol and a baggie containing 7.66 grams of cocaine. (*Id.* at #15466-70.) Police also found $743 in cash on Titington, plus a cell phone that included text messages related to drug trafficking, such as a text that Titington sent to Darden two months earlier, stating, "I got a half you can get. But you got to come get it." (R. 1645, TTR: Lockerman, #15499-05; R. 1645, TTR: Patterson, #15550-55.) Further investigation revealed that the Glock 9mm was the same gun that Titington had used six weeks earlier to shoot at two Vice Lords at a MiniMart. (R. 1662, TTR: Hodge, #20104-06.) Titington also stipulated that, at the relevant times, he was a convicted felon. (R. 1662, TTR: Stipulation, #20123-25.)

On the basis of this conduct, the jury convicted Titington of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841 (Count 40); possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count 41); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 42). (R. 831, Third Superseding Indictment, #6001-02; R. 1368, Titington Verdict Form, #10446-47.) On appeal, Titington challenges his convictions on Counts 40 and 42. The evidence was more than sufficient to sustain them.

"To establish a violation of § 841(a)(1), the government must prove the following elements: (1) knowing (2) possession of a controlled substance (3) with

49

intent to distribute." *United States v. Mackey*, 265 F.3d 457, 460 (6th Cir. 2001) (quotation omitted). "Circumstantial evidence alone can be sufficient to sustain a conviction." *Id.* Here, the evidence showed that Titington—like all GDs—was prohibited from using cocaine himself, but could and did sell cocaine to others on a regular basis. The presence of the gun, the cash, and the drug-related text messages further supported the conclusion that Titington possessed the cocaine that day because he intended to distribute it, not because he was saving it for personal use— a possibility unsupported by any proof. A reasonable juror could thus find Titington guilty on Count 40. *See id.* (affirming § 841 conviction on similar facts).

With regard to the possession-in-furtherance prong of § 924(c), the government must show "a specific nexus between the gun and the crime charged," such that the gun was capable of "promot[ing] or facilitat[ing]" the crime, rather than being in the vicinity by "mere chance of coincidence." *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016) (quotations omitted). Here, police found the gun in close proximity to the drugs, and both were within Titington's grasp, making the gun "quickly and easily available for use." *Id.* (quotations omitted). "Other factors that may be relevant to a determination of whether or not the in-furtherance-of requirement has been met include: (1) whether the gun was loaded, (2) the type of weapon, (3) the legality of its possession, (4) the type of drug activity conducted, and (5) the time and circumstances under which the firearm was found." *Id.*

(quotations omitted). These factors also support the inference that Titington possessed the gun in furtherance of his drug crime: the gun was loaded; it was of a type used for personal protection (rather than, say, hunting); it was illegally possessed, since Titington was a convicted felon; it was found next to a substantial quantity of drugs; and it was recovered at 3 a.m. from the floorboard of a wrecked car (which was registered to Titington's mother). That Titington had used the gun a few weeks earlier to shoot at rival gang members further supports the jury's conclusion that Titington possessed it specifically "to provide defense or deterrence" in the event that he encountered a threat while distributing the cocaine. *Id.* at 920 (quotations omitted). The jury's verdict on these Counts should therefore be affirmed.

## II. THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF DISCRETION, AND IN ANY EVENT DID NOT CONSTITUTE REVERSIBLE ERROR.

Darden next challenges the admission of testimony from four purported "surprise experts" (Darden Br. at 15-43) as well as the admission of certain testimony under the coconspirator exception to the hearsay rule (Darden Br. at 44-50). The district court did not err by admitting the evidence, and even if it did, any error would be harmless in light of the record as a whole.

### A. Standard of Review.

This Court typically reviews a district court's decision to admit or exclude evidence under a deferential abuse-of-discretion standard. *United States v. Young*,

847 F.3d 328, 349 (6th Cir. 2017). But if the defendant failed to raise a contemporaneous objection below, the evidentiary decision is instead reviewed for plain error. *Id.* This Court takes a similar approach to errors under Rule 16, reviewing preserved claims for abuse of discretion and forfeited claims for plain error. *See United States v. Faulkenberry*, 614 F.3d 573, 590 (6th Cir. 2010); *United States v. Jordan*, 544 F.3d 656, 667 (6th Cir. 2008).

## B. Evidence from Purported "Surprise Experts" Was Properly Admitted.

### 1. Relevant testimony.

Darden first argues that the district court abused its discretion by permitting four witnesses to give purportedly improper expert testimony. Those four witnesses testified as follows.

*Gregory Beebe*. Gregory Beebe was an ATF Task Force Officer and a former sergeant over the gang intelligence unit of the Clarksville Police Department. (R. 1643, TTR: Beebe, #14915-16.) For over a decade, Beebe investigated gangs in Clarksville, including the GDs. (*Id.* at #14915-17, 14922-23.) Gang violence in Clarksville began to escalate in 2006, in the wake of the murder of Sylvester Hockett (the GD known as "Mac Chicken") by members of the Bloods. (*Id.* at #14918-19.) Beebe explained that it was unusual for law enforcement to have been able to identify the Bloods as the perpetrators, because "[v]ictims are not willing to cooperate with the police. Witnesses are not willing to cooperate with the police

52

because we don't as a local agency have the capabilities of protecting them as much as a federal organization would." (*Id.* at #14919-20.) Neither Darden nor any other defendant objected to this portion of Beebe's testimony.

Beebe then began to testify about the founding of the GDs. (*Id.* at #14920.) Darden objected that Beebe had not been identified "as an expert on gangs." (*Id.*) The government responded that it was not offering Beebe as an expert but would "lay a foundation on his basis of knowledge of Gangster Disciples." (*Id.*) When the district court asked if that "t[ook] care of" his objection," Darden responded, "We would just ask the Court to be vigilant, as we will be, about [Beebe] sort of launching into law, exegesis on gangs." (*Id.*) The district court reminded Darden that he would "need to object," and Darden agreed that he would. (*Id.* at #14920-21.)

Beebe then testified that the GDs were founded in Chicago by Larry Hoover, and used certain symbols and numbers—such as the numbers 7 and 4, since G and D are, respectively, the seventh and fourth letters of the alphabet—to display their membership. (*Id.* at #14921-22.) Darden then raised the "same objection," reiterating that Beebe "has not been disclosed as a gang expert." (*Id.* at #14922.) The district court overruled the objection, noting that Beebe was "not being offered as an expert." (*Id.*) Beebe clarified that his knowledge consisted of not only trainings and other investigations, but the specific investigation into the Clarksville GDs, in which he had examined dues rosters, violation reports, and photographs of members traveling

53

to Memphis to celebrate Larry Hoover's birthday. (*Id.* at #14922-23.) Beebe had also personally observed symbols like six-pointed stars tattooed on the bodies of people he knew to be GDs. (*Id.* at #14923-24.)

Based on this investigation, Beebe identified each defendant, plus several other individuals connected to the case, as members of the Clarksville GDs. (*Id.* at #14925-33.) Darden objected that this testimony was "very conclusory" and asked that "they lay a foundation," which was overruled. (*Id.* at #14925-26, 14947.) Beebe later reiterated that his identification was based on his personal involvement in the investigation. (*Id.* at #14948.)

*John Harrell*. John Harrell was an ATF digital forensic examiner who had been trained to extract data from cell phones and had performed over 1,000 extractions. (R. 1644, TTR: Harrell, #15239-40.) As part of this investigation, Harrell was asked to extract data from two cell phones seized from Darden. (*Id.* at #15240-41.) After discovering that the cell phones were passcode protected, Harrell sent them to a company called Cellebrite to be unlocked. (*Id.* at #15241-43.) Cellebrite unlocked the phones and returned them to Harrell, who then processed the extracted data and created an extraction report. (*Id.* at #15243-44.)

When the extraction report from the first phone was offered into evidence, Darden objected based on the chain of custody, arguing that because no witness from Cellebrite had testified, there was "no way to know the reliability, the

54

trustworthiness of that extraction. Cellebrite itself has been subject to hacking" (*Id.* at #15245-47.) The district court overruled the objection, noting that a chain-of-custody challenge goes to the weight of the evidence, not its admissibility. (*Id.*) Harrell then recited the information extracted from the first phone, which included gang-related notes and text messages. (*Id.* at 15243-80.)

