NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0426n.06

Nos. 19-6390/6392/6393/6394

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ELANCE JUSTIN LUCAS (19-6390); MARCUS | ) | COURT FOR THE MIDDLE |
| TERMAINE DARDEN (19-6392); DERRICK | ) | DISTRICT OF TENNESSEE |
| LAMAR KILGORE (19-6393); DECARLOS | ) | |
| TITINGTON (19-6394), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

FILED
Sep 09, 2021
DEBORAH S. HUNT, Clerk

BEFORE:    BOGGS, MOORE, and LARSEN, Circuit Judges.

BOGGS, Circuit Judge. Four members of the Gangster Disciples street gang appeal their convictions for crimes committed during a decade-long racketeering conspiracy. Those crimes include a separate drug-trafficking conspiracy and a score of substantive drug, firearms, and violent offenses (including assault and attempted murder). For the reasons that follow, their appeals are generally without merit. Aside from one procedural error during Mr. Lucas's sentencing, the district court committed no harmful error. Thus, we vacate the district court's sentence of Mr. Lucas and remand for resentencing. We affirm his conviction and all of the judgments as to the other appellants.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

## I.      BACKGROUND

### A.  The Gangster Disciples, Generally

The Gangster Disciples (or "GDs") are a national street and prison gang founded in Chicago in the late 1960s from the merger of David Barksdale's and Larry Hoover's two respective gangs. This case grew out of an investigation of the gang's activities in Middle Tennessee.

The gang organizes itself hierarchically. Nationally, it is governed by a board of directors, on which Larry Hoover continues to sit as chairman despite serving a federal life sentence. The board appoints a "governor" in charge of each state and a "governor of governors" to supervise the governors in geographical groupings of states (for example, the governor of Tennessee also has responsibility over the governors of North Carolina, Kentucky, and other states). The gang divides states into regions, often named after the corresponding area codes, each of which a "regent" leads. For example, the "615" region, which this case concerns, contains Clarksville, Nashville, and Murfreesboro, among other cities in Middle Tennessee.

Generally, each city in a region has its own "deck," the gang's smallest organizational unit, which too is headed by a regent. A deck might claim members in nearby smaller cities (as Clarksville did Guthrie, a small town on the Kentucky side of the Tennessee–Kentucky border), and some larger cities have more than one deck. Each deck, region, or state has other "positions of authority" such as chief of security, enforcer, treasurer, secretary, and literature coordinator. And other members are secretly part of elite "blackout squads" called on to assassinate nonmembers or members of opposing gangs—or to execute fellow Gangster Disciples.

Each deck in good standing with the national gang has monthly meetings and collects monthly dues from each member. Dues are a flat fee that goes into the deck's "box," a metaphor for the deck's cash-on-hand. The deck in turn sends funds to the regional and state boxes. The box

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

is, in part, a kind of social welfare: funds might be used to help members who needed food, were behind on personal bills, or needed to make bail. Monies might also go onto incarcerated members' commissary accounts. But the box also helped the gang perpetuate and attain its criminal objectives—through helping fugitive members, buying firearms, or investing in drugs to resell at a profit.

Membership in the Gangster Disciples has perks beyond access to box funds. Some members could be fronted drugs to sell (especially in return for the risk of transporting drugs by car) or given discounts by other members. Members can sell drugs in GD-controlled territory under the protection of the local deck, with territorial monopolies enforced against nonmembers through violence. Members have access to trap houses where guns and drugs can be stored. And members in good standing get reference numbers to prove their membership—and access these benefits— anywhere in the country.

The gang's literature consists of "the teachings of the honorable chairman," Mr. Hoover, and other elements such as the "I Pledge," the "We Pledge," the "Creed," and the "17 Laws." The gang purportedly adopted a new "720 concept" focused on "growth and development" in place of an older, more violent "360 concept." Indeed, much of the 720 literature espouses virtues such as love, self-sacrifice, and integrity.

But "things still stayed the same way that they was," as one member testified: "Still violence, still drug selling, still all of the same things that were going on under 360." The rules still emphasize "silence and secrecy" foremost—never to talk about gang business with outsiders, especially law enforcement. Members must "report all incidents, major and minor" to the deck— whether activity by rival gangs or law enforcement or violations by other members. And members must "aid and assist" other members "in all righteous endeavors," which might include attacks on

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

other gangs or shielding fellow members from detection or arrest. The gang also forbids certain personal conduct, such as stealing from other Gangster Disciples, sex between two men, and the use of "addictive drugs" such as heroin, cocaine, or crack. (Marijuana use, however, is permissible, so long as it is not excessive.)

Violations of the gang's rules go through an internal analog of criminal procedure. If a member accused of a violation does not appear for a hearing on the matter, an officer may issue an order for that member's "GD arrest." A member may appeal a violation by requesting a "GD trial," complete with a prosecutor, defense lawyer, judge, and jury. There are even potential appeals to regional and state officers. Penalties for violations include fines paid to the box and "smashings": beatings that vary in severity by duration, number of assailants, and whether the member being smashed may "cover up" (defend himself). A member guilty of a severe violation might also be "smashed off" (beaten and expelled from the gang) or "eradicated" (put to death).

## B.  The Clarksville Deck

In the mid-2000s, the Clarksville deck was trying to establish its stature and reputation in the 615 region. Marcus Darden, already in a position of some authority in the deck, had ambitious goals for himself and for the Gangster Disciples in the region. In January 2006, several Gangster Disciples saw William Miller, a member of the rival Crips gang, "throwing down the pitchforks," a sign of disrespect toward one of the Gangster Disciples' symbols, the pitchfork. Mr. Darden saw this as the perfect opportunity to put his deck—and himself—"on the map."

The next day, Mr. Darden and Rex Whitlock, another member of the Clarksville deck, saw Mr. Miller. They confronted and shot him. In the words of Tray Galbreath, a deck member who helped conceal the firearms used to shoot Mr. Miller, that shooting "[l]et the streets know that GD

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

is a power to be reckoned" with. And gang violence in Clarksville escalated "starting from that point on."

Even so, the deck continued to cycle through booms and busts, often corresponding with its leaders' respective freedom or custody. For example, Mr. Whitlock and Mr. Galbreath were the main suppliers of cocaine for the deck, running kilos up from Atlanta. When they were arrested in 2008, the cocaine supply in the 615 region dried up for some time. Because most members did not have legitimate jobs, they drew their income primarily from drug sales. So Mr. Whitlock's arrest ended the deck's times of plenty, at least temporarily.

Things changed when Danyon Dowlen assumed leadership of the deck. He had joined the Gangster Disciples in the late 1990s while in custody, and he was in and out of prison several times up through 2010. That December, when Mr. Dowlen was released from prison, he found the Clarksville deck scattered from a lack of structure and leadership. He received a call from the regent for the 615 region, asking for help getting the Clarksville deck back "on count" (in good standing).

Mr. Dowlen agreed, and in mid-2011, he called a meeting of about thirty Clarksville-area Gangster Disciples. At that meeting, the deck elected its officers. Mr. Dowlen became the head of the deck. Elance Lucas, Derrick Kilgore, and DeCarlos Titington were also at that meeting, and Mr. Titington too took on a position of authority. Mr. Darden, who had previously served as the deck's enforcer because he was "prone to violence," was not at the meeting because he was in prison. But after his release, he became Mr. Dowlen's second-in-command. Together, Mr. Dowlen and Mr. Darden tried "to get everything organized" and take the deck "to bigger heights" than before.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

Mr. Darden succeeded Mr. Dowlen as the head of the Clarksville deck and eventually rose to the 615 regency. His continued goal was to "raise the stature of [the gang], to have the street fame of it, [and] to be revered as a power to be reckoned with." He "ran [the deck] with an iron fist," purging weak members—and potential police cooperators—instead surrounding himself with loyal allies whom he could trust to do the gang's business.

The violence only grew with Mr. Darden's rise to power. There were smashings and eradications, especially for cooperation with law enforcement, no matter how slight; the murder of Malcolm Wright, a Blood, in response to the Bloods' killing of a Gangster Disciple, *see United States v. Burks*, 974 F.3d 622, 624–25 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1722 (2021) (mem.); and a retaliatory drive-by shooting against the Vice Lords, with Mr. Kilgore driving. One particularly violent member, Brandon Hardison, murdered Derrick Sherden in cold blood over a drug debt and for breaking a solemn oath to repay it, and then he murdered Mr. Sherden's girlfriend Amanda Weyand to prevent her from being a witness. For bringing "undue heat" upon the gang, he was brought before regional and state leadership for sentencing. They were initially inclined to eradicate him, but Mr. Dowlen convinced the tribunal not to execute him. Indeed, Mr. Hardison's standing in the deck increased, and he earned a place in the deck's blackout squad.

## C.  Procedural Summary

A grand jury in the Middle District of Tennessee indicted the four appellants in June 2017. By November 2018, the government had obtained a third superseding indictment—the one in effect at the appellants' trial—charging twelve Gangster Disciples with 45 counts. Those counts included conspiracy under the Racketeer-Influenced and Corrupt Organizations (RICO) Act, in violation of 18 U.S.C. § 1962(d); conspiracy to traffic drugs, in violation of 21 U.S.C. § 846;

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

murder, attempted murder, and other violent crimes; substantive drug-trafficking charges; and firearms offenses.

The four appellants went to trial along with a fifth defendant, Maurice Burks. Trial lasted nearly two months: voir dire began March 1, 2019, and the jury returned its verdicts on April 29, after six-and-a-half days of deliberation. Before sentencing, the district court granted Mr. Burks's motion for a new trial on four counts related to Malcolm Wright's murder, but we reversed that order upon the government's appeal. *Burks*, 974 F.3d 622. The district court denied the four appellants' motions under Federal Rules of Criminal Procedure 29 and 33 and sentenced them to prison terms of 240 months (Mr. Lucas), 480 months (Mr. Darden), 420 months (Mr. Kilgore), and 270 months (Mr. Titington).

The appellants filed timely notices of appeal, and we now exercise jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## II.    ELANCE LUCAS

### A.  The Jury Unanimously Found a Pattern of Racketeering Activity

A defendant has a Sixth Amendment right to a unanimous verdict on each element of a crime. One element of RICO conspiracy is that the defendant must agree "that either he or another conspirator would engage in a pattern of racketeering activity." *United States v. Nicholson*, 716 F. App'x 400, 405 (6th Cir. 2017). A "pattern of racketeering activity requires a minimum of two predicate acts." *United States v. Fowler*, 535 F.3d 408, 419 (6th Cir. 2008); 18 U.S.C. § 1961(5).

Mr. Lucas argues that the jury did not unanimously find the predicate acts for his RICO conviction. His first premise is that the jury "unanimously found that the defendants agreed to two underlying racketeering activities: murder and drug trafficking." His second premise is that the district court "removed" one of those predicate acts by finding that the government had not proved

- 7 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

by a preponderance that Mr. Lucas was part of a planned (but aborted) shooting at a nightclub. Both premises are flawed.