When Harrell turned to the second phone, Darden stated that he "object[ed] on the same grounds as before, but I would like to object on additional grounds"— namely, that "[u]nder Rule 702, this witness is not qualified to attest to the reliability or authenticity of this scientific evidence, and he's not been disclosed as an expert." (*Id.* at #15285.) The district court overruled this objection and admitted the evidence, which included additional gang-related text messages. (*Id.* at #15285-98.) On cross-examination, Harrell further explained that he "spot check[s] contacts, call logs, text messages" and photos to ensure that the extracted data matches the phone. (*Id.* at #15308-09.)

*J. Howard Patterson.* James Howard Patterson was a former assistant special agent in charge who had supervised the digital forensics section of the Tennessee Bureau of Investigation. (R. 1645, TTR: Patterson, #15533.) In that role, he had extracted data from cell phones and other devices on hundreds of occasions, and supervised other agents who did the same. (*Id.* at #15533-34.) As part of this investigation, Patterson extracted data from a cell phone seized from Titington after

55

the February 2015 incident in which he was found unconscious in his car. (*Id.* at #15535.) Patterson explained that, because the phone was locked, he had to physically disassemble the device and remove the memory card, which then allowed him to extract the data and create an extraction report. (*Id.* at #15535-36.)

The district court admitted the extraction report into evidence without objection. (*Id.* at #15538.) After Patterson testified about the identifying information associated with the phone, Darden raised the same "objection as to expert testimony" that was raised when Harrell testified—namely, that "[t]his gentleman was not disclosed as an expert." (*Id.* at #15542.) The district court overruled this objection, and Patterson testified about the contents of the phone, including the text message that Titington sent to Darden, stating, "I got a half you can get. But you got to come get it." (*Id.* at #15555.)

*James Atkins.* James Atkins was a Clarksville police officer who also worked as a federal crash investigator. (R. 1659, TTR: Atkins, #19486.) As part of this investigation, Atkins measured the distance between a barber shop where Darden sold drugs and the campus of Austin Peay State University. (*Id.* at #19487-88.) This distance was relevant to Count 15, which charged Darden with distributing cocaine within 1,000 feet of a public university, in violation of 21 U.S.C. §§ 841 and 860. (R. 831, Third Superseding Indictment, #5986-87.)

56

Atkins explained that he measured the distance using a LIDAR (or light detection and ranging) device, which is "an electronic unit that emits an infrared beam of light that's reflected off a solid object and returned to the unit. The unit divides the time that it takes that light to travel out and back in half and multiplies that by the speed of light to calculate the distance traveled." (R. 1659, TTR: Atkins, #19486.) Atkins explained that he had been trained and certified to use LIDAR devices. (*Id.* at #19486, 19502-03.) And in this case, he used two different brands of LIDAR device "just to confirm with one another," and "took two measurements with one LIDAR unit and another two measurements with a separate LIDAR unit at three separate locations to two separate buildings [on the campus]." (*Id.* at #19488.) Each measurement showed a distance of less than 1,000 feet. (*Id.* at #19500-02.)

Darden objected that this testimony "require[d] a scientific, technical, or specialized knowledge about a technology[,] that is LIDAR technology[,] to which this witness has not and cannot, without being an expert, testify as to its reliability or general acceptance in the scientific community." (*Id.* at #19497-98.) The district court overruled this objection. (*Id.*)

### 2. *The district court properly admitted the challenged testimony.*

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, *see* Fed. R. Evid. 602, while opinion testimony can be presented by either a lay or expert witness, *see* Fed. R. Evid. 701

& 702." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) (cleaned up).

Rule 701 permits a witness who "is not testifying as an expert" to testify "in the form

of an opinion" if the testimony is "(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact

in issue; and (c) not based on scientific, technical, or other specialized knowledge

within the scope of Rule 702." Fed. R. Evid. 701. Rule 702, in turn, provides that

"[a] witness who is qualified as an expert by knowledge, skill, experience, training

or education may testify in the form of an opinion or otherwise if" certain

requirements are met. Fed. R. Evid. 702. Specifically, the expert's "scientific,

technical, or other specialized knowledge" must "help the trier of fact to understand

the evidence or to determine a fact in issue"; the testimony must be "based on

sufficient facts or data"; it must be "the product of reliable principles and methods";

and the expert must have "reliably applied the principles and methods to the facts of

the case." *Id.*

"To determine whether a lay witness impermissibly offered expert testimony,

[this Court] look[s] to the witness's reasoning: 'lay testimony "results from a process

of reasoning familiar in everyday life," whereas "an expert's testimony results from

a process of reasoning which can be mastered only by specialists in the field."'"

*United States v. Jones*, 825 F. App'x 335, 343 (6th Cir. 2020) (quoting *United States

v. White*, 492 F.3d 380, 401 (6th Cir. 2007) and *State v. Brown*, 836 S.W.2d 530,

549 (Tenn. 1992)). Thus, a lay witness may testify "that 'a footprint in snow looked like someone had slipped, or that a substance appeared to be blood,'" but only an expert could say "that skull trauma caused the bruises on a victim's face." *White*, 492 F.3d at 401 (quoting *Brown*, 836 S.W.2d at 550). Likewise, a lay witness who uses a "home medical thermometer[]" may testify about a person's body temperature, but only an expert could determine a person's paternity by comparing blood samples. *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006). Here, none of the testimony fell within the ambit of Rule 702.

*Gregory Beebe*. Darden appears to challenge three aspects of Beebe's testimony: his statement that victims and witnesses in gang cases often refuse to cooperate with law enforcement; his identification of Darden as a member of the gang; and his brief references to the GDs' founding and symbols. Only the last claim is reviewed for abuse of discretion; the others are reviewed for plain error, since Darden did not object to the first statement below and objected to the second only for lack of foundation.

Regardless of the standard, all were properly admitted. None of the testimony relied on a process of reasoning that can be mastered only by specialists in the field. For example, experiences familiar from everyday life lead to the uncontroversial conclusion that victims of crimes committed by organized street gangs may be unwilling to cooperate with law enforcement. Likewise, testimony that the GDs were

founded by Larry Hoover and use symbols like pitchforks and a six-pointed star represent simple (and widely available[15]) historical facts, the grasp of which requires no specialized training. And Beebe's conclusion that Darden belonged to the gang—based on his years-long investigation of the GDs, including his review of gang rosters—reflected his personal knowledge and did not implicate specialized or esoteric reasoning.

Moreover, "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007). Thus, even if Beebe's testimony relied in part on specialized knowledge, that would not render his testimony "expert" here. His testimony was properly admitted.

*John Harrell and J. Howard Patterson.* Testimony from Harrell and Patterson was also properly admitted.[16] In testifying about the contents of certain cell phones, neither witness offered "testimony in the form of an opinion." Fed. R. Evid. 702. For example, neither witness sought to "define[] an ambiguous term" or "explain[] a

---

[15] *See* https://en.wikipedia.org/wiki/Gangster_Disciples.

[16] Darden did not raise a contemporaneous Rule 702 objection to the evidence extracted from the first of his two phones, so that claim is reviewed for plain error. The admission of the evidence from his second phone, and from Titington's phone, is reviewed for abuse of discretion.

60

technical concept," *Jones*, 825 F. App'x at 343, or otherwise interpret the data extracted from the phones. Instead, they testified about "the actions [they] took to extract the data," and then described the extracted data. *United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir 2019). This makes Darden's reliance on *Ganier*—which involved a witness's interpretation of complicated forensic data, 468 F.3d at 926—inapplicable.

Of course, the process of unlocking a phone and extracting its contents requires some specialized training. But it does not involve any *process of reasoning* that is unfamiliar in everyday life. If, during the course of an investigation, a law enforcement agent cracked a locked safe (pursuant to a search warrant), he could testify to what he found inside without being qualified as an expert, even though the act of safecracking requires specialized training. Similarly, an agent who unlocks a phone and extracts its data can testify as a lay witness, as courts have often held. *See, e.g.*, *United States v. Montijo-Maysonet*, 974 F.3d 34, 47-48 (1st Cir. 2020); *Chavez-Lopez*, 767 F. App'x at 434-35; *United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017); *United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014).

Moreover, even if some portion of Harrell and Patterson's testimony fell within the scope of Rule 702, it would still have been properly admitted despite the absence of formal qualification, since there is no need for a district court to formally qualify a witness as an expert when the "witness's qualifications are obvious."

61

*United States v. Nixon*, 694 F.3d 623, 629 (6th Cir. 2012) (quotations omitted). Here, Harrell and Patterson were experienced and qualified forensic examiners, and they had conducted hundreds of similar extractions in the past. Their qualifications were obvious, so the district court would have correctly admitted their testimony even if it was expert in nature.