First, he misunderstands the purpose of count one's special-verdict questions.[1] They did not ask the jury to identify which predicate acts underlay the conspiracy. Rather, the questions are required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in order to justify an increase in Mr. Lucas's statutory penalty. The statutory maximum sentence for a bare RICO conviction is 20 years but increases to life imprisonment "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). The special-verdict questions corresponded to a racketeering activity for which the maximum penalty includes life imprisonment. Because the jury found "yes" on at least one (in fact, on all three) of the questions, the higher maximum of life applies to Mr. Lucas. Thus, even if there *were* insufficient evidence

---

[1] For the reader's reference, we reproduce Mr. Lucas's verdict form for count one here:

With respect to Count One of the Indictment, which charges RICO Conspiracy, we, the Jury, unanimously find the Defendant, **Elance Justin Lucas** (check one):

Guilty ___✓___          Not Guilty _____

*If you find the Defendant guilty of Count One, proceed to the questions below.*

*If you find the Defendant not guilty of Count One, skip these questions and proceed to the next count.*

(1) We, the Jury, having found the Defendant guilty of the offense charged in Count One, further unanimously find that as part of that offense the Defendant conspired to distribute and possess with intent to distribute cocaine hydrochloride and cocaine base and that it was reasonably foreseeable to the Defendant that the conspiracy involved the distribution of and possession with intent to distribute the following:
(a)  five kilograms or more of cocaine hydrochloride (cocaine):
Yes ___✓___          No _____
(b)  280 grams or more of cocaine base (crack cocaine)
Yes ___✓___          No _____

(2) We, the Jury, having found the Defendant guilty of the offense charged in Count One, further unanimously find that from at least in or about 2005 through on or about November 7, 2018, the Defendant agreed to conduct and participate in the conduct of the affairs of the Gangster's [sic] Disciples enterprise through a pattern of racketeering activity that included acts involving murder, as alleged in the Indictment.
Yes ___✓___          No _____

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

that the gang engaged in acts involving murder, Mr. Lucas would still be guilty of RICO conspiracy and subject to a maximum sentence of life.

Second, Mr. Lucas misunderstands the legal effect of the district court's ruling on his sentencing objection. Although the PSR found him accountable under the Guidelines for conspiracy to commit murder at the Plush nightclub, the district court sustained his objection to that finding. The only factual basis for that allegation came from testimony by Mr. Dowlen, whom the district court had found to be unreliable in some respects. But that refusal to hold Mr. Lucas accountable for conspiracy to commit murder for *sentencing* purposes does not negate the *jury's* finding that he had agreed to "participate in the conduct of the affairs of [the conspiracy] through a pattern of racketeering activity that included acts involving murder." The evidence showed that the Clarksville deck was responsible for multiple murders, attempted murders, and conspiracies to commit murder—of William Miller, Jesse Hairston, Darius Wilridge, Derrick Sherden, Amanda Weyand, and Malcolm Wright, to name just a few—in furtherance of the gang's goal of greater power and reputation. The jury could reasonably have found that the RICO conspiracy's pattern of racketeering activity included those acts. So the court's ruling on the sentencing objection was consistent with the jury's affirmative answer to special-verdict question two.

Thus, Mr. Lucas has not shown a lack of unanimity on count one's predicate acts.

**B. The RICO Conviction Was Not Otherwise Defective**

Mr. Lucas next challenges his RICO conviction for what he calls a lack of an "individualized verdict based on sufficient evidence." He presents a variety of claims in support. Beyond the unanimity challenge dispatched above, he argues that the discrepancies between the special-verdict findings on counts one and two show that the jury did not find him individually responsible for the higher quantities in count one; that there was insufficient evidence to prove that

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

the Clarksville deck was a jointly undertaken criminal enterprise; and that Mr. Dowlen's testimony was insufficiently credible to support the verdict. We tackle two of these claims in turn.[2]

1. *We Will Not Review the Purportedly Inconsistent Special-Verdict Findings*

In general, inconsistent jury verdicts in a criminal case are unreviewable. *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015). But there are two exceptions, creating circumstances in which we will review them. First, a verdict that is "marked by such inconsistency as to indicate arbitrariness or irrationality" may warrant relief. *Ibid.* (quoting *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009)). Second, if a "guilty verdict on one count necessarily excludes a finding of guilt on another," we may review a defendant's convictions of those mutually exclusive offenses. *Id.* at 610–11 (quoting *United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010)). But this latter exception is narrow: it is limited to "a situation in which a defendant receives two *guilty* verdicts that are logically inconsistent," such as "both larceny and embezzlement based on the same underlying conduct." *Ruiz*, 386 F. App'x at 533 (emphasis added) (citing *United States v. Powell*, 469 U.S. 57, 69 n.8 (1984)).

Because Mr. Lucas did not raise a verdict-inconsistency challenge below, we review his claim for plain error. Fed. R. Crim. P. 52(b).

The inconsistency here—if any—does not necessarily indicate either arbitrariness or irrationality. The jury found that it was reasonably foreseeable to Mr. Lucas that the *RICO* conspiracy in count one "involved" at least five kilograms of cocaine and at least 280 grams of crack. And it found that it was reasonably foreseeable to Mr. Lucas that the *drug-trafficking* conspiracy in count two "involved" no powder cocaine and at least 28 and fewer than 280 grams of crack.

---

[2] The third, challenging Mr. Dowlen's credibility, is not sufficient grounds for relief on its own, as discussed below.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

The explanation is simple: the jury found that there were two separate conspiracies. One focused on increasing the power and stature of the Gangster Disciples in Clarksville, and the other was a relatively smaller venture with the less ambitious aim of just making money. The differing amounts make sense, too. Mr. Lucas could reasonably foresee that increasing the deck's power and stature would involve distributing a large quantity of both powder and crack cocaine. After all, most of the deck's primary source of income was from drug sales, and the deck's funding came exclusively from its members.

The indictment and jury instructions support this distinction. The two conspiracies were charged separately. Count two made no mention of the Gangster Disciples as the organizing framework of the drug-trafficking conspiracy, and it included substances (marijuana and opioids) absent from the notice of enhanced sentencing factors listed in count one. The court instructed the jury that the conspiracies in counts one and two need not be the same even though they started on the same date. Some defendants even argued that there had been multiple conspiracies.

Thus, because the evidence permits this view of the facts, the jury's different findings on counts one and two are not necessarily inconsistent, let alone arbitrary or irrational. And for that same reason, the special-verdict findings on counts one and two are not mutually exclusive in the sense that both larceny and embezzlement for the same act are. Thus, neither of the two exceptions applies, and the verdicts' purported inconsistency is unreviewable.

2. *Sufficient Evidence Supports That the Clarksville Deck Was an "Enterprise"*

There is insufficient evidence to support a conviction only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012). In making that determination, we "do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

the jury." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999). We must view the evidence in the "light most favorable to the Government" and make all "reasonable inferences and resolutions of credibility" in favor of the jury's verdict. *Washington*, 702 F.3d at 891.[3] "Circumstantial evidence alone" is sufficient to uphold a conviction. *Ibid.* And so is "the uncorroborated testimony of an accomplice." *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017) (quoting *United States v. Frost*, 914 F.2d 756, 762 (6th Cir. 1990)).

Under RICO, "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" must not "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A conspiracy to violate that provision is also illegal. *Id.* § 1962(d).

An "enterprise" for purposes of RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4). The definition is "obviously broad, encompassing '*any* . . . group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). The statute additionally directs that "its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Ibid.* (quoting 18 U.S.C. § 1961 note). Thus, "RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct'" and may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 944–45 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). The dissent in *Boyle* advocated for a narrower definition: one that "demands evidence of a certain quantum of businesslike organization—*i.e.*, a system of processes, dealings, or other affairs that can be 'directed.'" *Id.* at 954 (Stevens, J., dissenting).

---

[3] Thus, Mr. Dowlen's supposed lack of credibility is not a reason for relief.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

Even under the dissent's stricter definition, there was sufficient evidence for a jury to find that the Clarksville deck formed an enterprise. The deck had an organizational hierarchy and established leadership roles with defined duties. It had a framework for making decisions. It had internal discipline mechanisms, including monetary and physical punishments. It had regular meetings, usually on the sixteenth of the month. And it had a practice of reinvesting proceeds from the enterprise to promote and expand it: members would pay monthly dues to the deck's box, often from drug-sale proceeds, and those funds were used to help fugitives, bail out members from jail, and buy firearms and drugs. The deck used these processes to perpetuate itself and expand its power and influence. Thus, the jury could find that the deck was an "association-in-fact" enterprise. *See Boyle*, 556 U.S. at 948. It is no response that members could keep virtually all of their drug-sale profits, as Mr. Lucas contends. Even granting that, the deck would still remain an association-in-fact enterprise.

It therefore sufficed that the government proved that Mr. Lucas agreed to further the gang's expansion of power through a pattern of racketeering activity. Mr. Lucas's long-term association with the gang and his contributions through dues were enough for a reasonable juror to so find.

## C. No Cumulative Trial Error Violated Mr. Lucas's Due-Process Rights

Mr. Lucas contends that, besides the errors listed above, there were others during trial that, even if individually harmless, overall unfairly prejudiced the proceedings against him. Individually harmless errors may indeed have a "cumulative effect" warranting a new trial. *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013) (quoting *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012)). But the errors' combined effect must be "so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). And they must

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

truly be errors: nonerrors don't count. *United States v. Underwood*, 859 F.3d 386, 395 (6th Cir. 2017).

Mr. Lucas presents several unpreserved claims of trial error in addition to his claims above. We review each in turn.

### 1. Failure to Sever

An indictment may charge multiple defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). But "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

In general, defendants indicted together "should be tried together." *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987)). The Supreme Court has set a high standard for Rule 14 severance: "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "[L]ess drastic measures, such as limiting instructions," are preferred and "often will suffice to cure any risk of prejudice." *Ibid.* And severance is inappropriate "if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *Driver*, 535 F.3d at 427 (quoting *Causey*, 834 F.2d at 1287).

Mr. Lucas concedes that he did not move to sever his trial below. We review for plain error. Fed. R. Crim. P. 52(b); *United States v. Soto*, 794 F.3d 635, 656 (6th Cir. 2015).[4] To show error, he

---

[4] The government argues that our decisions are "conflicting" on whether such a failure to move "constitutes waiver or forfeiture," citing *United States v. Sherrill*, 972 F.3d 752, 762 (6th Cir. 2020) (collecting cases). As *Sherrill* notes, in *United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987), we prospectively ruled that, for cases tried after January 1,

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

"must show 'compelling, specific, and actual prejudice'" from the lack of severance. *Driver*, 535 F.3d at 427 (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)). That means "evidence that the jury was not able to heed the district court's instruction to consider separately the evidence against each defendant" or that "a specific trial right was compromised as a result of the joint trial." *Id.* at 427–28.

Here, he has not shown the jury's inability to consider the evidence against him separately from that against other defendants. The district court instructed the jury to consider separately the evidence against each defendant, and there is no indication that the jury could not. To the contrary, the district court observed during sentencing that the jury was "diligent in following the instructions" because "they found not guilty" for some defendants "and changed the drug amounts on others. They were . . . pretty thorough." That observation "strongly suggests that the jury was not confused by the testimony adduced at trial" and "was able to attribute to each appellant evidence pertinent to that particular party." *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985). Although Mr. Lucas argues that the jury was improperly influenced by evidence against others because its "special verdict finding the amount of drugs at issue in the RICO conspiracy . . . differed vastly from their finding in the drug trafficking charge . . . ," he does not explain how the findings indicate prejudice rather than, as discussed above, a deliberate finding that different types and amounts of drugs were foreseeably involved in two separate conspiracies.

---

1987, a defendant waives a Rule 14 objection on appeal if he moves for severance during trial but does not renew that motion after the close of evidence.

But the *Swift* line of cases does not apply here because Mr. Lucas never raised Rule 14 before trial. In *Soto*, 794 F.3d at 656, we interpreted the revised Federal Rule of Criminal Procedure 12 to mean that a defendant who did not move under Rule 14 before trial could raise the issue on appeal under plain-error review. Although it seems anomalous to punish a defendant with waiver for failing to renew an objection that he has already made but to punish him only with forfeiture for failing to raise the issue at all, that is the law under *Swift* and *Soto*.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

And he identifies no specific right that the joint trial compromised. He gestures at potential prejudice in that, because "[t]he defendants, all black, were required to sit behind their attorneys at trial," there was a "'back of the bus' appearance." But even if the seating arrangements had "bad optics," as his trial counsel put it, he does not explain how they caused him actual prejudice.

Because Mr. Lucas has not shown compelling, specific evidence of actual prejudice from his joint trial with the other defendants, permitting a joint trial was not plain error.