*James Atkins.* Atkins also did not offer opinion testimony or seek to interpret data. Instead, he simply used a device that measures physical distances and reported the result, making his testimony analogous to that of a person who uses a thermometer to measure body temperature. *Cf. Ganier*, 468 F.3d at 926. And, like Harrell and Patterson, his qualifications were obvious, since he had been certified to use the LIDAR device and had used it many times. His testimony was also properly admitted.

### 3.   *Any error in admitting the testimony would be harmless.*

Even if the district court had erred by admitting any of the challenged testimony, reversal would be unwarranted. This is true whether the issue is analyzed as an evidentiary error or a Rule 16(a)(1)(G) violation.

*Purported evidentiary error.* "'[A]n error by a district court with respect to the admission of evidence is subject to harmless error analysis, and it is well settled that an error which is not of a constitutional dimension is harmless unless it is more probable than not that the error materially affected the verdict.'" *United States v.*

*Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (quoting *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008)); *see also United States v. Kettles*, 970 F.3d 637, 643-45 (6th Cir. 2020) (noting lingering uncertainty between a preponderance standard and a "fair assurance" standard for assessing the harmlessness of non-constitutional evidentiary errors). "'In determining whether an error is harmless, the reviewing court must take account of what the error meant to the jury, not singled out and standing alone, but in relation to all else that happened.'" *Davis*, 577 F.3d at 670 (quoting *United States v. Gibbs*, 506 F.3d 479, 485 (6th Cir. 2007)).

Here, there is no likelihood that the challenged testimony affected the jury's verdict, given that it was either cumulative of other evidence or concerned facts not in dispute. For example, numerous witnesses—including gang members testifying from personal knowledge—described the gang's history and symbols and identified Darden as a member (indeed, the leader) of the group. In a recorded call, Darden referred to himself as the regent. In closing argument, Darden even conceded that he was a member and leader of the gang, but argued that he "led a poorly organized bunch of rogues" and that "[m]ere membership in a gang d[id] not make [him] a criminal conspirator to murder." (R. 1665, TTR: Darden Closing, #20678-81, 20695.) Other witnesses confirmed from their own experience that cooperating against gang members can be dangerous. (*See, e.g.*, R. 1655, TTR: Austin, #18437-38 (after meeting with federal prosecutors, he "got beat real bad" by three GDs who

63

said that they knew he "was snitching").) The evidence from Darden and Titington's phones was also cumulative, given the number of witnesses who confirmed their gang membership and involvement in drug trafficking. Because the challenged testimony "was separately confirmed by witnesses who testified to the same or very similar facts," any error in admitting it was harmless. *United States v. Rios*, 830 F.3d 403, 416-17 (6th Cir. 2016).

Although Atkins's testimony about the distance between the barbershop and Austin Peay State University was not confirmed by other witnesses, it was uncontroverted at trial and implicated a fact that is susceptible to judicial notice since it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. 201(b)(2); *see also Carpenter v. Norfolk & W. Ry. Co.*, 145 F.3d 1330, 1998 WL 199723, at *4 (6th Cir. 1998) (table). Its admission, even if erroneous, was also harmless.

Moreover, the proof as a whole was overwhelming. Even if each piece of challenged testimony was disregarded, the jury had ample evidence to convict, given the evidence documenting numerous murders, assaults, drug sales, and other racketeering crimes. Any evidentiary error was harmless.

*Purported Rule 16 violation.* The same result would obtain if the Court analyzed Darden's claim as a discovery violation under Rule 16. Indeed, this is the more appropriate framework, given Darden's failure to challenge any of the

testimony under Rule 702's reliability standard. Instead, he simply argues that the testimony fell within the ambit of Rule 702 and, accordingly, should have been disclosed pre-trial disclosure under Rule 16(a)(1)(G).

Even if this objection had merit, the proper remedy would not have been to exclude the testimony entirely. A district court should impose "the least severe sanction necessary" to remedy a Rule 16 violation, with suppression "limited to circumstances in which it is necessary to serve remedial objectives." *Ganier*, 468 F.3d at 927 (quotations omitted). In choosing the appropriate sanction, a court should consider "(1) the reasons for the government's delay in producing the materials, including whether it acted intentionally or in bad faith; (2) the degree of prejudice, if any, to the defendant; and (3) whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or recess." *Id.* (quotations omitted).

In addressing this standard, Darden characterizes the challenged witness testimony as an unfair "surprise." (Darden Br. at 2, 13, 15, 20, 29, 32, 38, 41.) But a month before trial, the government not only disclosed the identity of each of these witnesses, it summarized their anticipated trial testimony. (R. 1171, Sealed Govt. Witness List.) Specifically, it advised Darden that: (1) Gregory Beebe "[m]ay testify regarding the genesis of the Gangster Disciples investigation and regarding various persons and locations relevant to the investigation" (*id.* at p. 4); (2) John Harrell

65

"[m]ay testify regarding extractions conducted from two cell phones seized in connection with the arrest of defendant Marcus Darden on June 29, 2017" (*id.* at p. 13); (3) Howard Patterson "[m]ay testify regarding the extraction of data from cell phones seized in connection with the arrest of defendant DeCarlos Titington on February 15, 2015" (*id.* at p. 22); and (4) James Atkins "[m]ay testify regarding the measurement of the distance between the controlled buy of narcotics from defendant Marcus Darden on January 24, 2014 and Austin Peay State University" (*id.* at p. 3). (The reports underlying the testimony had been produced in discovery even earlier.)

After receiving this witness list, Darden did not request a *Daubert* hearing,[17] file a motion *in limine* seeking to exclude the testimony under Rule 702, or otherwise raise the issue with the Court until after each witness was on the stand. As such, Darden's allegations of unfair "surprise" and bad faith by the government lack merit.

Nor has Darden shown prejudice. For example, he has not explained how the trial would have been different had the government identified these witnesses as experts and provided earlier or more thorough summaries of their testimony. Moreover, any such assertion—if timely raised to the district court—could have been cured by postponing these witnesses to later in the six-week trial. Accordingly, any alleged Rule 16 violation would not warrant reversal here. *See, e.g.*, *White*, 492 F.3d at 407.

---

[17] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## C. Testimony Relaying Statements by Coconspirators Was Properly Admitted.

### 1. Relevant testimony.

Darden next argues that the district court abused its discretion by admitting testimony from two witnesses who relayed statements from coconspirators. The challenged testimony is as follows.

*Tray Galbreath.* Galbreath, a former treasurer of the GDs, testified about the gang's history, membership, and structure. Among other things, he described a 2006 incident when he was sitting on a porch as Darden and Whitlock pulled up and motioned for him to come over. (R. 1647, TTR: Galbreath, #16181-83.) When Galbreath did, Whitlock said, "Here, bruh, take this," and handed him a "hoodie" wrapped around some guns, at least one of which was still warm. (*Id.* at #16182-84.) Darden and Whitlock, who looked "anxious" and "jittery"—like "something happened"—drove away, and Galbreath heard sirens. (*Id.*)

A day or two later, Whitlock came to retrieve the guns from Galbreath and told him "[t]hat they had shot Lil Will. You know, that's why they needed me to keep the guns, because they was – they had just did that when he saw me and gave me the guns." (*Id.* at # 16185-86.) Given the context, Galbreath understood Whitlock's reference as implicating himself and Darden in the shooting. (*Id.*) Whitlock further explained to Galbreath that they had shot Miller "[t]o put GD on the map," and "[l]et the streets know that GD is a power to be reckoned with." (*Id.*

67

at # 16186-87.) Galbreath considered that murder to be "the beginning" of the GDs' rise to prominence in Clarksville. (*Id.* at #16187-88.)

*Johnny Austin.* Austin, a former chief of security for the GDs, also testified about the gang's history, membership, and structure. Among many other incidents, Austin described a 2014 meeting where a GD called "Mac T" told him about a recent smashing he received as a result of a violation. (R. 1655, TTR: Austin, #18341-44.) Mac T told Austin that he "got beat up real bad," and that the beating had been ordered by Darden and administered by other members. (*Id.* at #18344-45.) Austin saw that Mac T's face was "swoled up real bad," and he was limping and leaning against another GD for support. (*Id.*)

Mac T had previously been the regent for the 615 region, but had stepped down from a leadership position to run his car wash (*Id.* at #18344.) He told Austin and others that, in light of his former position, he should have received leniency. (*Id.*) The other GDs at the meeting told Mac T that as long as he continued to pay his dues and allow the gang to use his car wash, he could have "a grace period" to get himself together, because "he was really terrorized" by the beating. (*Id.* at #18346.) After that meeting, Mac T would continue to "fool with a couple of [the GDs]," but would "never click up or come to meetings or nothing." (*Id.*)

68

### 2. The district court properly admitted the challenged testimony.

A statement is not hearsay if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Darden does not dispute that the out-of-court statements by Whitlock and Mac T were made by a coconspirator during the conspiracy. He argues, however, that neither statement was made in furtherance of the conspiracy.