   2.  *Alleged* Brady *Violation*

Mr. Lucas alleges that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding a pretrial preparation report concerning Mr. Dowlen. Mr. Dowlen testified that, when Mr. Burks told him that he had murdered Malcolm Wright, Mr. Burks was wearing a .45-caliber pistol on his hip, calling it the "twin" to the weapon he had shot Mr. Wright with. But, some weeks before trial, Mr. Dowlen had said during a preparation session with the government that the handgun may have been either a .40- or a .45-caliber gun. The government did not disclose Mr. Dowlen's more ambivalent description of the pistol until several months after the trial ended. Mr. Lucas argues that, because Mr. Dowlen was the "only witness linking [him] to murder, one of the two predicate acts found unanimously by the jury" and "one of only two witnesses linking [him] to drug trafficking," it was crucial for him to challenge Mr. Dowlen's credibility.

Even though the government disclosed the pretrial notes before appeal, Mr. Lucas did not challenge his conviction on *Brady* grounds in the district court, so we review his claim for plain error. Fed. R. Crim. P. 52(b).

To prove a *Brady* violation, a defendant must show that the undisclosed evidence is both "favorable" to the defendant—meaning either "exculpatory" or "impeaching," *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)—and "material either to guilt or to punishment." *Brady*, 373 U.S. at

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

87. "Evidence is material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *France v. Lucas*, 836 F.3d 612, 630 (6th Cir. 2016) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995)). And a "'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome'" of the proceeding. *Ibid.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Here, although the undisclosed report could have been used to impeach Mr. Dowlen, it is not material to Mr. Lucas's guilt. Mr. Dowlen's testimony on the abortive Plush nightclub shooting is not reasonably related to his recall of Mr. Burks's gun caliber. And Mr. Lucas does not challenge the evidence of other acts involving murder, noted above, committed by the Clarksville deck in furtherance of its goals. So it is unlikely that the jury would have changed its verdict with respect to Mr. Lucas had the pretrial report been timely disclosed.

Nor was that report material to Mr. Lucas's punishment. Even had the jury answered special question two under count one in the negative, its findings on special question one would still have exposed him to the same statutory minimum and maximum punishments. Moreover, even before the government disclosed the impeachment material on Mr. Dowlen, the district court had already determined not to hold Mr. Lucas accountable under the Guidelines for any acts involving murder. It struck the PSR's finding that Mr. Lucas was accountable for conspiracy to commit murder at the Plush nightclub, the only part of his PSR holding him responsible for acts involving murder. Thus, Mr. Dowlen's testimony about Mr. Wright's murder could not have affected Mr. Lucas's sentence, so there is no reasonable probability that disclosing the report would have changed the outcome of Mr. Lucas's sentencing hearing.

Because the undisclosed evidence was immaterial to Mr. Lucas's guilt or punishment, the government did not violate his rights under *Brady*.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

### 3. Juror Misconduct

After the jury retired to deliberate, one juror sent the district court a note stating that another juror had behaved disrespectfully during deliberations. After consulting with all parties' counsel, the district court brought the jury into the courtroom and summarized the contents of the note. The court identified neither the juror who had made the allegations nor the allegedly disrespectful juror. It admonished the jury as a whole to behave respectfully toward one another and listen to one another. Mr. Lucas did not object to this course of action or request a mistrial, and there were no further complaints about juror conduct during the remainder of deliberations.

Mr. Lucas now argues that the juror's alleged misconduct "should have resulted in a mistrial." He argues that "there was pressure on jurors to convict the defendants and to not consider the defendants individually" and that the juror's alleged conduct "was clearly prejudicial to Mr. Lucas' defense, especially because the evidence against him was weaker than that against his co-defendants."

Because Mr. Lucas did not request a mistrial in the district court, we review for plain error. Fed. R. Crim. P. 52(b).

In line with the objectives of the Double Jeopardy Clause—"the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions"—even if there is prejudicial error because of "judicial or prosecutorial error," a criminal defendant has the right to take his case "to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States v. Dinitz*, 424 U.S. 600, 608 (1976) (quoting *United States v. Jorn*, 400 U.S. 470, 484 (1971)). Thus, when the defendant has not requested a mistrial, "the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option" to stick with the first jury "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

would not be served by a continuation of the proceedings." *Jorn*, 400 U.S. at 485 (citing *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)).

Here, there was no "manifest necessity" to declare a mistrial in the absence of any defense motion. After the district court admonished the jurors to treat one another with respect, there were no further complaints about juror conduct. The jurors finished deliberations and reached verdicts on all counts. And the jury did not make blanket findings of guilt for each defendant—as noted above, the jurors were "diligent in following the instructions" because "they found not guilty" for some defendants "and changed the drug amounts on others. They were . . . pretty thorough." All these facts show that the past disrespectful conduct by one juror did not render the jury incapable of discharging its factfinding duty. To the contrary, the district court's admonition had its intended effect.

Because there was no manifest necessity for a mistrial in this case, it was not error—let alone plain error—for the district court to allow deliberations to continue.

*          *          *

Because Mr. Lucas has shown no trial error, his cumulative-error claim necessarily fails.

**D.  The District Court Erred Procedurally in Sentencing Mr. Lucas**

Mr. Lucas argues that his sentence is both procedurally and substantively unreasonable. "Procedural reasonableness requires the court to 'properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir.), *cert. denied,* 140 S. Ct. 44 (2019) (quoting *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018)). Substantive reasonableness concerns "whether a 'sentence is too long (if a defendant

- 19 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

appeals) or too short (if the government appeals)" to accomplish the congressional goals codified in 18 U.S.C. § 3553(a)—the essential claim is that "the court placed too much weight on some of the § 3553(a) factors and too little on others." *Ibid.* (quoting *Rayyan*, 885 F.3d at 442).

We review preserved claims of both procedural and substantive unreasonableness for an abuse of discretion, with underlying factual findings reviewed for clear error and legal conclusions reviewed de novo. *Ibid.* Unpreserved claims—generally, claims not raised during the sentencing hearing—receive plain-error review. *Id.* at 1048.

1. *Mr. Lucas's Sentencing*

The offense level for a conviction under 18 U.S.C. § 1962 is calculated using USSG § 2E1.1, which provides for a base level of 19 unless "the offense level applicable to the underlying racketeering activity" is greater. USSG § 2E1.1(a). Offense levels for underlying activities are computed as though they were separate counts of conviction. *Id.* § 2E1.1(a), comment. (n.1).

The PSR held Mr. Lucas accountable for three kinds of underlying racketeering activity: conspiracy to commit murder, drug trafficking, and interstate travel or transportation in aid of racketeering. As noted above, the district court did not consider conspiracy to commit murder for sentencing purposes because it was not supported by a preponderance of evidence. The remaining two activities were grouped together per USSG § 3D1.2(d), and their grouped offense level was computed under USSG § 2D1.1. The PSR held Mr. Lucas accountable for five kilograms of cocaine and 280 grams of crack cocaine based on the jury's special-verdict findings on count one. Combined, those quantities equate to 1999.88 kilograms of converted drug weight, USSG § 2D1.1, comment. (n.8(D)), which corresponds to a base offense level of 30, *id.* § 2D1.1(a)(5), (c)(5).

Mr. Lucas objected that the quantities in the jury findings on count one were not relevant conduct for purposes of the Guidelines. But the district court believed that it was bound to use the

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

jury's findings on count one because of *United States v. Cockett*, 330 F.3d 706, 711 (6th Cir. 2003) ("[W]hen sentencing a defendant under the guidelines, [a court] cannot rely on a finding that directly conflicts with the jury's verdict."). The district court did sustain other objections by Mr. Lucas, striking enhancements under USSG §§ 2D1.1(b)(12) and 3B1.1(b), but it overruled his objection to a two-level enhancement for possessing a dangerous weapon under USSG § 2D1.1(b)(1). That resulted in an offense level of 32 for count one.

For count two, the district court first sustained Mr. Lucas's objection to the PSR's finding of 168.05 grams of crack cocaine, reducing the quantity to 97.17 grams. That amount corresponds to a base offense level of 24. USSG § 2D1.1(a)(5), (c)(8). Applying the two-level dangerous-weapon enhancement under USSG § 2D1.1(b)(1), the district court computed a total offense level of 26 for count two.

Because counts one and two were grouped together under USSG § 3D1.2(b), the higher of the offense levels for those counts, 32, became his offense level. With 10 criminal history points, his criminal history category was V. His advisory Guidelines range was therefore 188 to 235 months of imprisonment.

The district court heard allocution from Mr. Lucas and testimony from witnesses attesting to his rough upbringing and generous character. After hearing argument on the § 3553(a) factors and asking additional questions of the defendant, the district court explained its findings on the § 3553(a) factors and imposed a sentence of 240 months of imprisonment and 10 years of supervised release. The district court concluded: if its "calculation of the guidelines [wa]s wrong, then the Court would have imposed the same sentence applying all of the 3553(a) factors as a whole."

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

2. *Not Making Findings for Drug Types and Quantities on Count One Was Procedural Error*

Mr. Lucas argues that the district court improperly relied on the jury's special-verdict findings of at least five kilograms of cocaine and at least 280 grams of crack cocaine on count one in assigning a base level of 30 to that count in sentencing. He is correct—the district court erred.

The district court misapplied *Cockett*. There, it actually had been "possible to reconcile" the jury's verdict and the district court's finding of diminished capacity, resulting in a Guidelines departure. *Cockett*, 330 F.3d at 711. The government had argued that the guilty verdict on a tax charge, which required a "willful" mens rea, foreclosed any finding of diminished capacity. *Id.* at 712–13. But we found that the defendant's willful—meaning intentional and voluntary—violation of tax laws did not necessarily mean that she was "[un]impaired in her ability to exercise the power of reason," that is, had a diminished capacity; thus, the two findings were not necessarily contradictory. *Id.* at 713–14.

Likewise here. The jury's finding of *criminal liability* for 280 grams of crack and five kilograms of powder cocaine does not compel *sentencing accountability* for the same types and amounts. We have consistently noted that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000) (quoting *United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir. 1993)). Only *relevant* conduct, as defined in USSG § 1B1.3, may be used to compute an offense level.

Under the Guidelines, a base offense level "shall be determined" from "all acts and omissions of others that were[] (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3(a)(1)(B); *see also id.* § 1B1.3, comment. (n.3(B)).

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

Thus, the Guidelines "limit a defendant's vicarious liability for the acts of her coconspirators . . . by instructing district courts to distinguish between each coconspirator's jointly undertaken activity." *United States v. McReynolds*, 964 F.3d 555, 563 (6th Cir. 2020). To enforce that limitation, we have required that the district court "make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Ibid.* (quoting *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002)); *see also id.* at 564 ("In short, our case law instructs that a district court cannot hold a defendant to the entire conspiracy-wide drug amounts at sentencing . . . without any particularized findings as to why it is doing so.").

That rule makes sense because there are different factual predicates for liability under 21 U.S.C. § 841(b)(1) and USSG § 1B1.3(a)(1)(B). A defendant is *criminally* liable for all types and quantities of drugs "involv[ed]" in a drug-trafficking conspiracy so long as he could have reasonably foreseen that involvement—there is no requirement that he individually agree to help make or sell those specific drugs or quantities. But the defendant's individual "agreement to jointly undertake the particular criminal activity" is essential for *sentencing accountability* under the Guidelines. USSG § 1B1.3, comment. (n.3(B)).