"A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy." *United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998) (quotations omitted). "'[S]tatements "in furtherance" of a conspiracy can take many forms,' such as keeping co-conspirators advised, or concealing aspects of the scheme." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quoting *United States v. Doerr*, 886 F.2d 944, 951-52 (7th Cir. 1989)). "This requirement is satisfied when the statements are made to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears." *United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005). "Statements that prompt a coconspirator to act in a matter that facilitates the carrying out of the conspiracy, or that serve as a necessary part of the conspiracy by concealing or impeding the investigation, are also made in furtherance of the conspiracy." *Id.* "[A] statement may be made in furtherance of a conspiracy even if not exclusively, or even primarily, made to further the

69

conspiracy." *United States v. Bailey*, 973 F.3d 548, 561 (6th Cir. 2020) (quotations omitted). The statements here easily meet that standard.

Whitlock's statement to Galbreath—that he and Darden had shot a rival gang member—furthered the conspiracy by apprising Galbreath of the conspiracy's progress and explaining why he had needed to hide the weapon. Moreover, the act of claiming credit for the shooting is precisely what "put GD on the map" in Clarksville, thus advancing the conspiracy's core objectives.

Mac T's statement to Austin—that Darden had ordered his smashing—likewise furthered the conspiracy by explaining to fellow members that even a former gang leader could be severely punished for violating gang rules. And while Mac T's involvement in the gang largely ended after that meeting, he was still a coconspirator at the time he made the challenged statement, as evidenced by the fact that other GDs offered him a grace period going forward so long as he continued to pay dues and grant them access to his car wash. As such, the challenged statements met the requirements of Rule 801(d)(2)(E) and were properly admitted at trial.

### 3. *Any error in admitting the testimony would be harmless.*

Finally, any error in admitting the challenged testimony was harmless. *See Kettles*, 970 F.3d at 643-45.[18] Even without Whitlock's out-of-court statement,

---

[18] Darden rightly does not suggest that either statement was testimonial within the meaning of the Confrontation Clause, so the claimed error is non-constitutional in nature.

Galbreath's testimony provided ample circumstantial evidence to infer that Whitlock and Darden had just shot Miller. Moreover, Miller's shooting did not underlie any substantive count and was simply one of 76 overt acts of the RICO conspiracy. The jury had ample basis to convict even without this one act.

Any assertion of prejudice with respect to Mac T's statements is even less compelling. Carlos Jordan testified that Darden told him about his involvement in Mac T's smashing, since Jordan (the gang treasurer) would have to pay the club owner to repair the damage caused by the smashing. (R. 1658, TTR: Jordan, #19170-71.) And, as above, the smashing of Mac T did not undergird any substantive count. Darden's claim of reversible error should be rejected.

### III. THE JURY VERDICT FORM DID NOT DEPRIVE LUCAS OF A UNANIMOUS VERDICT, AND HIS CUMULATIVE ERROR CLAIMS LACK MERIT.

Lucas argues that "the lack of a special verdict by the jury on the alleged predicate acts, coupled with the trial court's determination of insufficient evidence of the murder predicate, denied Mr. Lucas his Constitutional right to a unanimous verdict." (Lucas Br. at 23-29.) Lucas also raises "cumulative error" claims: (1) that his trial should have been severed; (2) that a new trial is warranted under *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) that a juror engaged in misconduct. (Lucas Br. at 45-50.) These claims fail.

71

## A. Standard of Review.

As Lucas concedes, he did not raise any of these claims below. "Where trial counsel fails to object to a trial  error raised on appeal, the plain error standard applies." *United States v. Lanham*, 617 F.3d 873, 883 (6th Cir. 2010); Fed. R. Crim. P. 52(b).

## B. Lucas Was Not Deprived of a Unanimous Verdict.

"Under the Sixth Amendment, a criminal defendant has a right to a unanimous jury verdict in federal court." *United States v. Hall*, 979 F.3d 1107, 1116 (6th Cir. 2020) (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020)). While this right requires a jury to "unanimously agree that the government proved each *element* of a crime beyond a reasonable doubt, [the jury] need not agree on the *facts or means* underlying each element." *United States v. Wilson*, 579 F. App'x 338, 346-47 (6th Cir. 2014) (citing *Richardson v. United States*, 526 U.S. 813, 817-18 (1999) (emphasis added).

As applied to the RICO-conspiracy count, the jury had to unanimously find "that each defendant agreed (1) to associate with an enterprise that has activities affecting interstate commerce; (2) to participate in the conduct of the enterprise's affairs; and (3) that either he or another conspirator would engage in a pattern of racketeering activity." *Nicholson*, 716 F. App'x at 405. And while "[a] pattern of racketeering requires a minimum of two predicate acts," *Fowler*, 535 F.3d at 419,

72

the jury was not required to agree on *which* two or more acts constituted the pattern of racketeering activity. *See Rios*, 830 F.3d at 434; *Wilson*, 579 F. App'x at 347 ("[T]o convict a defendant of RICO conspiracy, the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit."). The jury's failure to make such findings in this case does not constitute error.

This Court has not fully resolved whether "the jury must be unanimous as to the *types* of predicate racketeering acts that someone would commit." *Rios*, 830 F.3d at 434 (quotations omitted); *see also United States v. Schiro*, 679 F.3d 521, 534 (7th Cir. 2012). But no such question is present in this appeal, because the district court instructed the jury that its "verdict must be unanimous as to which type or types of predicate racketeering activity that the particular defendant agreed would be committed." (R. 1666, TTR: Jury Instructions, #20872.) As the court explained, "The indictment charges several types of racketeering activity, including, A, acts involving murder; B, drug trafficking; C, witness, victim, or informant tampering; D, obstruction of justice; and E, interstate travel in aid of racketeering." (*Id.*; *see also* R. 831, Third Superseding Indictment, #5967-68.) The jury was thus required to find, "for example, at least two acts of trafficking in controlled substances, or at least one act of trafficking in controlled substances and one act of murder or witness tampering, or any combination thereof of the type or types of racketeering activity charged in the indictment." (R. 1666, TTR: Jury Instructions, #20872.)

73

Accordingly, the degree of unanimity required of the jury was at least as great as the law requires, if not more so. No decision of this Court required the jury to identify on a special verdict form each type of predicate racketeering activity it had found—particularly where, as here, the defendants did not request one. *See United States v. Ledbetter*, 929 F.3d 338, 365 (6th Cir. 2019). Instead, a special verdict form is required only "when a finding of one alternative element over another is used to enhance a sentence beyond what would otherwise be the statutory maximum." *Id.*

That is precisely what happened here. Under the RICO statute, the default statutory maximum is 20 years, but it increases to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). To trigger this increased statutory maximum, the indictment must allege, and the jury must find, that the violation was based on a racketeering activity with a statutory maximum of life. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000). As such, the verdict form here asked the jury to determine whether the RICO conspiracy included such an offense—that is, at least one act involving murder, or distribution of at least 5 kilograms of powder cocaine or 280 grams of crack cocaine. (R. 1366, Lucas Verdict Form, #10435-36.) The enhanced statutory range applied if the jury found any one of these aggravating facts, and the jury found them all. (*Id.*)

Lucas's argument misapprehends of the significance of these penalty-enhancing findings. Given the limited purpose of the verdict form, the jury did not

conclude that the conspiracy involved two (and only two) predicate racketeering activities (*i.e.*, exactly one murder and exactly one drug offense). Instead, the verdict form reflected the jury's conclusion that, *in addition* to a pattern of racketeering activity, the RICO conspiracy contemplated three racketeering activities carrying a statutory maximum of life imprisonment: acts involving murder, distribution of more than 5 kilograms of powder cocaine, and distribution of more than 280 grams of crack cocaine. The jury could have convicted even if it had found that *none* of the enhanced penalty provisions applied. It follows that any subsequent decision to "remove" one of these findings would cast no doubt on the underlying guilty verdict.