Here, the jury's special verdict on count one implies only criminal liability, not sentencing accountability. There was no finding about the scope of Mr. Lucas's individual agreement in the RICO conspiracy. And the district court's factual findings at the sentencing hearing support only that Mr. Lucas was personally accountable for about 97 grams of crack and no powder cocaine— in a different conspiracy. Thus, without a finding by the district court that at least five kilograms of cocaine and at least 280 grams of crack cocaine were within the scope of Mr. Lucas's agreement on count one, assigning a base offense level of 30 for that count was error.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

### 3. The Procedural Error Was Harmful

Harmless-error review applies to sentencing errors. Sentencing error is harmless if "a reasonable probability of prejudice does not exist." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016). If that is the case, we need not remand for resentencing. *United States v. Duckro*, 466 F.3d 438, 446 (6th Cir. 2006) ("[W]e are required to remand for resentencing unless we are certain that any such error was harmless—i.e. any such error did not affect the district court's selection of the sentence imposed."). One point in favor of harmlessness is that "the [district] court recognized the potential error in applying" a Guidelines provision. *United States v. Montgomery*, 815 F. App'x 962, 964 (6th Cir.), *reh'g denied,* 969 F.3d 582 (6th Cir. 2020). Another is that the depth of the district court's discussion of an issue in the record indicates that it had that potential error in mind while contemplating a final sentence. *Ibid.* In such circumstances, a district court's declaration that the error would not have affected its ultimate sentence has justified a finding of harmlessness. *Ibid.* (collecting cases).

Even so, it should not be the norm that Guidelines-calculation errors are harmless. Even though it is now advisory, the Guidelines range must still be considered in passing sentence. 18 U.S.C. § 3553(a)(4). And the Supreme Court has stressed that "[i]n *most cases* a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Molina-Martinez*, 136 S. Ct. at 1346 (emphasis added); *see also id.* at 1347 ("Absent unusual circumstances," a "defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder."). That is because "there is 'considerable empirical evidence indicating that the Sentencing Guidelines have the intended

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

effect of influencing the sentences imposed by judges.'" *Id.* at 1346 (quoting *Peugh v. United States*, 569 U.S. 530, 543 (2013)).

Indeed, there is some evidence here that the district court was influenced by the Guidelines range. The district court varied only five months above the top of Mr. Lucas's computed range. Likewise for Mr. Titington: his range was 168 to 210 months of imprisonment plus a mandatory consecutive five years for his conviction on count forty-two. He ended up with 270 months of imprisonment, exactly the sum of 210 months and five years. The anchoring influence of the Guidelines was also evidenced by the contrasting sentences for Mr. Kilgore and Mr. Darden. The district court computed their Guidelines ranges to each be life imprisonment (plus a consecutive 10 years for Mr. Kilgore). And they accordingly got much higher sentences: 420 months for Mr. Kilgore (300 months plus the mandatory consecutive 10 years), 175% of Mr. Lucas's sentence; and 480 months for Mr. Darden, fully twice Mr. Lucas's sentence.

And although the district court's thorough analysis of the § 3553(a) factors weighs in favor of harmlessness, here, the district court's analysis did not consider the potentially large variance should Mr. Lucas be accountable only for 97 grams of crack cocaine. If that be the case, his total offense level would be 26, yielding a Guidelines range of 110 to 137 months. The top of that range is 98 months lower than the top of his current range. If the district court were to impose the same sentence under that lower Guidelines range, which a finding of harmless error would imply, then it would have to justify an upward variance of 103 months—75%.

Last, while the district court did state that it would have imposed the same sentence despite any error in its Guidelines calculations, we are not persuaded by that statement here. The purpose of harmless-error analysis, "to avoid the efficiency cost of resentencing in cases where we are absolutely certain that the district court would have announced the same sentence had it not erred,"

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

is thwarted by a "standard-issue pledge that the district court would have come to the same result under the § 3553(a) factors had it calculated the Guidelines range correctly." *Montgomery*, 969 F.3d at 583. We count such pledges "a point in favor of harmless error," *ibid.*, chiefly when they go beyond unadorned boilerplate to explain how the district court's properly invoked discretion reasonably arrives at the same sentence. For example, the district court might recognize that it had some doubt in applying a specific enhancement yet give reasons why the final sentence would be the same with or without it. *See, e.g.*, *United States v. Morrison*, 852 F.3d 488, 492 & n.2 (6th Cir. 2017). Or the district court might recognize that, regardless of its finding on some enhancement, its ultimate sentence would be within the resulting Guidelines ranges with and without the enhancement. *See, e.g.*, *United States v. McCarty*, 628 F.3d 284, 294 (6th Cir. 2010).

By contrast, a bare statement that the district court would impose the same sentence regardless of any difference in the Guidelines range, even one invoking all the sentencing factors as a whole, does not aid our review. If the statement is unconnected to a specific provision under consideration, there is little to guarantee that the district court would actually impose the same sentence. A district court might well reconsider its sentence if it learned that it had overstated the Guidelines range by ten or twenty years. And it should. A statement that *any* difference in the Guidelines range would be immaterial to the sentence is evidence that the district court in fact failed to consider one of the § 3553(a) factors—the Guidelines range itself. 18 U.S.C. § 3553(a)(4).

Here, the district court buttressed Mr. Lucas's sentence with such a bare statement. And the district court recited the same caveat at each of the sentencing hearings for the defendants in this appeal. In fact, it did so at the same point in each hearing—right after the *Bostic* question.[5] None

---

[5] *See generally United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004).

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

of those statements was connected to controversies over specific Guidelines provisions. Instead, the district court's language was general, being nearly identical as to each defendant.

Because the district court appeared to use the Guidelines ranges as anchor points in sentencing each defendant, because of the potential 98-month discrepancy in Mr. Lucas's computed Guidelines range, and because the district court's pledge to give the same sentence despite any Guidelines errors appears to be boilerplate, we hold that the district court's procedural error was harmful. We therefore vacate Mr. Lucas's sentence and remand for his resentencing. At the new sentencing hearing, the government may introduce evidence about the scope of Mr. Lucas's individual agreement in the RICO conspiracy, and the district court should make any appropriate factual findings.

   4. *Imposing the Two-Level Dangerous-Weapon Enhancement Was Not Clear Error*

Mr. Lucas also challenges the two-level enhancement for possessing a dangerous weapon under USSG § 2D1.1(b)(1). This challenge fails because there was no clear error in the district court's factual finding that "[t]here's sufficient evidence to conclude by a preponderance that Mr. Lucas had possession of a firearm." The district court pointed to his conviction for unlawfully carrying or possession of a weapon in 2008, in which he "crashed his vehicle and fled on foot before being apprehended" and "[a] search of his vehicle revealed four loaded handguns." Because counts one and two extended from at least as early as 2005 onward, that firearm possession occurred during the course of each conspiracy. There was also trial testimony that during a March 2012 traffic stop of Mr. Lucas, police found a gun under the passenger seat of the car along with $2,600 on Mr. Lucas's person. Although Mr. Darden was a passenger in the car, the district court could permissibly have found by a preponderance of the evidence that Mr. Lucas possessed the firearm jointly with him. Because he possessed those firearms during the conspiracies charged in

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

the two counts, there was a presumption that the firearm was possessed in connection with the drug-trafficking activity in those counts. *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003). The district court could permissibly find that Mr. Lucas did not rebut that presumption. Thus, there was no clear error in assigning this enhancement.[6]

### III.    MARCUS DARDEN

Mr. Darden challenges the admissibility of two classes of testimony from government witnesses: (1) what he characterizes as expert testimony by witnesses who were not so qualified and (2) out-of-court statements by two coconspirator declarants.

We review preserved evidentiary claims for abuse of discretion. *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002). That means that we "will leave rulings about admissibility of evidence undisturbed unless" the district court "improperly applie[d] the law or use[d] an erroneous legal standard" or we are "left with the definite and firm conviction" that the district court "committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Ibid.* (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)). Unpreserved evidentiary claims are reviewed for plain error. *Cf. Haywood*, 280 F.3d at 725; Fed. R. Evid. 103(e); Fed. R. Crim. P. 52(b). A party preserves a claim that evidence was erroneously admitted only if that party makes a timely objection or motion to strike and states the ground for the objection with specificity (unless the ground was apparent from context). Fed. R. Evid. 103(a)(1).

---

[6] Because we remand for his resentencing, we need not address Mr. Lucas's challenges to the adequacy of the district court's explanation for its five-month upward variance and to the substantive reasonableness of his sentence.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

## A.  Expert-Testimony Challenges

The first class of challenged testimony comes from four law-enforcement officers who Mr. Darden alleges were not properly qualified to give expert opinion testimony.[7]

Except for expert testimony under Rule 703, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. A witness not qualified as an expert under Federal Rule of Evidence 702 may give "testimony in the form of an opinion" only if it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The purpose of the third requirement is to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note (2000).

We determine whether a lay witness's opinion testimony constitutes impermissible expert opinion testimony by examining the kind of reasoning the witness used. *See generally United States v. White*, 492 F.3d 380, 400–04 (6th Cir. 2007). Explicating the state-court case whose reasoning was incorporated into Rule 701 by the advisory committee, *White* characterized lay-opinion testimony as "result[ing] from a process of reasoning familiar in everyday life" and expert testimony as "result[ing] from a process of reasoning which can be mastered only by specialists in the field." *Id.* at 401 (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). The prototypical examples of permissible lay-opinion testimony are that "a footprint in snow looked like someone

---

[7] Mr. Darden also complains that the government did not disclose the purported expert witnesses under Federal Rule of Criminal Procedure 16(a)(1)(G), but he does not present analysis of the issue or specifically request relief for that error. Rather, he uses the failure to disclose as a reason that the error in admitting the testimony was harmful. Thus, he has waived Rule 16(a)(1)(G) as a standalone ground for relief because he failed to brief it sufficiently. *See Bard v. Brown Cnty.*, 970 F.3d 738, 765–66 (6th Cir. 2020) (opinion of Siler, J., for the court).

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

had slipped, or that a substance appeared to be blood." *Ibid.* (quoting *Brown*, 836 S.W.2d at 550). By contrast, the prototypical example of opinion testimony that only an expert could give is "testimony that skull trauma caused the bruises on a victim's face" because making such an inference would require "specialized skill or expertise." *Ibid.* (quoting *Brown*, 836 S.W.2d at 550).

We have applied this doctrine to testimony by forensic specialists about data extracted from electronic devices. *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006). In *Ganier*, the government argued that a computer specialist would offer lay testimony because all the specialist would do is "run[] commercially-available software, obtain[] results, and recit[e] them," which it characterized as "facts . . . that could be observed by any person reasonably proficient in the use of commonly used computer software, such as Microsoft Word and Microsoft Outlook." *Id.* at 925–26. But after examining the reports generated by the software, which consisted of contents of the operating system registry whose meaning the lay person could only guess at, we disagreed. *Id.* at 926 ("Software programs such as Microsoft Word and Outlook may be as commonly used as home medical thermometers, but the forensic tests [the specialist] ran are more akin to specialized medical tests run by physicians.").

As for gang-expert witnesses, we have recognized that the inner workings of organized crime are "a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'" *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000)). We gave the example of an FBI agent's testimony "on the structure, the organization, [and] the rules" of an organized-crime entity as a proper subject for expert testimony. *Ibid.* (alteration in original) (quoting *Tocco*, 200 F.3d at 418). But such an officer should not become "a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt" rather than

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

"a sociologist describing the inner workings of a closed community." *Id.* at 414 (quoting *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008)). In other words, the gang-expert officer should not give "a summary of the facts" but rather be an aid to the factfinder in understanding them. *Ibid.*

*United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), provides some additional guidance regarding law-enforcement witnesses who offer lay opinion testimony. There, we held that an officer cannot "repeatedly substantiate[] his responses and inferences with generic information and references to the investigation as a whole." *Id.* at 596. "[P]*ersonal* experiences that led him to obtain his information are required." *Ibid.* Otherwise the jury has "no way of verifying his inferences or of independently assessing the logical steps he had taken." *Id.* at 597. Instead, the officer's testimony "can convey the impression that evidence not presented to the jury, but known to the [prosecutor], supports the charges," and that impression "jeopardize[s] the defendant's right to be [tried] solely on the basis of the evidence presented to the jury." *Id.* at 599 (quoting *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013)).