Lucas's argument also misapprehends of the significance of the district court's sentencing findings. The Probation Office recommended that Lucas be held accountable for his personal involvement in planning "a shooting at the Plush nightclub." (R. 1608, Lucas PSR, #14573.) In the Probation Office's view, Lucas's conduct qualified as conspiracy to commit murder under U.S.S.G. § 2A1.5(a). (*Id.*) As the district court explained, this was the only murder-related racketeering activity that influenced Lucas's guidelines calculation, because "the presentence report only takes account of the murders . . . in which defendant personally participated." (R. 1676, Lucas Sentencing Tr. Vol. II, #21291.)[19] The district court sustained Lucas's

---

[19] The government objected to this approach and urged the court to calculate each defendant's offense level by reference to criminal acts that were within the scope of the conspiracy and reasonably foreseeable. (R. 1533, Govt. Sentencing Position.)

objection to this guideline, however, based on the court's skepticism regarding the government's proof of this shooting. (*Id.* at #21298.)[20]

The district court's unwillingness to find, for purposes of sentencing accountability, that Lucas participated in the planned Plush Nightclub shooting in no way casts doubt on the jury's verdict that he joined the broader RICO conspiracy. The district court evidently understood as much, given that it rejected Lucas's sufficiency challenge (and his request for a new trial) in the same opinion that it granted Burks a new trial based on its concerns about Dowlen's credibility. (R. 1460, Mem. Op.) As such, this case is readily distinguishable from *United States v. Driver*, 535 F.3d 424 (6th Cir. 2008), where the jury found the defendant responsible for exactly two racketeering activities, and this Court found that one of those activities was supported by insufficient evidence. *Id.* at 430-33.

Lucas's claim also fails on its own terms, since the jury's drug-related findings involved two separate predicates: distributing 5 kilograms or more of powder and

---

Although the government maintains that the court's approach was mistaken, it has not appealed the issue, and any error on this point redounded to the defendants' favor.

[20] At sentencing, the district court generally declined to find any guidelines-enhancing fact that relied solely on the testimony of Danyon Dowlen. (R. 1679, Consolidated Sentencing Tr., #21600-10; R. 1675, Titington Sentencing Tr., #21236-37.) Although the district court's skepticism of Dowlen's testimony was misplaced, *see Burks*, 974 F.3d at 626 (noting that the district court "saw inconsistencies in [Dowlen's] testimony that the record does not bear out"), that issue is not before the Court on appeal.

distributing 280 grams or more of crack. Even without the murder-related predicate, then, the jury made two unanimous findings that independently supported its decision to convict Lucas. Lucas's claim to have been retroactively deprived of a unanimous jury verdict by the district court's finding should be rejected.

### C. Lucas's Additional Claims of Cumulative Error Are Unavailing.

Finally, Lucas raises three claims under the heading of cumulative error. Whether the Court considers them individually or collectively, no relief is warranted.

*Severance.* A single indictment may charge multiple defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). If the joinder of defendants "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "[A]s a general rule, persons jointly indicted should be tried together," and "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quotations omitted). "Even where the risk of prejudice is high, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* (quotations omitted).

Had Lucas moved for severance below, he would now be required to "show compelling, specific, and actual prejudice from the [district] court's refusal to grant the motion." *Id.* (quotations and alterations omitted). Lucas did not, however, seek such relief below. This Court has issued conflicting decisions on whether such an omission constitutes waiver or forfeiture, *see United States v. Sherrill*, 972 F.3d 752, 762 (6th Cir. 2020). The former would bar appellate review; the latter would simply restrict it to plain error.

Even under the latter standard, Lucas cannot prevail. Because Lucas was charged with RICO conspiracy, all the key evidence would have been admissible against him in a separate trial, even if he did not personally and directly participate in the specific criminal acts. Thus, a severance would not have materially altered the nature or quantum of evidence against him, which precludes him from showing prejudice. *See United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (no prejudice from joint trial on conspiracy charge where the challenged evidence "would have been admissible against [the defendant] in a separate trial").

Moreover, the district court instructed the jury "to separately consider the evidence against each defendant on each charge and to return a separate verdict for each one of them." (R. 1666, TTR: Jury Instructions, #20855.) Juries are "presumed capable of sorting out the evidence and considering the case of each defendant separately." *Driver*, 535 F.3d at 427 (quotations omitted). And there was concrete

evidence that the jury did so here, given that, on Count Two, Lucas was held responsible for a lower drug quantity than his co-defendants, and other defendants were acquitted on certain charges. Indeed, the district court observed at sentencing that the jury was "diligen[t] in following the instructions. They didn't just go through and check—I mean, they found not guilty on some and changed the drug amount on others." (R. 1679, Consolidated Sentencing Tr., #21547.) This circumstance shows "that the jury . . . was able to attribute to each [defendant] evidence pertinent to that particular party," *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985), foreclosing Lucas's suggestion of prejudice.

*Brady Claim.* While preparing for Brandon Hardison's trial (which the district court had severed), the government discovered two investigatory reports that it believed—but could not confirm—had been disclosed prior to trial in this case, including a report documenting a pretrial interview with Dowlen. (R. 1689, Response.) At trial, and in nearly all his interviews, Dowlen said that when Burks confessed to him that he had murdered Malcolm Wright, Burks was carrying a .45 caliber pistol that he described as a "twin" to the murder weapon. But in one pretrial prep session more than six years after the murder, Dowlen said that the gun may have been a .45 caliber pistol or a .40 caliber pistol. The undisclosed report noted this equivocation. Lucas now complains that this nondisclosure violated *Brady*.

Lucas failed to seek a new trial on this basis, so his claim is reviewed for plain error. Burks did present such a claim, however, and the district court found that the undisclosed reports would not have affected the jury's verdict on Counts One and Two. (R. 1685, Motion; R. 1703, Memorandum.) The district court's ruling reflected an appropriate exercise of its discretion: in light of the overwhelming evidence about dozens of predicate racketeering activities, Dowlen's minor equivocation about one detail of a single murder would not have changed the result of his trial. Given that Lucas was not charged with a substantive offense based on this crime, and considering the district court's analysis rejecting Burks's motion for a new trial on a similar *Brady* claim, Lucas cannot demonstrate plain error.

<u>*Juror Misconduct.*</u> During deliberations, one juror advised the district court that another juror had made "uncalled for" comments in the jury room. (R. 1670, TTR, #20990-91.) With the agreement of each defendant, the district court summoned the jurors reminded them to be "respectful" and "professional toward each other," and not to "demean or belittle each other." (*Id.* at #20996-97.) No juror raised further concerns during deliberations, and no defendant lodged an objection.

Lucas now claims that the district plainly erred by failing to declare a mistrial *sua sponte* on the basis of juror misconduct. But this minor, one-time complaint about the civility of deliberations at the end of a six-week trial does not amount to misconduct or invite an inference of prejudice.

The alleged misconduct also did not authorize the district court to grant a mistrial *sua sponte*. Even when an error occurs, a defendant "may nonetheless desire to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States v. Dintz*, 424 U.S. 600, 607-08 (1976) (quotations omitted). In light of "the defendant's right to pursue this course," a district court should not grant a mistrial *sua sponte* absent "circumstances of manifest necessity." *Id.* No such circumstances were present here.

In sum, none of these forfeited claims involve error. And "[b]ecause cumulative error analysis examines only actual errors, the accumulation of non-errors cannot collectively amount to a violation of due process." *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017) (quotations omitted).

## IV.  THE SENTENCES IMPOSED WERE REASONABLE.

Titington and Lucas challenge their sentences. Titington argues that "the district court failed to recognize that it had discretion" to depart downward under U.S.S.G. § 2K2.23. (Titington Br. at 31-35.) In the alternative, he contends that U.S.S.G. § 5G1.3 is facially unconstitutional. (*Id.* at 35-37.) Lucas argues that the district court miscalculated the base offense level and erred by adding two levels for possession of a firearm. (Lucas Br. at 38-41.) He also argues that the 240-month sentence—which represented a slight upward variance from the 188-235-month range—was inadequately explained and substantively unreasonable. (*Id.* at 41-45.)

81

## A. Standard of Review.

This Court normally "review[s] claims of both procedural and substantive unreasonableness for an abuse of discretion," and reviews "the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019). But where, as here, the defendant contends that the district court committed procedural error by inadequately explaining the sentence, the claim is reviewed for plain error absent a timely objection. *See United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc).

## B. Titington's Sentence Was Reasonable.

### 1. Relevant facts.

The Probation Office calculated Titington's guidelines range at 324-405 months, to be followed by 60 months on the § 924(c) count. (R. 1606, Titington PSR, #14490.) This calculation, which featured an offense level of 36, reflected Probation's conclusion that Titington shot committed attempted murder when he shot at the two Vice Lords in the Mini Mart incident. (*Id.* at #14465-67.)