Last, on the topic of whether an expert witness has been appropriately qualified, we have held that, if "a witness's qualifications are obvious," then "there is no need to formally qualify him as an expert." *United States v. Nixon*, 694 F.3d 623, 629 (6th Cir. 2012) (quoting *United States v. Cobb*, 397 F. App'x 128, 139 (6th Cir. 2010)); *see also United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006). For example, we have held that DEA agents with at least six years of employment with the agency were obviously qualified to testify that a defendant who was riding a bicycle around a neighborhood "was engaging in counter-surveillance" for drug-traffickers against police and that "certain scraps of paper were drug ledgers and the numbers contained therein corresponded to kilograms of cocaine and dollar amounts." *Lopez-Medina*, 461 F.3d at 742. In another case, a witness, who opined that the defendant had stolen money and forged signatures,

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

had become an FBI agent just four months before working on the case. *Nixon*, 694 F.3d at 629, 631. But because he had a "background and training in the field of financial investigations" and had handled 20 to 30 cases, including as an auditor for a national accounting firm, we held that any weaknesses in the witness's qualifications went to "the weight rather than the admissibility of his opinion testimony." *Id.* at 629–30.

1. *Any of Sergeant Beebe's Testimony That Was Erroneously Admitted Was Harmless*

Gregory Beebe is a sergeant with the Clarksville Police Department and a member of a task force with ATF. He supervises the department's narcotics section, has been part of the gang-intelligence unit since 2006 or 2007, and started investigating the Gangster Disciples in 2013 or 2014.

The government described him at trial as "sort of an intro witness" because much of his testimony identified photographs of persons, including the defendants, and places figuring into the testimony that later witnesses developed. But he also made other factual claims about these persons (such as nicknames, gang associations, and who was involved in certain offenses) and places (primarily what events, such as shootings, had occurred where). He recited background facts about the Gangster Disciples, including their founder Larry Hoover and their symbology. He also stated at one point early in his testimony that one obstacle to his investigation had been that "[v]ictims [we]re not willing to cooperate with the police" because the local department did not have the resources to protect them "as much as a federal organization would." (No defendant objected to this statement.)

Mr. Darden objected to Sgt. Beebe's testimony several times on a few different bases. He objected to the background testimony about the Gangster Disciples—for example, Larry Hoover and his significance to the gang as its founder, and the symbols that gang members use and their

- 32 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

significance. Mr. Darden argued that "the government ha[d] not identified Detective Beebe as an expert on gangs" and that there had been no foundation for his testimony. The district court overruled the objections because the government was not offering the sergeant as an expert.

Another objection came after Sgt. Beebe testified that Mr. Darden was a member of a street gang—namely the Gangster Disciples—and had the nicknames "MD" and "Mac Tuff." That objection was for lack of foundation. The district court overruled that objection too. The government did not ask Sgt. Beebe to explain how he knew that Mr. Darden was a member of the Gangster Disciples or knew these were his nicknames.

After Sgt. Beebe identified a score of other persons and testified to their nicknames and gang associations, Mr. Darden again objected for lack of foundation. And when Sgt. Beebe testified that he knew someone to be a member of the Gangster Disciples because that person "was associated with" Mr. Darden and Mr. Lucas, Mr. Darden yet again objected: "He's saying they're gang members because they know my client, who is a gang member. It's a circle." Still, the district court overruled his objections.

a.    The District Court Admitted Some of Sergeant Beebe's Testimony in Error

Mr. Darden challenges Sgt. Beebe's testimony on appeal for several reasons. He argues that Sgt. Beebe improperly testified to facts for which he provided no foundation. He also contends that the government improperly used Sgt. Beebe to introduce expert testimony on gangs without being qualified as an expert. And he also complains that the comment that the Clarksville police were unable to provide protection to victims was an improper insinuation that Mr. Darden and his codefendants were violent.[8]

---

[8] Mr. Darden further asserts that Sgt. Beebe's testimony violated the Confrontation Clause. But he does not give analysis or present supporting case law, so he has forfeited any confrontation claim. *See Bard v. Brown Cnty.*, 970 F.3d 738, 765–66 (6th Cir. 2020) (opinion of Siler, J., for the court).

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

The district court erred in admitting Sgt. Beebe's testimony to case-specific facts without having sufficient foundation. Mr. Darden rightly objects that Sgt. Beebe acted as "a chronicler of the recent past," *Rios*, 830 F.3d at 414. For example, Sgt. Beebe identified no "*personal* experiences that led him to obtain his information," *Freeman*, 730 F.3d at 596, that Mr. Darden went by "MD" or "Mac Tuff," that he was a member of the Gangster Disciples, or that he was a member of any street gang at all. He merely asserted those propositions as fact. After Mr. Darden's repeated objections, the government began to elicit more specifics of Sgt. Beebe's specific sources of knowledge for the facts he testified to. But it did not circle back to ask how Sgt. Beebe knew these particular facts about Mr. Darden—there was no testimony that he saw Mr. Darden's name or nickname on any membership lists or in any photographs of Gangster Disciples meetings.

The next category of challenged testimony is Sgt. Beebe's testimony about the founder of the Gangster Disciples and signs and symbols. His testimony as to these facts was impermissible as lay testimony. *See* Fed. R. Evid. 602. Sgt. Beebe gave little specific foundation for his personal knowledge of the facts about the gang. He said that he had "encountered Gangster Disciples" through "part of his duties" in the Clarksville Police Department "[t]hrough arrests, through interviews, through surveillance." He offered that he had received "training on gangs and gang investigations," that he had "been involved in numerous state and federal gang investigations," that he had "attended outlaw motorcycle gang training," and that he was "a member of the Tennessee Gang Investigators Association" for "over four years." Asked to describe indicators of membership in the Clarksville deck, "based on what [he] know[s] of Clarksville Gangster Disciples," Sgt. Beebe noted that he had seen "dues rosters where dues are paid," "books of knowledge," "photographs where they have traveled to Memphis, Tennessee, to celebrate Larry Hoover's G-day, his birthday," and "numerous documentations" including "violation reports." He

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

concluded by noting that he had "had contact with people that have tattoos of six-pointed stars on their body that [we]re members of the Gangster Disciples."

But we have recognized that testimony about the "history, organization, and unique terminology or symbols" of a gang is "within the appropriate scope of gang-expert testimony." *Rios*, 830 F.3d at 415. It is possible that Sgt. Beebe's qualifications were "obvious" enough, as in *Nixon*, 694 F.3d at 629, for him to give expert testimony on the Gangster Disciples. But we are not certain that is the case here. He stated broadly that he had had training about gangs and "outlaw motorcycle gang[s]," but he did not testify that he had been trained specifically on the Gangster Disciples—which is *not* a motorcycle gang. He certainly had qualifications in *investigating* gangs, but it is not explained how proficiency in gang-investigation techniques translates into prowess with a particular gang's arcana. And his testimony that he had merely "seen" the gang's "books of knowledge" does not show that he was well-versed in their contents.

And even had Sgt. Beebe been qualified as a Gangster Disciples expert, his testimony as to facts about the gang's history and symbology remain inadmissible except to the extent that he personally observed them. He was not asked to give an expert opinion under Rule 703, so his testimony as to facts, even specialized facts, must be grounded in personal knowledge. Fed. R. Evid. 602 ("This rule does not apply to a witness's expert testimony *under Rule 703*." (emphasis added)); *United States v. Langan*, 263 F.3d 613, 623–24 (6th Cir. 2001); *see also* 27 Victor J. Gold, *Wright and Miller's Federal Practice and Procedure* § 6025 (2d ed. 2021) ("When experts testify as to facts and not opinions, Rule 703's exemption from the personal knowledge requirement does not apply."). Likewise, because he was not giving an opinion, he could not give his impressions of the significance of Larry Hoover and the Gangster Disciples symbols to gang members, nor could the government sneak in the underlying facts through his testimony using Rule 705.

- 35 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

But because the admission of Sgt. Beebe's testimony was ultimately harmless, as we discuss below, we do not sift through the record to identify every item the district court should have excluded.

Last, we consider Sgt. Beebe's statement that victims do not often cooperate because they fear retaliation and because the local police cannot protect witnesses as well as federal agencies. Mr. Darden did not object at trial to that statement, so his claim on appeal receives only plain-error review. And the statement's admission was not plainly erroneous. It does not take specialized training or knowledge to infer that victims of street-gang crime are hesitant to cooperate because of a fear of retaliation. Nor that local police typically have fewer resources than federal agencies and are therefore less able to provide witness protection. And to the extent that Mr. Darden appears to argue that the statement was significantly more unfairly prejudicial than probative, he has forfeited that argument by failing to brief it adequately. *See Bard v. Brown Cnty.*, 970 F.3d 738, 765–66 (6th Cir. 2020) (opinion of Siler, J., for the court).

b.   But the Error Was Harmless

We review error in admitting testimony for harmlessness. *United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017) (citing Fed. R. Crim. P. 52(a)); *see also* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."). Because Mr. Darden does not claim any error depriving him of constitutional rights, the government need only "show by a preponderance of the evidence that the error did not materially affect the verdict" for us to disregard that error. *Young*, 847 F.3d at 349–50. We "must take account of what the error meant to the jury, not singled out and standing alone, but in relation to all else that happened." *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (quoting *United States v. Gibbs*, 506 F.3d 479, 485 (6th Cir. 2007)). To assess harmlessness, we have considered

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

whether the testimony is "separately confirmed by witnesses who testified to the same or very similar facts," *see Rios*, 830 F.3d at 416; whether its "force and importance" was relatively light compared to other evidence against the defendant, *see United States v. Lovett*, 764 F. App'x 450, 455–56 (6th Cir. 2019); and whether there was "overwhelming evidence" of guilt beyond the erroneously admitted testimony, *see Gibbs*, 506 F.3d at 485. (Though intertwined, these considerations are not identical.)

Mr. Darden asserts that the testimony was harmful error because, without it, "the evidence was insufficient to convict on any of the charged counts." That is an overstatement. Other witnesses, including members or former members of the Gangster Disciples, testified to the history and organization of the gang and its signs, symbols, and rules and their significance. There was also testimony that Mr. Darden was a member of the Gangster Disciples and a leader of the Clarksville deck. His monikers "MD" and "Mac Tuff" came in through other witnesses as well. And Sgt. Beebe's testimony was of limited importance to the government's overall case. The government aptly described him as an "intro witness" (even though it was error to use him in this way). After he testified, the government presented ample evidence of Mr. Darden's racketeering activity, including both drug-related and violent crimes. It is unlikely the jury's verdict would have changed absent Sgt. Beebe's testimony.

Mr. Darden also argues that the error in admitting Sgt. Beebe's testimony was compounded by the "primacy effect," a phenomenon in which a person tends to weigh information received first more heavily than that received later. He cites S.E. Asch, *Forming Impressions of Personality*, 41 J. Abnormal & Soc. Psych. 258 (1946), for that proposition. But the Asch study's focus, as the article's title indicates, was not impressions of guilt or innocence based on evidence but rather impressions of a person's personality based on descriptive adjectives. In other research, we have

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

found at least some evidence of a potentially stronger *recency* effect in criminal trials; that is, of heavier weight given to evidence of guilt presented later in the proceedings. *See* Christoph Engel et al., *Coherence-Based Reasoning and Order Effects in Legal Judgments*, 26 Psych., Pub. Pol'y, & L. 333, 340–44 (2020). In any event, Mr. Darden cites no precedent for the proposition that a primacy effect increases the harmfulness of a legal error,[9] and he has not persuaded us to graft it onto our case law.

Mr. Darden last argues that the error was harmful because the government unfairly surprised him by failing to disclose Sgt. Beebe's expert-witness testimony under Rule 16(a)(1)(G). In his reply brief, he suggests that the case might have had a different outcome had he been aware of it beforehand: "the Appellant's defense team certainly would have engaged its own 'gang expert' long before trial to refute much of what Beebe was allowed to say unchecked." Maybe so. But Sgt. Beebe's improper expert testimony on the gang's origins and symbology was sparse. Former gang members, such as Mr. Dowlen and Mr. Galbreath, discussed those topics in greater depth, and Mr. Darden *did* have advance notice of *their* testimony on the topics through the government's witness list. And the fact remains that these points were not the linchpins of the government's case. The government relied on eyewitness testimony and records of Mr. Darden's actions. There was plenty of that to convict him.