Titington objected to the attempted-murder cross-reference (*id.* at #14499), which the district court sustained, finding that the shooting was "more aptly described as aggravated assault" (R. 1675, Titington Sentencing Tr., #21242). This ruling (when combined with the court's other guidelines-related findings), reduced Titington's total offense level to 30, and reduced his guidelines range on the non-

82

924(c) counts to 168-210 months. The ruling also meant that the Mini Mart shooting did not affect the offense level or applicable guideline range, which were now driven by the drug weight. (*Id.* at #21244-45.)

The Probation Office noted that Titington had previously been convicted of aggravated assault based on the Mini Mart shooting and had completed his state sentence after serving 52 months. (*Id.* at #14488.) Because this fully discharged sentence was for "a case that is considered to be relevant conduct to the instant offense," the Probation Office noted that a departure might be warranted under § 5K2.23.[21] (*Id.* at #14488, 14491.) In his sentencing memorandum, Titington explicitly requested a 52-month downward departure under § 5K2.23. (R. 1547, Titington Sentencing Mem., #13685-86.)

At sentencing, the district court confirmed that it had reviewed both the PSR and Titington's sentencing memo. (R. 1675, Titington Sentencing Tr., #21229-30, 21262, 21271.) And it specifically discussed with both the government and defense counsel whether a 52-month downward departure was appropriate (*id.* at #21259-

---

[21] Section 5K2.23 provides: "A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of §5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment or Anticipated Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense."

60, 21262), before ultimately telling Titington, "I'm not going to depart, as suggested by your counsel, for the 52 months because I think that's inappropriate and not justified by the guidelines" (*id.* at #21278-79).[22] The court imposed a total sentence of 270 months' imprisonment. (*Id.* at #21279.)

### 2. *The district court understood its discretion.*

This Court has "consistently held that the decision by a district court not to depart downwards from the Guidelines is not reviewable on appeal unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Mitchell*, 681 F.3d 867, 880 (6th Cir. 2012) (quotations omitted). The district court clearly understood that it had such discretion here: the PSR noted the possibility of a departure, Titington requested that the court exercise its discretion, and the court specifically asked the government whether it should do so, before ultimately concluding that a departure under the circumstances would be "inappropriate and not justified by the guidelines." (R. 1675, Titington Sentencing Tr., #21278-79.) Because the court understood its discretion, its decision not to do so is unreviewable.

---

[22] The district court likely declined to depart because the Mini Mart shooting did not affect Titington's guidelines range. The requested departure would thus have granted him an unwarranted windfall, and therefore not have been "fashioned to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5K2.23.

### 3. *U.S.S.G. § 5G1.3 is not unconstitutional.*

In the alternative, Titington asks the Court to declare § 5G1.3 unconstitutional, on the ground that it treats undischarged and fully discharged sentences differently without a rational basis. As Titington concedes, he did not raise this claim below, so it is reviewed for plain error. The claim is also foreclosed by binding circuit precedent. *See United States v. Dunham*, 295 F.3d 605, 610-11 (6th Cir. 2002); *see also United States v. White*, 617 F. App'x 545, 552 (6th Cir. 2015). Because the district court correctly followed governing law, Titington's sentence should be affirmed.

## C. Lucas's Sentence Was Reasonable.

### 1. *Relevant facts.*

The Probation Office calculated Lucas's offense level at 39 and his guidelines range at 360 months to life. (R. 1608, Lucas PSR, #14586.) In calculating the offense level for the RICO conspiracy count, the PSR noted that Lucas was personally responsible for three underlying racketeering offenses: (1) conspiracy to commit murder, in connection with the planned Plush Nightclub shooting; (2) conspiracy to distribute cocaine; and (3) interstate travel or transportation in aid of racketeering. (*Id.* at #14572-73.)

The offense level for the conspiracy to commit murder was 33. (*Id.*) The offense level for the drug conspiracy and the racketeering-related interstate travel

85

(which were grouped for guidelines purposes) was 37. (*Id.* at #14573-74.) This latter offense level was based on four related findings. First, the Probation Office calculated the applicable drug weight by relying on the jury's findings on Count One—holding Lucas responsible for distributing at least 5 kilograms of powder cocaine and 280 grams of crack cocaine—which yielded a base offense level of 30. (*Id.* at #14573.) Second, the Probation Office added two levels under U.S.S.G. § 2D1.1(b)(1), because Lucas "was known to carry firearms during the distribution of crack cocaine." (*Id.*) Third, the Probation Office added two levels under U.S.S.G. § 2D1.1(b)(12), because Lucas "maintained 'stash' and 'trap' houses in Clarksville, Tennessee, and Guthrie, Kentucky." (*Id.* at # 14574.) Fourth, the Probation Office added three levels under U.S.S.G. § 3B1.1(b), because Lucas "was a main distributor of crack cocaine for the Gangster Disciples," making him a "manager or supervisor." (*Id.*) Lucas objected to all of these calculations. (*Id.* at #14593-97; R. 1540, Lucas Position Regarding PSR.)

Lucas's sentencing proceeded in three steps. First, the district court held a consolidated hearing with all of the defendants to resolve objections to the PSRs. (R. 1679, Consolidated Sentencing Tr.) Second, the court heard Lucas's allocution and heard from his friends and family. (R. 1699, Lucas Sentencing Tr. Vol. I.) Third, the court ruled on the disputed guidelines issues, heard argument about the 18 U.S.C. § 3553(a) factors, and imposed sentence. (R. 1676, Lucas Sentencing Tr. Vol. II.)

86

The district court sustained Lucas's objections to the conspiracy-to-commit-murder cross-reference and the stash-house and managerial-role enhancements. (R. 1676, Lucas Sentencing Tr. Vol. II, #21298-21300.) The court overruled, however, Lucas's objection to the drug-weight calculation and the firearm enhancement. (*Id.*)[23] As the court explained, the drug weight was established by the jury's findings, and the trial testimony established that Lucas possessed a firearm. (*Id.*) These rulings resulted in an offense level of 32, which, when combined with a criminal history category of V, resulted in an advisory range of 188-235 months. (*Id.* at #21301-03.)

After hearing from the parties, and engaging in an extended colloquy with Lucas, the district court imposed a sentence of 240 months' imprisonment. (*Id.* at #21337.) The court offered a lengthy explanation for how it selected that sentence, and Lucas voiced no objection its adequacy. (*Id.* at #21339.) The court also stated that if its "calculation of the guidelines is wrong, then the Court would have imposed the same sentence applying all of the 3553(a) factors as a whole." (*Id.*)

### 2. *The district court findings regarding drug weight and firearm possession were correct, and any error was harmless.*

In calculating the applicable drug weight, the district court relied primarily on the jury's findings on Count One, as it was entitled to do. *See, e.g.*, *United States v.*

---

[23] Lucas raised a separate objection to the drug weight for purposes of the drug-conspiracy count, which the district court sustained. (R. 1676, Lucas Sentencing Tr. Vol. II, #21300.)

*Cockett*, 330 F.3d 706, 711 (6th Cir. 2003) (a sentencing court "cannot rely on a finding that directly conflicts with the jury's verdict"). The court's finding also tracked the trial testimony and other evidence at sentencing. For example, one witness testified that Lucas and Burks were the principal suppliers to the GDs in 2011 and 2012, and described seeing them packaging a shoebox full of crack at a trap house. (R. 1473, TTR: Dowlen, #12121-22.) Another witness (whose grand jury testimony was admitted as substantive evidence) testified that he saw Lucas cooking powder cocaine into crack and later selling it. (R. 1321, TTR: Daniels, #10224-26.) Law enforcement also conducted several controlled buys from Lucas in 2015, buying roughly an ounce of crack cocaine each time. (R. 1649, TTR: Anderson, #16815-35.) Other circumstantial evidence corroborated the picture of Lucas as a drug dealer, including a March 2012 incident when he and Darden were stopped in a car and Lucas was found with $2,600 on him. (R. 1648, TTR: Blanchard, #16578.)

In addition, Lucas acknowledged in his allocution that he had sold drugs since he was 17 or 18 (*id.* at #21321-27), and he had previously been convicted for selling cocaine, based on a series of four controlled buys in 2007, which fell within the period of the charged conspiracy (R. 1608, Lucas PSR, #14576). *See United States v. Chisom*, 249 F. App'x 406, 412-13 (6th Cir. 2007) (a district court can rely on a defendant's admissions at sentencing). As the district court told Lucas, "the overwhelming evidence as it relates to you pertains to your drug trafficking activity,"

in which "you sold drugs" and "were the source of drugs for yourself and others." (R. 1676, Lucas Sentencing Tr. Vol. II, #21331-32.) This record amply supports the district court's drug-weight finding; no clear error occurred.