Because Sgt. Beebe's erroneously admitted testimony was harmless, it entitles Mr. Darden to no relief.

---

[9] A Westlaw search uncovers only one case in the Sixth Circuit containing the phrase "primacy effect": a district-court opinion in an elections case. *Green Party of Tenn. v. Hargett*, 953 F. Supp. 2d 816 (M.D. Tenn. 2013), *rev'd and remanded*, 767 F.3d 533 (6th Cir. 2014).

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

### 2. *It Was Proper to Admit Special Agent Harrell's Testimony*

ATF Special Agent John Harrell is assigned to the "crime gun intelligence center" in Nashville, where he works "[p]rimarily" as a "digital forensic examiner." He has had that job since about 2010, has "done well over a thousand" data extractions, "constantly" undergoes training in his field, and is "certified as a computer forensic examiner from the International Society of Computer Forensics" and as proficient in the tools he uses.

Special Agent Harrell testified that he received two cell phones and a warrant authorizing him to extract data from them. He attempted to do so, but they were both locked by passcodes. So he sent the phones to Cellebrite, a government contractor that offers phone-unlocking services. Cellebrite sent back the passcodes to unlock the phones as well as hard drives containing the phones' data. Special Agent Harrell then used Cellebrite's "Physical Analyzer" software to parse the extracted data and generate reports from it. At trial, he described the report he generated from one cell phone, explaining the meaning of some of the items on it. It included mundane fields such as the phone's passcode as well as technical fields such as IMEI, ECID, and UDID (all types of unique device identifiers).

Special Agent Harrell then related excerpts of textual data extracted from the phone. For example, "favorites" and other contacts from Facebook, Facebook Messenger, and Instagram, the contents of several items created using Apple's "Notes" app, and messages sent using iMessage. Mr. Darden objected for lack of chain of custody, for lack of relevance, and for unfair prejudice, but the district court overruled his objections.

Special Agent Harrell testified to the same process for the second phone and described similar contents, including contacts, notes, and messages. Mr. Darden objected to the admission of the report for the second phone on the same grounds as he had for the first phone, and he also

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

included the "additional grounds" that Special Agent Harrell had not been "qualified [under Rule 702] to attest to the reliability or authenticity of this scientific evidence, and he's not been disclosed as an expert." The district court overruled the objections. Mr. Darden renewed his expert-testimony objection when Special Agent Harrell began explaining what "activation time" meant in the report. His objection was again overruled.

On cross-examination, Special Agent Harrell explained that he "spot-check[s] contacts, call logs, text messages," and photographs to verify that the extracted data matches what is present on phones. And he testified on redirect examination that he was unaware of any incident in which Cellebrite had altered evidence. He further offered that if Cellebrite were ever to tamper with the contents of a device, ATF would never contract with the company again.

Mr. Darden challenges Special Agent Harrell's testimony on the grounds that there was no proper foundation or authentication for "the admission of a report that was created by someone other than Agent Harrell." He also challenges Special Agent Harrell's "interpret[ation of] thousands of pages of data extracted from the phones" because he was not qualified as having the "'expertise' and special knowledge the testimony required." Because Mr. Darden waited until the government offered the second phone's report into evidence to object on the expert-testimony ground, he preserved that claim only as to the second phone. We review the claim as to the first phone for plain error only.

Special Agent Harrell's testimony explaining the significance of technical terms on the reports generated by the Physical Analyzer was indeed expert testimony. Those explanations, although not presenting an opinion, required reasoning not available to a layperson. It is comparable to interpreting the registry report in *Ganier*, 468 F.3d at 926 n.4.

- 40 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

But it was not error to admit that expert testimony. Special Agent Harrell testified to his qualifications, and Mr. Darden did not object to them. Those qualifications were far stronger than those of the FBI special agent in *Nixon*, more on par with those of the veteran DEA agents in *Lopez-Medina*. So his qualifications were obvious, and the district court did not need to make a formal finding that he was an expert in data extraction.

By contrast, merely reading off the contents of the extracted data (such as contact information, notes, and messages) requires no specialized reasoning. After Special Agent Harrell extracted the data from the phones, it was available in printable format that the jury could read—in fact, at the district court's request, the government printed out the data to make hard copies so that the jury could follow along during testimony. So Special Agent Harrell's specialized training was not necessary to introduce the contents of the phone. All he did was recite the text that the extraction and report-generation process had already produced.

Thus, there was no error in admitting Special Agent Harrell's testimony.

### 3. Mr. Darden Has Forfeited Any Challenge to Mr. Patterson's Testimony

Mr. Darden's opening brief quotes a colloquy between the district court and counsel about James Howard Patterson. Mr. Patterson is a former assistant special-agent-in-charge at the Tennessee Bureau of Investigation's digital-forensics section. Mr. Darden cites this colloquy as an example of the district court's purported errors in its expert-testimony rulings. But aside from quoting that colloquy, he does not "cite any cases, provide any analysis, or develop any argument" explaining why Mr. Patterson's testimony was inadmissible, so he has forfeited any challenge to it on appeal. *See Bard*, 970 F.3d at 765–66.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

### 4. It Was Proper to Admit Officer Atkins's Testimony

James Atkins, an officer in the Clarksville Police Department's traffic unit and a federal crash investigator, had worked there for eight years at the time of trial. He uses LIDAR (meaning "light detection and ranging") technology in the regular course of his duties to determine distances. He has been certified since 2010 to operate LIDAR devices and since 2015 to instruct others in operating them. Those certifications are valid for life.

Officer Atkins explained the basic physics for how LIDAR works. He then described his process for measuring the distances between a barber shop where Mr. Darden had allegedly sold drugs and Austin Peay State University. (This measurement is relevant to count fifteen, which charged Mr. Darden with distribution and possession with intent to distribute cocaine within a thousand feet of a public university.) He reported that the measurements were all less than a thousand feet. Mr. Darden objected that Officer Atkins's testimony was impermissible expert testimony by a lay witness, but the district court overruled the objection.

On appeal, Mr. Darden continues to challenge Officer Atkins's testimony as improper expert testimony. But no specialized reasoning beyond the ken of a layperson is necessary to understand Officer Atkins's process for measuring distances using LIDAR. He identified the points between which he took measurements and the distances he measured between each. And he used two distinct brands of LIDAR equipment to perform each measurement. Thus, the jury could "verify[] his inferences" and "independently assess[] the logical steps he had taken" in making the measurements. *Freeman*, 730 F.3d at 597. And to the extent that Officer Atkins's brief description of how LIDAR functions[10] required specialized knowledge, his several years of user and instructor

---

[10] The full extent of the explanation was: "It's an electronic unit that emits an infrared beam of light that's reflected off a solid object and returned to the unit. The unit divides the time that it takes that light to travel out and back in half and multiplies that by the speed of light to calculate the distance traveled."

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

certification and his regular use of the device at work was enough to make his qualifications on that point obvious.[11]

## B. Coconspirator-Statement Challenges

Mr. Darden next appeals the admission of two out-of-court statements as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). The proponent of a statement under Rule 801(d)(2)(E) must show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the party against whom the statement is offered was part of that conspiracy, (3) the declarant was part of that same conspiracy at the time the statement was made (that is, the statement was made "in the course" of the conspiracy), and (4) the statement was made "in furtherance of the conspiracy." *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011).

We review the district court's findings on these factual prerequisites for clear error. *United States v. Gessa*, 971 F.2d 1257, 1260–61 (6th Cir. 1992) (en banc). A finding of fact is clearly erroneous only if, after a review of the entire record, "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Mahoney v. United States*, 831 F.2d 641, 645 (6th Cir. 1987) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). And if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 645–46 (quoting *Bessemer City*, 470 U.S. at 574).

A statement is "in furtherance of a conspiracy if it was intended to promote conspiratorial objectives." *United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998) (quoting *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)). Although "idle chatter or casual conversation about past events" is not admissible through Rule 801(d)(2)(E), statements "keeping

---

[11] At trial, Mr. Darden also raised a challenge to the reliability of LIDAR technology overall. It is unclear whether he intended to maintain that challenge on appeal, but he has forfeited it by not sufficiently briefing it. *See Bard*, 970 F.3d at 765–66.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

coconspirators advised" or "concealing aspects of the scheme" are properly in furtherance of the conspiracy. *Tocco*, 200 F.3d at 419 (quoting *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994)); *see also United States v. Martinez*, 430 F.3d 317, 327 (6th Cir. 2005) (statements made "to apprise a coconspirator of the progress of the conspiracy, to induce his continued participation, or to allay his fears" were in furtherance of the conspiracy, as was a warning letter "providing information relating to the government's ongoing investigation, warning that some of its members could no longer be trusted, and advising caution in future dealings"). And a statement's purpose need not be "exclusively, or even primarily" to further the conspiracy for it to be admissible through Rule 801(d)(2)(E). *Tocco*, 200 F.3d at 419 (quoting *Shores*, 33 F.3d at 444).

   1.  *It Was Proper to Admit Mr. Whitlock's Statement to Mr. Galbreath*

   Tray Galbreath, a former Gangster Disciple, testified about events following the 2006 shooting of William Miller, also known as Lil Will. Over objection from Mr. Darden, he testified that he had learned of Mr. Miller's shooting through a conversation with Mr. Whitlock. Mr. Whitlock and Mr. Darden were both in a car that pulled up to a porch where Mr. Galbreath had been sitting. Mr. Whitlock rolled down his window and motioned for Mr. Galbreath to come to the car. Saying, "Here, bruh. Take this," Mr. Whitlock gave Mr. Galbreath a hoodie with "at least" a couple of handguns bundled inside. The guns were "hot—still warm." Messrs. Whitlock and Darden seemed "kind of panicky," "anxious," and "real jittery," and Mr. Galbreath remembered hearing sirens at the time. The two in the car drove off shortly after Mr. Galbreath got the guns.

   Mr. Galbreath kept the guns in hiding for "maybe a day or two" until Mr. Whitlock came to pick them up. Then, while Mr. Galbreath was in a car with Mr. Whitlock, Mr. Whitlock told him that "they had shot Lil Will" and "that's why they needed [Mr. Galbreath] to keep the guns." Mr. Whitlock did not expressly say whom the pronoun "they" referred to, but Mr. Galbreath assumed

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

it meant Mr. Whitlock and Mr. Darden "because they were the ones that pulled up together when they gave [him] the guns." Mr. Whitlock also told Mr. Galbreath why they had shot Mr. Miller—"[t]o put GD on the map," which Mr. Galbreath interpreted to mean "[l]et the streets know that GD is a power to be reckoned" with. And "a lot of the violence started, from that point on" because the shooting had put Messrs. Whitlock and Darden "on the map, and then GD followed with that." It is these statements that Mr. Darden challenges on appeal. He contends that Mr. Whitlock did not make them in furtherance of the conspiracy but rather only as a recounting of past events.

The district court did not clearly err in finding that the statements made by Mr. Whitlock to Mr. Galbreath were in furtherance of the Clarksville deck's conspiracy. It is a permissible view of the evidence that Mr. Whitlock intended his statements to inform Mr. Galbreath about the status of the conspiracy. The shooting of Lil Will was a significant event in the deck's history: it "[l]et the streets know that GD [wa]s a power to be reckoned" with. That was Mr. Darden's stated goal for the deck: to "[b]low its stature up" and "[i]ncrease its reputation." The district court could therefore permissibly infer that at least part of the purpose of Mr. Whitlock's statements was to let Mr. Galbreath know that the conspiracy had begun to accomplish its objectives in earnest. And implicating Mr. Darden was necessary for that purpose—putting Mr. Darden, a high-ranking member, on the map ensured that the deck too would increase in stature.