The record likewise supports the district court application of the firearm enhancement. A witness at trial testified that Lucas had a "nice share" of guns, including "[a]ssault rifles, handguns, AKs, HKs," which he stored at a house in Guthrie. (R. 1472, TTR: Dowlen, #12021-22.) Other witnesses testified that all \GDs had regular access to guns and were expected to carry them for protection. (R. 1646, TTR: Galbreath, #15854-60; R. 1655, TTR: Austin, #18368-69.) During the March 2012 traffic stop of Lucas, police found a gun was under the driver's seat—although Darden later claimed ownership. (R. 1648, TTR: Blanchard, #16575.) Lucas also had a conviction for unlawfully possessing a firearm, based on a 2008 incident (again, during the period of the charged conspiracy) when Lucas crashed his car and fled from police, who found four loaded handguns in his vehicle. (R. 1608, Lucas PSR, #14577.) The district court did not err by applying the two-level enhancement.

Finally, any error in calculating the offense level would be harmless in light of the court's statement that it would have imposed the same sentence regardless under § 3553(a). *See, e.g.*, *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016); *United States v. Morrison*, 852 F.3d 488, 491-92 (6th Cir. 2017). Lucas did not object to that statement, and there is no evidence that it was mere "boiler-plate

89

language" included in the court's "standard sentencing colloquy, even in cases where the parties do not object to the Sentencing Guidelines calculation." *Cf. United States v. Montgomery*, 969 F.3d 582, 583 (6th Cir. 2020) (emphasis omitted).

### 3.  *The district court adequately explained the sentence.*

The district court's explanation was more than sufficient. The court explained that the chosen sentence would  "incapacitate each member who was part of the Gangster Disciples" and "send a message of general deterrence to other Gangster Disciples members, as well as to all that engage in acts of violence or drug trafficking with or without firearms." (R. 1676, Lucas Sentencing Tr. Vol. II, #21329.) The court tailored Lucas's sentence to his individual conduct, given that he was "a member of the Gangster Disciples for a very, very long time," during which he had "a consistent pattern of drug trafficking activity" and possessed, or had access to, firearms. (*Id.* at #21332-33.)

The court also described Lucas's personal history, observing, for example, that he grew up in a home where his father was a drug dealer and addict. (*Id.* at #21333.) The court noted, however, that Lucas's sister (who grew up in the same household) had resisted a life of crime and instead earned a master's degree and pursued a career in social work. (*Id.* at # 21334.) The court also remarked on Lucas's fairly extensive criminal history, which "has shown a persistent disrespect for the law." (*Id.*) The court furthered considered Lucas's age and how the sentence would

affect his likelihood of recidivism, based on Sentencing Commission statistics. (*Id.* at #21335.) Finally, the court compared Lucas to his co-defendants, to ensure that the sentence "d[id] not create any sentencing disparities." (*Id.* at #21336-37.)

Lucas complains that the district court's explanation "touched on the factors in § 3553(a), but did not adequately convey that [it] had actually considered the arguments made by Mr. Lucas and impartially rejected them." (Lucas Br. at 45.) It is unclear what additional explanation, in Lucas's view, was necessary. In any event, the record demonstrates that the court "listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account in sentencing him." *Vonner*, 516 F.3d at 387 (quotations omitted). The court's explanation was therefore adequate, particularly on plain-error review.

### 4. *The sentence was substantively reasonable.*

Finally, the district court's 20-year sentence was substantively reasonable. Although within-guidelines sentences are presumptively reasonable, no presumption of unreasonableness attaches to a sentence outside the guidelines. *Id.* at 389-90. Here, the slight upward variance was not an abuse of discretion.

Lucas was a longstanding, active member of a violent street gang that engaged in murders, assaults, and large-scale drug-trafficking over many years. Lucas had a lengthy criminal history and personally distributed a large quantity of drugs. The district court reasonably concluded that a 20-year sentence would be sufficient, but

91

not greater than necessary, to meet the goals of § 3553(a). *See, e.g., United States v. Nunley*, 559 F. App'x 470, 472-73 (6th Cir. 2014) (affirming above-guidelines 252-month sentence on less egregious facts). Lucas's sentence should be affirmed.

## CONCLUSION

For the reasons set forth above, the defendants' convictions and sentences should be affirmed.

Respectfully submitted,

NICHOLAS L. MCQUAID
Acting Assistant Attorney General

DONALD Q. COCHRAN
United States Attorney
Middle District of Tennessee

DAVID L. JAFFE
Chief
IVANA NIZICH
Trial Attorney
Organized Crime and Gang Section
Criminal Division
U.S. Department of Justice

*/s/ Cecil W. VanDevender*
CECIL W. VANDEVENDER
BEN SCHRADER
Assistant U.S. Attorneys
110 Ninth Avenue South, Ste. A-961
Nashville, Tennessee 37203-3870
(615) 736-5151

*Attorneys for Plaintiff-Appellant*

92

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief contains 22,373 words, exclusive of the items listed in Rule 32(f). Because this total exceeds the type-volume limitations set forth at Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure, the government will file a contemporaneous motion asking the Court to accept an oversized brief.

/s/ Cecil W. VanDevender
CECIL W. VANDEVENDER

## CERTIFICATE OF SERVICE

The undersigned certifies that on this the 15th day of February, 2021, an electronic copy of this brief was served via the Court's electronic filing system upon counsel for Elance Lucas, Marcus Darden, Derrick Kilgore, and Decarlos Titington.

/s/ Cecil W. VanDevender
CECIL W. VANDEVENDER

93

**ADDENDUM: APPELLANT'S DESIGNATION
OF RELEVANT DISTRICT COURT DOCUMENTS**

Appellant, pursuant to 6th Cir. R. 28(c) and 6th Cir. R. 30(b), hereby designates the following relevant district court documents in the electronic record:

| Record Entry No. | Description of Document | PageID# |
|---|---|---|
| 500 | Mitchell Plea Hearing | 3019-3020 |
| 831 | Third Superseding Indictment | 5958-6008 |
| 908 | Jenkins Plea Hearing | 6464-6465 |
| 910 | Order | 6467-6468 |
| 925 | Whitlock Plea Hearing | 6609 |
| 955 | Brown Plea Hearing | 6863-6864 |
| 1032 | Luke Plea Hearing | 7316-7317 |
| 1143 | Order | 8209-8218 |
| 1171 | Sealed Govt. Witness List | N/A |
| 1204 | Minute Entry | 8642 |
| 1321 | TTR (4/1/19) | 10164-10233 |
| 1341 | Govt. Response | 10362-10371 |
| 1360 | Darden Verdict Form | 10397-10401 |
| 1362 | Burks Verdict Form | 10407-10411 |
| 1364 | Kilgore Verdict Form | 10417-10425 |
| 1366 | Lucas Verdict Form | 10435-10437 |
| 1368 | Titington Verdict Form | 10441-10447 |
| 1370 | Exhibit and Witness List | 10455-10515 |

| Record Entry No. | Description of Document | PageID# |
|---|---|---|
| 1460 | Mem. Op. | 11776-11825 |
| 1472 | TTR (3/18/19) | 11867-12106 |
| 1473 | TTR (3/19/19) | 12107-12336 |
| 1474 | TTR (3/20/19) | 12337-12613 |
| 1475 | TTR (3/25/19) | 12614-12749 |
| 1483 | TTR (3/21/19) | 12779-12819 |
| 1506 | TTR (3/21/19) | 13118-13146 |
| 1510 | TTR (3/25/19) | 13266-13289 |
| 1511 | TTR (3/25/19) | 13290-13319 |
| 1530 | Order | 13563-13564 |
| 1533 | Govt. Sentencing Position | 13568-13572 |
| 1540 | Lucas Position Regarding PSR | 13607-13617 |
| 1547 | Titington Sentencing Mem. | 13669-13687 |
| 1590 | Kilgore Judgment | 14291-14299 |
| 1592 | Darden Judgment | 14310-14319 |
| 1594 | Titington Judgment | 14331-14339 |
| 1598 | Lucas Judgment | 14366-14373 |
| 1601 | Lucas NOA | 14386-14387 |
| 1602 | Darden NOA | 14388 |
| 1603 | Kilgore NOA | 14389 |
| 1604 | Titington NOA | 14390 |
| 1606 | Titington PSR | 14449-14501 |