2. *It Was Harmless Error to Admit Mac T's Statement to Mr. Austin*

Johnny Austin is another former member of the Gangster Disciples who testified for the government. Among other events, he described what had transpired at a January 2014 meeting at the All Is One Car Wash, owned by another member, Mac T.

Mac T used to have a position of authority in the Gangster Disciples. But, after leaving office to focus on his car wash, he violated the gang's rules and got a "six-minute no coverup"

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

smashing, the most brutal smashing permitted for a violation. Mr. Austin recounted that, at the January 2014 meeting, Mac T's face was "swoled up real bad" and he was limping and needed to lean against another gang member to stand up. Mac T complained that he should have gotten some leniency because of his previous position in the gang, and he thought that "other brothers were trying to be hard on him" because he had "stepped down so he c[ould] take care of his car wash." Because of what he felt was an excessive punishment, he did not want to participate in any more Gangster Disciples meetings. Mr. Austin testified that others at the meeting "just gave [Mac] T what he wanted": "as long as he paid dues and they" could continue to meet at the All Is One, he could have a "grace period" to pull himself together.

Over objection, Mr. Austin also testified that Mac T had said that Mr. Darden had ordered the smashing. The district court admitted the testimony under Rule 801(d)(2)(E). Mr. Darden disputes now, as he did below, both the finding that Mac T was part of the conspiracy when he made those statements and the finding that the statements were in furtherance of the conspiracy.

The district court did not clearly err in finding that Mac T was part of the conspiracy when he made the statement inculpating Mr. Darden. At that time, Mac T had promised to continue providing support to the deck through dues and the use of his car wash for meetings. And the other members at the meeting allowed him to take a grace period—connoting a temporary break—from participating so long as he followed through on his promises. From these facts, the district court could permissibly infer that Mac T had not yet renounced membership as of January 2014, even though it turned out that he would end up not coming to any further meetings.

But there is no view of the evidence permitting a finding that Mac T's statement that Mr. Darden had ordered his smashing was in furtherance of the conspiracy. The only reasonable interpretation of the record is that Mac T was angry about his perceived mistreatment and wanted

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

to reduce his involvement with the deck in response. If anything, he would be sowing discord within the deck by separating himself from it. As Mr. Austin testified, some gang members found that sort of separation repugnant to the gang's fundamental principles—"it's death before dishonor. You supposed to be there until you die." Moreover, losing the loyalty of a former deck leader would be a signal to other gangs that the deck was weakening. That would threaten the deck's overall goal of increasing its power and stature.

The government's argument that Mac T "furthered the conspiracy by explaining to fellow members that even a former gang leader could be severely punished for violating gang rules" fails for two reasons. First, unlike with identifying Mr. Darden as a participant in Lil Will's shooting, there was no need for Mac T to identify Mr. Darden as having ordered the smashing to accomplish the government's hypothesized furtherance of the conspiracy. Second, it is clear from Mr. Austin's testimony that Mac T had been complaining about his mistreatment and trying to reduce his involvement with the deck. He had no intention of instructing his fellow gang members about the consequences of his violation. Even if the statement may have incidentally provided some benefit to the conspiracy, it is *intent* to promote conspiratorial objectives that is required for admissibility under Rule 801(d)(2)(E). *Maliszewski*, 161 F.3d at 1008; *see also United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009) (holding that whether a statement is in furtherance of a conspiracy turns on two facts—the context in which the statement was made and the declarant's intent in making it); *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir. 1982) ("Rule 801(d)(2)(E) explicitly says statements need be 'in furtherance of the conspiracy,' not that they 'further the conspiracy.'").

But, although the statement was erroneously admitted, the error was harmless. Mac T's smashing was in Clarksville, the base of Mr. Darden's zone of control within the gang. Mr. Austin

- 47 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

also testified that Mr. Darden had run Clarksville "with an iron fist." And another witness testified to Mr. Darden's apparent oversight of Mac T's smashing.[12] So there was ample evidence to infer that he had in fact ordered Mac T's smashing. And, as the government notes, Mac T's smashing did not underlie any of Mr. Darden's substantive convictions. It is unlikely that removing that one act from consideration would have affected the jury's verdict on the RICO conspiracy. Thus, the error was harmless.

## IV.    DERRICK KILGORE

### A.  Sufficient Evidence Supports That Mr. Kilgore Was in a Drug-Trafficking Conspiracy

Mr. Kilgore first challenges the sufficiency of the evidence for his conviction on count two, drug-trafficking conspiracy. A conviction under 21 U.S.C. § 846 "requires an agreement to violate the drug laws, the defendant's knowledge of the agreement, and the defendant's decision to voluntarily join (or 'participate in') it." *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). Here, there was sufficient evidence that Mr. Kilgore sold drugs, and he does not dispute that fact. He instead argues that the government produced no evidence that his sales had been part of a conspiracy. He also argues that, even if there had been a conspiracy, it necessarily ended in 2008 after Mr. Whitlock, the former primary supplier of cocaine for the Clarksville deck, had been arrested.

But there is a reasonable view of the evidence under which the defendants had formed a single conspiracy originating before Mr. Whitlock's arrest and surviving that shock to their supply chain. Mr. Dowlen, who testified that he had known Mr. Kilgore "[s]ince he was a kid," testified

---

[12] In a phone call, Mr. Darden told the witness, the deck's former treasurer, that he and other members had "served a violation" on Mac T. Mr. Darden had told the members beating Mac T not to get too close to the flimsy wall at the venue of the smashing, but they got too close to the wall anyway and knocked Mac T completely through it. The purpose of the call was to direct the treasurer to release funds from the box to pay the venue's owner for the damage.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

that Mr. Kilgore had become a member of the Gangster Disciples in 2007. He testified that Mr. Kilgore had sold powder and crack cocaine from 2007 to 2013 "numerous times" and that he never knew Mr. Kilgore "to have a legitimate job." And he also testified that, around that time, Mr. Whitlock "was a steady source of supply [of drugs] for the Gangster Disciples," so much so that the members of the deck were "doing good"—they were making money and "throwing parties" and "had a rap group."

Even though the gang's drug supply "[k]ind of fell off" after Mr. Whitlock was arrested, they were still able to get drugs, albeit from "scattered" sources. Several messages on Mr. Kilgore's flip phones bolster the conclusion that he continued to work with others to make and distribute drugs after Mr. Whitlock's arrest. There was a text message on one of his cell phones about manufacturing crack cocaine. Another message on one of Mr. Kilgore's phones, from 2017, well after Mr. Whitlock's arrest, asked for a notification when someone received "soft" (that is, powder cocaine). Those were just two out of several texts on his phone referring to drug trafficking. He also made calls from jail, using coded language, directing someone to look for hidden drugs and money. And there is evidence that he cooked powder cocaine into crack before his arrest. At his mother's house, where he stayed, police found a Pyrex jar containing a measuring cup with an "off-white residue." Witnesses testified that the jar likely had been used to cook crack cocaine.

From this evidence, the jury could have reasonably found that Mr. Kilgore was working with others to traffic drugs in a single conspiracy lasting from 2005 up through 2017. So there was sufficient evidence for his conviction.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

## B.  Sufficient Evidence Supports That Mr. Kilgore Was in a RICO Conspiracy

Mr. Kilgore's second challenge is to the sufficiency of the evidence for his RICO conviction. As Mr. Lucas did, he argues that the Clarksville deck did not form an "enterprise" for RICO purposes. Our analysis above refutes his argument.

In his reply brief, Mr. Kilgore adds a new theory to support his claim—that the deck was not involved in a pattern of racketeering activity. He contends that, "[f]or there to be a pattern of racketeering activity, the violence had to be connected to drug trafficking."

He is wrong. Predicate racketeering acts "do not necessarily need to be directly interrelated." *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000). A pattern exists so long as the predicate acts are "connected to the affairs and operations of the criminal enterprise." *Ibid.* And there was sufficient evidence for a rational juror to find the acts so connected. The acts involving murder were directly responsible for increasing the deck's stature, and drug trafficking and travel in interstate commerce financially supported the deck's members, who contributed back to the deck through their dues.

## V.    DECARLOS TITINGTON

## A.  Sufficient Evidence Supports the Convictions on Counts Forty and Forty-Two

Mr. Titington first challenges his conviction on counts forty and forty-two as unsupported by sufficient evidence.[13] The only element of count forty (possession with intent to distribute cocaine) that he disputes is intent to distribute the cocaine found in his car. He contends that, because his conviction on count forty-two (possession of a firearm in furtherance of drug-

---

[13] Mr. Titington further complains that the district court did not provide a sufficient analysis of the evidence in response to his Rule 29 motion. Because we review the entire record to determine whether the evidence was sufficient for conviction, *see Jackson*, 443 U.S. at 319, and do not defer to the district court's denial of his Rule 29 motions, our present review cures any defect below.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

trafficking) is premised on his conviction on count forty, the conviction on count forty-two necessarily falls if the conviction on count forty does.

The relevant record evidence is as follows. On February 15, 2016, the day after Valentine's Day, Mr. Titington was found unconscious behind the wheel of a car that had crashed into a tree. After finding him, police searched the car and found a loaded Glock 9-millimeter pistol and a baggie containing 7.66 grams of cocaine sitting on top of roses. Those were all on the driver's side. There was also $743 in cash and a phone on his person. It turned out that the Glock was the same gun that Mr. Titington had used six weeks earlier to shoot at two members of a rival gang who had attacked him at a convenience store.

That evidence is sufficient for a rational juror to find beyond a reasonable doubt that Mr. Titington had an intent to distribute the cocaine. First, it is reasonable to infer from Mr. Titington's membership in the Gangster Disciples that he did not intend to use the cocaine because it would violate the gang's rules. Given the deck's "report everything" code and the harsh punishments associated with violations, it is reasonable to expect that Mr. Titington would have followed those rules. Without any intent to use the cocaine personally, the only reasonable inference is that he intended to give or sell it to someone else.

The Glock and the large amount of cash also allow a reasonable inference of intent to distribute. *See Haywood*, 280 F.3d at 722; *United States v. Mackey*, 265 F.3d 457, 462–63 (6th Cir. 2001) (holding it reasonable for a juror to find that the purpose of a firearm near drugs "was to provide defense or deterrence in furtherance of . . . drug trafficking; defendant also possessed "a large sum of cash"). That Mr. Titington used the Glock a few weeks beforehand to shoot at rival gang members, whether he initiated that shooting or not, supports that the gun's purpose was "to provide defense or deterrence." *Mackey*, 265 F.3d at 462–63. And its closeness to the cocaine

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

further supports that any intended defense or deterrence was in furtherance of drug trafficking. *Id.* at 463.[14] Not to mention testimony that the cocaine found with Mr. Titington had a high street value (an eighth-ounce of powder cocaine cost about $300 to $350, meaning the quarter-ounce Mr. Titington was found with had a street value of $600 to $700) and that a buyer from Mr. Titington had used only a gram of cocaine per day.

Mr. Titington cites cases in which he says that larger amounts of drugs were found insufficient for proof of intent to distribute. *See Turner v. United States*, 396 U.S. 398, 422–24 (1970); *United States v. Latham*, 874 F.2d 852, 863 (1st Cir. 1989). But those cases do not help him.

Although binding on us, *Turner* does not apply here. It resolved a different question: the validity of former 26 U.S.C. § 4704(a), "which authorize[d] an inference of guilt from the fact of possession of narcotic drugs." *Turner*, 396 U.S. at 400.[15] The Court found that statutory presumption "infirm" because possessing 14.68 grams of a cocaine-and-sugar mixture *could* have been consistent with personal use rather than intent to distribute. *Id.* at 423. But that holding does not prevent a jury from reasonably inferring intent to distribute based on additional facts. And, as noted above, such facts are present here.