95

| Record Entry No. | Description of Document | PageID# |
|---|---|---|
| 1608 | Lucas PSR | 14559-14597 |
| 1643 | TTR (3/5/19) | 14893-15181 |
| 1644 | TTR (3/6/19) | 15182-15482 |
| 1645 | TTR (3/7/19) | 15483-15779 |
| 1646 | TTR (3/11/19) | 15780-16070 |
| 1647 | TTR (3/12/19) | 16071-16338 |
| 1648 | TTR (3/13/19) | 16339-16605 |
| 1649 | TTR (3/14/19) | 16606-16884 |
| 1655 | TTR (3/26/19) | 18253-18534 |
| 1657 | TTR (4/1/19) | 18692-18955 |
| 1658 | TTR (4/2/19) | 18956-19278 |
| 1659 | TTR (4/3/19) | 19279-19517 |
| 1660 | TTR (4/4/19) | 19518-19782 |
| 1661 | TTR (4/8/19) | 19783-20034 |
| 1662 | TTR (4/9/19) | 20035-20265 |
| 1664 | TTR (4/11/19) | 20324-20560 |
| 1665 | TTR (4/15/19) | 20561-20839 |
| 1666 | TTR (4/16/19) | 20840-20944 |
| 1670 | TTR (4/23/19) | 20986-20999 |
| 1675 | Titington Sentencing Tr. | 21224-21284 |
| 1676 | Lucas Sentencing Tr. Vol. II | 21285-21342 |
| 1679 | Consolidated Sentencing Tr. | 21446-21612 |

| Record Entry No. | Description of Document | PageID# |
|---|---|---|
| 1685 | Motion | 21653-21675 |
| 1689 | Response | 21682-21746 |
| 1699 | Lucas Sentencing Tr. Vol. I | 21983-22023 |
| 1703 | Memorandum | 22093-22098 |
| 1768 | Warfield Plea Hearing | N/A |
| 1780 | Order | 22606-22609 |

# APPENDIX: GLOSSARY

## *Trial Defendants*

**Maurice Burks** ("Mac Reese"). A member of the Clarksville deck who served as Marcus Darden's "right-hand man"; killed Malcolm Wright at C-Ray's in 2012. Convicted on six counts; later granted a new trial on four counts, which this Court then reversed; awaiting further proceedings on remand.

**Marcus Darden** ("MD" or "Mac Tuff"). The leader of the Clarksville deck and the 615 region. Convicted on five counts and sentenced to 480 months' imprisonment.

**Derrick Kilgore** ("Smut"). A member of the Clarksville deck who held various positions of authority, including secretary, treasurer, and member of the security team. Convicted on fifteen counts and sentenced to 420 months' imprisonment.

**Elance Lucas** ("Mac Luke"). A member of the Clarksville deck who held unspecified positions of authority; for a time, one of the principal drug suppliers to other members. Convicted on two counts and sentenced to 240 months' imprisonment.

**Decarlos Titington** ("Los" or "Los T"). A member of the Clarksville deck who held various positions of authority, including chief of security and enforcer. Convicted on six counts and sentenced to 270 months' imprisonment.

## *Other Gangster Disciples*

**Johnny Austin**. A former chief of security for the Nashville deck; testified about the gang's structure and history and about numerous criminal incidents.

1a

**Danyon Dowlen** ("Mac Danger" or "Dangerous Dan"). A former leader of the Clarksville deck; testified about the gang's history and structure and about numerous criminal incidents.

**Shannon Fairley** ("Mac Juve"). Killed by the Bloods in 2012; his murder formed the backdrop of the GDs' murder of Malcolm Wright.

**Deversea Fitts** ("Vossie"). The head of the blackout squad; Fitts directed the murder of D'Anthony Hall after Hall gave a statement to the police.

**Christopher Fletcher**. A member of the Clarksville deck; shot by Vice Lords shortly before the retaliatory shooting at Treeland Drive.

**Tray Galbreath**. A former treasurer of the Clarksville deck; testified about the gang's structure and history and about numerous criminal incidents.

**Deanton Greenwade**. A former gang member who was subject to a severe smashing in 2008 after he left the gang to join the Crips.

**Brandon Hardison** ("Creep"). A member of the gang's blackout squad; killed Derrick Sherden and Amanda Weyand; involved in the 2012 melee at Sidelines that led to Malcom Wright's murder at C-Ray's.

**Sylvester Hockett** ("Mac Chicken"). A member of the Clarksville deck who was killed by the Bloods in 2006; his murder formed the backdrop for the GDs' murder of Jesse Hairston.

**Keilo Hoosier**. A member of the Clarksville deck; participated in the shooting at Treeland Drive.

**Larry Hoover**. The gang's founder and chairman; serving a life sentence at ADX Supermax.

1b

**Carlos Jordan**. A member of the Murfreesboro deck and former treasurer for the 615 region; testified about the gang's structure and history and about numerous criminal incidents.

**James Luke** ("New York"). A member of the Clarksville deck; mistakenly shot Crystal Allen as he was trying to shoot a Vice Lord.

**Deron Lundy**. A member of the Clarksville deck; participated in the shooting at Treeland Drive.

**Mac T**. A former gang leader who was subject to a severe smashing in 2014, resulting in damage to the wall of a club.

**Deandrea Mason** ("Seattle"). A member of the Clarksville deck; gave drugs to his roommate, John Windsor Clark, in exchange for Clark letting the GDs use his home and car for drug trafficking.

**Lawrence Mitchell** ("Chop"). A member of the Clarksville deck who saw the Vice Lords shoot Christopher Fletcher and a companion; participated in the retaliatory shooting at Treeland Drive.

**Byron Purdy** ("B"). The governor over Tennessee and a "gov of governors," to whom other state leaders reported.

**Errika Stephens**. A former gang member who testified about a 2014 incident when she was beaten by "Sisters of the Struggle" from Chattanooga, after she told police that Deversea Fitts had given her the guns seized from her home.

**Tavares Trotter** ("Wolf"). A member of the Clarksville deck; accompanied Brandon Hardison to Derrick Sherden's house on the day that Hardison murdered Sherden and Amanda Weyand and gave Hardison the murder weapon.

**Lamar Warfield** ("Jug"). A member of the Clarksville deck; participated in the shooting at Treeland Drive.

1c

**Rex Whitlock** ("StackHouse"). A member of the Clarksville deck; killed Jesse Hairston and shot William Miller; served as the principal drug supplier to the gang until his arrest in 2008.

*Members of Other Gangs*

**Dezorick Ford** ("Lord Slick"). A Vice Lord; attacked Brandon Hardison at Sidelines, starting the melee that preceded Malcolm Wright's murder.

**Jesse Hairston**. A member of the Bloods; killed by Rex Whitlock in 2007.

**William Miller** ("Lil Will"). A member of the Crips; shot by Rex Whitlock and Marcus Darden in 2006.

**Malcolm Wright** ("X Gotti"). A member of the Bloods; killed by Maurice Burks in 2012.

*Select Law Enforcement Witness*

**James Atkins**. Officer with the Clarksville Police Department who used a LIDAR device to measure the physical distance between two points.

**Gregory Beebe**. ATF task for officer and sergeant at the Clarksville Police Department; testified about the investigation into the GDs.

**John Harrell**. ATF digital forensic examiner who extracted data from two of Darden's phones.

**J. Howard Patterson**. TBI digital forensic examiner who extracted data from one Titington's phones.

*Other Victims and Witnesses*

**Crystal Allen**. Shot by James Luke as he was trying to shoot a Vice Lord.

1d

**Taylor Barger**. A bystander who was hospitalized after being shot multiple times in the Treeland Drive shooting.

**Wallace "Gator" Bradley**. An early member of the GDs who testified in the defense case about how the gang changed after Larry Hoover's conviction.

**John Windsor Clark**. A former drug addict who lived with Deandrea Mason and allowed the GDs to use his home and car for drug trafficking.

**Ronnie Daniels**. Observed the prelude and aftermath of Malcolm Wright's murder, from the parking lot at C-Ray's; later heard Burks confess to the murder.

**D.F.** A sixteen-year-old bystander whose fingertip was shot off in the Treeland Drive shooting as he went to investigate what he thought was the sound of fireworks.

**Kristine Gaskin**. Malcolm Wright's girlfriend; saw several GDs confront Wright at C-Ray's but did not see who committed the murder.

**Lacey McIntire**. A bystander who was hospitalized after being shot in the Treeland Drive shooting.

**Derrick Sherden** ("Meech"). Claimed to be a GD from Chicago, but did not attend meetings or pay dues; killed by Brandon Hardison in 2012.

**Amanda Weyand**. Derrick Sherden's girlfriend; killed by Brandon Hardison in 2012.

**Darius and Robert Wilridge**. Cousins who got into an altercation with the GDs in 2007 in which Marcus Darden shot Darius.