And in *Latham*, the defendant had been convicted of possession with intent to distribute one ounce (about 28 grams) of cocaine, and there was "no question" that he had in fact possessed it. *Latham*, 874 F.2d at 862. But the First Circuit noted the absence of evidence of the defendant's

---

[14] Although Mr. Titington argues that the text messages found on his phone are either irrelevant, stale, or only show that others may have offered to give *him* drugs, we need not rely on those messages to find sufficient evidence for a conviction.

[15] The full statement of former 26 U.S.C. § 4704(a) was: "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found." *Turner*, 396 U.S. at 402 n.2.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

actual or constructive possession of any other amount of drugs. *Ibid.* It also noted that, unlike other cases in which it had upheld a finding of intent, there was no evidence to support such a finding here. *Ibid.* The court further noted that the facts did not support "bring[ing] into play the doctrine that possession of large quantities of drugs justifies the inference that the drugs are for distribution and not personal use." *Ibid.*

Mr. Titington does not persuade us to apply *Latham* here. Besides its nonbinding character, the case is also distinguishable. First of all, the issue presented was one of statutory interpretation: whether it was plain error for the district court to instruct the jury "that it could find Latham guilty . . . if he had the intent to distribute some unspecified amount of cocaine, that he did not currently possess, at some unspecified time in the future." *Id.* at 861. The subsequent analysis about whether there was sufficient evidence to find that the defendant had actually or constructively possessed any cocaine that he intended to distribute was relevant to the question presented only insofar as it showed that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" because the defendant might have been actually innocent, *United States v. Olano*, 507 U.S. 725, 736 (1993).

Second, in coming to its conclusion that "[b]oth the record and the case law counsel that an inference of intent to distribute is not warranted from the possession of one ounce of cocaine," *Latham* misconstrues *Turner* the same way that Mr. Titington does. *Id.* at 863. It parenthetically cites *Turner*'s holding as "possession of 14 grams of cocaine was not sufficient to conclude defendant was distributing," rather than understanding that holding in light of the statutory presumption that *Turner* was overturning. *Id.* at 862.

And third, *Latham*'s facts are distinguishable. There, a police sergeant testified that the defendant and a coconspirator "had specifically said that the one ounce was not for sale, that it was

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

for their . . . own personal use." *Ibid.* Nor was it "contended by the government that Latham [had] participated in the distribution of drugs prior to his arrest." *Ibid.* But here, Mr. Titington was part of a gang whose rules prohibited him from partaking in cocaine. The street value of the cocaine was larger than the amount typically possessed for personal use. And he had money and a gun with him. The facts here support an inference of intent far better than the facts did in *Latham*.

As for count forty-two in its own right, Mr. Titington argues (verbatim) in his reply brief that there was insufficient evidence of a "'specific nexus between the gun and the [drug-trafficking] crime charged.' *United States v. Cantrell*, 807 F. App'x 428, 433 (6th Cir. 2020) . . . ." It is true that "possession of a firearm on the same premises as a drug transaction [does] not, without a showing of a connection between the two, sustain a § 924(c) conviction." *Mackey*, 265 F.3d at 462. The gun must be "strategically located so that it is quickly and easily available for use." *Ibid.* Other relevant factors include (1) "whether the gun was loaded," (2) "the type of weapon," (3) "the legality of its possession," (4) "the type of drug activity conducted," and (5) "the time and circumstances under which the firearm was found." *Ibid.*

But here, most of these factors support a finding that the gun was sufficiently connected to Mr. Titington's intended cocaine distribution. The gun was loaded, making it easier for him to shoot someone if a deal went sour. As a handgun, its purpose was primarily for self-protection, not sport-shooting or hunting—Mr. Titington's use of the gun for defense in the shooting several weeks before the crash exemplifies that fact. He did not legally possess the gun because he was a convicted felon. And the gun was found under Mr. Titington, making it reasonable to infer that he intended to bring the gun with him in any distribution of the drugs in his car. So it is reasonable to find that Mr. Titington possessed the gun in furtherance of his drug-trafficking offense.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

Sufficient evidence therefore supports Mr. Titington's convictions on both counts forty and forty-two.

## B. Sufficient Evidence Supports the Jury's Special-Verdict Findings for Mr. Titington

Mr. Titington also raises a sufficiency challenge to the jury's findings that he is liable for at least five kilograms of powder cocaine and at least 280 grams of crack cocaine through the RICO conspiracy.[16] He argues that "while there was some evidence that [he] sold small quantities of cocaine in the Lincoln Holmes neighborhood, there was no evidence that he knew of or agreed to sell five kilograms or more of cocaine or 280 grams or more of crack cocaine." He further argues that he "was not present at transactions involving large quantities of drugs, did not facilitate transactions involving large quantities of drugs, and was not hired to protect large quantities of drugs." So, he concludes, "even if the jury found that [he] was a member of the Gangster Disciples and that he joined a conspiracy by gang members to sell drugs in and around Clarksville, there was no showing that [he] joined an agreement involving the quantities alleged in Count [One]."

His argument relies on a faulty view of the law. There is no requirement that a defendant *know* what types and quantities of drugs are involved in drug-trafficking activity for the penalty provisions in 21 U.S.C. § 841(b)(1) to apply. Those types and quantities merely need be "involved." He is criminally liable for the types and quantities of drugs that he could reasonably foresee that others in the conspiracy would traffic.

---

[16] Mr. Titington's brief misstates the count on which the jury made these findings. Although he purports to challenge count two, the jury found fewer than 500 grams of powder cocaine and no crack cocaine on that count. His argument therefore makes sense only as to count one. And because the government did not raise the error in its brief or at argument, instead responding as though the challenge were to count one, we discern no unfair prejudice to the government from our overlooking the mistake. We therefore treat Mr. Titington's sufficiency challenge as to count one, not count two.

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

And there is sufficient evidence from which a rational jury could find beyond a reasonable doubt that Mr. Titington could reasonably foresee that others in the conspiracy would distribute those quantities of cocaine and crack.

Consider Mr. Galbreath's testimony about the scope of the deck's drug-dealing operations. He had started dealing at age 14 because of "[p]eer pressure." That is evidence that others in the gang encouraged him to sell, from which a reasonable juror could find that members of the deck could reasonably foresee other members' sales. He also testified that he sold drugs "more or less continuously between about 2006 and 2008," in amounts ranging up to ounces (that is, units of about 28 grams) of crack cocaine. In fact, he sold about "four and a half ounces" a couple of times. And just ten ounces is enough to reach the 280-gram threshold.

Consider also Mr. Whitlock, who sold drugs out of a car wash "at least weekly" during 2007 and 2008. And Mr. Darden, who sold cocaine in quantities of "[a]nywhere from 4 1/2 to 36 ounces" and sometimes handled "kilogram quantities of cocaine" that he got from Mr. Whitlock. Between May and August 2008, at least five or six kilograms of powder cocaine passed through Mr. Darden's hands. Not to mention that Mr. Galbreath himself and Mr. Whitlock were arrested in August 2008 driving more than eight kilograms of powder cocaine up from Atlanta.

From all this evidence, a rational juror could have found that Mr. Titington reasonably foresaw that other members of the Clarksville deck would traffic the types and quantities of drugs found by the jury on count one.

**C. The District Court Correctly Instructed the Jury on the Mens Rea for 21 U.S.C. § 841(b)**

It is a federal crime to "knowingly or intentionally" "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as authorized by statute. 21 U.S.C. § 841(a), (a)(1). In § 841(b)(1)(A) and (B), there is a schedule of

- 56 -

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

minimum and maximum penalties for specific types and quantities of drugs "involv[ed]" in a violation of § 841(a).

Mr. Titington claims that the jury instruction on the special-verdict findings—that the jury "need not find that the defendant knew that his offense involved [a particular] quantity of drugs"—was erroneous. He tells us that this instruction is inconsistent with the Supreme Court's recent observation that, "[a]s 'a matter of ordinary English grammar,' we normally read the statutory term "'knowingly" as applying to all the subsequently listed elements of the crime.'" *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009)). Reading the penalty provisions of § 841(b)(1) as separate elements of crimes under *Apprendi*, 530 U.S. 466, and *Alleyne v. United States*, 570 U.S. 99 (2013), he contends that the "knowingly" mens rea in § 841(a) therefore applies to the penalty provisions of § 841(b)(1).

He did not preserve his claim below, so we review for plain error. And we find none because we have already considered and rejected his argument. *United States v. Mahaffey*, 983 F.3d 238, 242–45 (6th Cir. 2020) (holding that *Rehaif* did not change the rule that there is "strict liability as to the type and quantity of the drugs involved in a § 841(a) offense" under § 841(b)(1) (quoting *United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014))).

## D.  We Will Not Review the District Court's Refusal to Depart Downward by 52 Months

A special rule applies in computing the Guidelines sentence of a defendant who, at the time of sentencing, is serving a prison term from another offense that is "relevant conduct" under USSG § 1B1.3(a). The district court "shall adjust" the Guidelines sentence for the current conviction to account for the portion of the other sentence that the defendant has already served (unless the Bureau of Prisons will credit that sentence to the federal sentence), and the adjusted sentence "shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment."

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

USSG § 5G1.3(b). But the district court need not make that adjustment for defendants who have already finished serving a sentence for relevant conduct. Rather, a "downward departure *may* be appropriate" for a defendant who would have received a downward adjustment under USSG § 5G1.3 had the defendant's "completed term of imprisonment been undischarged at the time of sentencing for the instant offense." *Id.* § 5K2.23, p.s. (emphasis added). The district court should fashion any departure it does make under § 5K2.23 "to achieve a reasonable punishment for the instant offense." *Ibid.*

We do not review a district court's refusal to depart downward "unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008). The district court need not expressly state its awareness of that discretion on the record—"we presume that the district court understood its discretion, absent clear evidence to the contrary." *Ibid.*

Mr. Titington requested a downward departure under USSG § 5K2.23 of about 52 months because he had completed a state prison sentence of that length for conduct relevant to his federal convictions. The PSR noted that the district court had the authority to make that adjustment but did not make a recommendation either way. During sentencing, the district court requested argument from both parties on whether it should grant the requested departure. After hearing argument, the court denied the request, finding a departure "inappropriate and not justified" under the Guidelines.

There is no clear record evidence demonstrating that the district court believed it could not depart downwards. To the contrary, both the defendant and the PSR put the court on notice of its authority to depart downward. And the court considered and ruled on the issue, making no statement clearly indicating that it failed to comprehend its discretion. All Mr. Titington can muster

Nos. 19-6390/6392/6393/6394, *United States v. Lucas et al.*

is the court's reasoning that a departure was "not justified by the guidelines." But that statement, in context, most likely meant that the court thought that a 52-month departure would not "achieve a reasonable punishment for the instant offense." USSG § 5K2.23, p.s. That is not clear evidence that the court did not know of or did not understand its discretion to depart. Thus, we will not review the district court's decision.

### E. Precedent Forecloses Mr. Titington's Constitutional Challenges to the Guidelines

Last, Mr. Titington claims that the Guidelines' less defendant-friendly treatment of undischarged sentences under USSG § 5K2.23 violates the Equal Protection Clause and the substantive Due Process Clause. He concedes that he did not preserve these claims, so we review for plain error. Fed. R. Crim. P. 52(b). He further concedes that binding precedent forecloses his argument. *See United States v. Dunham*, 295 F.3d 605, 610–11 (6th Cir. 2002) (finding a rational basis for the different treatment of undischarged and discharged sentences); *see also United States v. White*, 617 F. App'x 545, 552 (6th Cir. 2015) (declining to revisit *Dunham* after USSG § 5G1.3's amendment). We therefore find no plain error.

### VI.   CONCLUSION

For the reasons above, we affirm the district court's judgments as to Mr. Darden, Mr. Kilgore, and Mr. Titington. And we affirm the conviction, but vacate the sentence, of Mr. Lucas, remanding for his resentencing.